FILED

*EX-PARTE* APPLICATION

Z:21CR260-AB

2021 MAY 27  AM 10: 29

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

## I. PRELIMINARY STATEMENT

JB

Out of fear and intimidation, PETITIONER, Abanoob Abdel-Malak, brings yet, another ~~civil~~ action that represents a road Respondent(s) have traveled down before, and continue to travel, since 1998 with Horace Roberts. The pattern and practice of Defendant illustrates why the Defendant's Supervisor John Tavaglione has stated "I think we need to say we're looking at sheriff for changing practices and training", in which is the reason why Riverside County officials are urging the Sheriff's Department to do more to limit lawsuits that have cost taxpayers millions of dollars. But yet, these practices and training have failed; in which an estimated $136 million in legal payouts have Riverside County finances in an 'emergency situation' as officials warns.

**First, In 1997**, Preliminary Injunction was granted against Respondent(s) denying the PETITIONER his constitutional rights and due process (Watson v. County of Riverside). **In 1998**, the County of Riverside, falsely imprisoned Horace Roberts for the murder of Terry Cheek, and was wrongly imprisoned for a murder he did not do, just as in my Ex-Parte Application, the Respondent(s)' suppressed evidence showing that Horace Roberts was innocent and fabricated other evidence, he is now free thanks to DNA evidence. **In 2008**, David Johansen of Riverside Police Department, shot and killed an unarmed man resulting in a $800,000 settlement (Douglas Steven Cloud v. County of Riverside). In 2011, a Pepsi driver was awarded more than $325,000 for a false arrest incident that occurred in 2004 (Perrin v. County of Riverside). In 2013, Defendant's beat a man to death costing the Respondent(s) to reach a

- 18 -

*EX-PARTE* APPLICATION

settlement for $1.1 million (Johnson v. County of Riverside). **In February 2019**, a jury awarded a mother $2.5 million for Riverside County Sheriff in a fatal shooting for the death of a mentally ill man (Smith v. County of Riverside). **In October 2019**, Horace Roberts sues County of Riverside for false imprisonment for over 20 years (Roberts v. County of Riverside). Despite these repeated injunctions and actions against Respondent(s), once again, an innocent individual deprived of his Federally protected rights comes to court to request another order directing Respondent(s) to stop the pattern and practice to stop violating the rights secured to the PETITIONER by the United States Constitution.

This civil rights action is brought to meet the requirements for an attempted Ex-Parte for a Temporary Restraining Order, Preliminary Injunction. Due to the lack of legal knowledge; and physical, mental, and psychological impairment from the misconduct the PETITIONER, Abanoob Abdel-Malak, has suffered, PETITIONER respectfully request legal assistance in serving, amending and drafting, and correcting any mistakes as a Pro Se litigant. The PETITIONER, Abanoob Abdel-Malak request immediate assistance of legal assistance, to stop the HATE CRIMES and irreparable harm from prior and current harassment encountered by Respondent(s) and to properly bring his claim against the Respondent(s), as described in the Ex-Parte Application. The PETITIONER, Abanoob Abdel-Malak's valid Ex-Parte Application requires a Temporary Restraining Order and Preliminary Injunction to have fundamental fairness, due process, privacy to properly prepare for this matter, and to stop living in fear of Respondent(s) past acts and unpredictable future acts against PETITIONER.

- 19 -

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

This civil rights action seeks compensatory and punitive damages on behalf of the (known and unknown) Respondent(s) Color of Law violations and Failure to Intervene under the United States Constitution (and/or federal law), and under the California Constitution (and/or state law) in connection to a false arrest and obstruction of justice regarding a federally protect activity, when the PETITIONER, Abanoob Abdel-Malak, was falsely arrested inside the Superior Court of California, County of Riverside, Family Law Division located at 4175 Main Street, Riverside, California 92501 while attempting to file an Ex-Parte as an indigent Defendant in Pro Se and to purchase certified copies of court documents to adequately defend himself in regards to the criminal cause as guaranteed under the California Constitution Article I, § 15.

In addition to the above Hate Crime, while the PETITIONER, Abanoob Abdel-Malak, was falsely imprisoned, **the Respondent(s) attempted to place Methamphetamine on the PETITIONER to fabricate evidence, denied the PETITIONER Medical Care, denied the PETITIONER food and water for an excess of 12 hours, denied and/or blocked the PETITIONER's call's for legal counsel and call to the FBI's West Covina office, did not return the PETITIONER's court document's for his Ex-Parte and did not provide just compensation for his property, and the Respondent(s)' only released the PETITIONER once he cried about chest pain needing to go the hospital upon the medical staff strongly urging Respondent(s)' to release him to seek medical treatment.**

The PETITIONER is an American Citizen and Californian Citizen, who has been denied equal protection of the law and due process from January, 2019 until now. Beginning from January 2019, the

- 20 -

*EX-PARTE* APPLICATION

PETITIONER has been denied nearly every right under the United States constitution given to a defendant in a criminal prosecution case. The PETITIONER, Abanoob Abdel-Malak, an American born citizen, brings this action to halt Respondent(s)' reckless, outrageous, and unfair use of public courts', V.A.W.A. Funding & Resources, and request protection from threats, intimidation, fear, and coercion resulting from the false arrest and harassment by Respondent(s).

The American Citizen respectfully seeks a temporary restraining order and preliminary injunction against any arrests, threats of arrest, criminal charges, threats of further criminal charges, prosecutions arising from alleged violation of DVRI 1901830 and; refrain Respondent(s)' from using CLETS in recording communications, monitoring internet activity of PETITIONER. Preliminary Injunction Relief is needed and warranted because the American Citizen has been deprived of Federally Protected rights, because the Respondent(s) have unjustly secured and continue to secure criminal charges from an investigation and/or prosecution based on this unconstitutional trial, and therefore the physical liberty, due process, and fundamental fairness of Abanoob Abdel-Malak are being violated. The Fourteenth Amendment secures the right to due process; the Eighth Amendment prohibits the use of cruel and unusual punishment. During an arrest or detention, these rights can be violated by the use of force amounting to punishment (summary judgment). The person accused of a crime must be allowed the opportunity to have a trial and should not be subjected to punishment without having been afforded the opportunity of the legal process.

Respondent(s) acts and omissions constitute unfair practices in violation of color of law and hate crimes by Respondent(s). In addition to

- 21 -

*EX-PARTE* APPLICATION

putting the public at serious risk of further hate crimes. Respondent(s) have thereby placed American citizens and California citizens in jeopardy of other serious harms, such as the loss of employment and employment opportunities. Law enforcement officers and other officials like judges and prosecutors have been given tremendous power by local, state, and federal government agencies—authority they must have to enforce the law and ensure justice in our country. These powers include the authority to detain and arrest suspects, to search and seize property, to bring criminal charges, to make rulings in court, and to use deadly force in certain situations.

Therefore, due to the Defendant's pattern and practice, failure to intervene, failure to keep from harm, and deprivation of federal activities, and motive of conspiring against PETITIONER. Respondent(s)' unwitting victims, such as myself and those mentioned above, cannot reasonably avoid injury because they are unlikely to discover that Respondent(s) have openly misused their power and have caused increase in loss of tax dollars due to law suits arising out of color of law violations. Individuals' who lack knowledge of how court's operate are unable to prevent injuries by the Respondent(s)'.

Courts are important because they help protect our constitutional rights to equal protection and due process under the law. Second, both criminal and civil courts provide the opportunity for the parties to have their cases heard by neutral judges and/or juries. This process ensures that all cases are decided in a fair and consistent manner. Third, Courts provide a forum to resolve disputes and to test and enforce laws in a fair and rational manner. Fourth, Courts are an impartial forum, and judges are free to apply the law without regard to the states wishes or the weight

of public opinion but in line with human rights. Fifth, Court decisions are based on what the law says and what the evidence proves; there is no place in the courts for suspicion, bias or favoritism.

This is why justice is often symbolized as a blindfolded figure balancing a set of scales, oblivious to anything that could detract from the pursuit of an outcome that is just and fair. Sixth, Courts exist to do justice, to guarantee liberty, to enhance social order, to resolve disputes, to maintain the rule of law, to provide for equal protection to all regardless of background and to ensure the due process of law. Seventh, Courts exist so that the equality of individuals and the state is reality rather than empty rhetoric and to ensure that the rights enshrined in the ECHR are applied in its decisions and complied with by legislation. Lastly, preventing abuse of this authority, however, is equally necessary to the health of our nation's democracy. That's why it's a federal crime for anyone acting under "color of law" to willfully deprive or conspire to deprive a person of a right protected by the Constitution or U.S. law. "Color of law" simply means the person is using authority given to him or her by a local, state, or federal government agency.

A Temporary Restraining Order ("TRO") is necessary to immediately halt Respondent(s)' illegal practices and protect the public. The proposed TRO filed herewith would enjoin Respondent(s)' illegal conduct, require the immediate investigation of CLETS misuse, and Court misuse. This relief is critical to prevent further harm to injured individual's like myself and preserve the Court's ability to provide effective final relief. A Temporary Restraining Order is needed to prevent imminent harm to PETITIONER. Defendant has made clear through repeated seizure and destruction of PETITIONERs' court documents' and property that this is

*EX-PARTE* APPLICATION

part of an ongoing procedure and practice to deprive an American citizen of his Federally Protected rights and ongoing Color of Law violations. As recently of March 14, 2019, Respondent(s)' acts of forging the PETITIONERs' signature was the start of "fabricating evidence against and falsely arresting an individual also violates the color of law statute, taking away the person's rights of due process and unreasonable seizure". In the case of deprivation of property, the color of law statute would be violated by unlawfully obtaining or maintaining a person's property, which oversteps or misapplies the official's authority. Unless restrained by an Order of this Court, these unlawful acts will continue and result in another false arrest and possible heart attack, to stop the current irreparable injury and deprivation of federal activities, and allow the PETITIONER to enter state courts without fear of a false arrest.

PETITIONER brings this action to halt Respondent(s)' continued misuse of CLETS with the intention and practice to prevent the PETITIONER to secure and search for legal representation to seek damages arising from Respondent(s)' false arrest on the PETITIONER on July 1st, 2019 while inside the Riverside Family Courthouse located at 4175 Main Street, Riverside, CA. Respondent(s)' have continued to deprive the PETITIONER's his constitutional rights' and privacy. The Respondent(s)' have denied the PETITIONER the right to file court documents, denied the PETITIONER the right to view the original file to his case as a defendant, denied the right to purchase certified copies, and denied the PETITIONER the right to issue one Subpoena from his 15 plus Witness List to key witnesses in his case, and have denied the PETITIONER the right to electronically file documents through e-submit. The Respondent(s)' conduct has placed the PETITIONER at substantial

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

risk of another heart attack, fraud, invasion of privacy, and job loss.
Respondent(s)' conduct also exposes a motive to once again falsely arrest
PETITIONER, in order to refrain the PETITIONER to sue Defendant for
damages arising from Civil Rights' violations and California Tort Claims.
Respondent(s)' actions have demonstrated a pattern or practice of conduct
that deprives persons of rights protected by the Constitution or U.S. laws,
as in the past with Horace Roberts v. County of Riverside, and now with
Abanoob Abdel-Malak. This law, commonly referred to as the Police
Misconduct Statute, gives the Department of Justice authority to seek
civil remedies in cases where law enforcement agencies have policies or
practices that foster a pattern of misconduct by employees. This action is
directed against an agency, not against individual officers.

    As a result of the foregoing, Respondent(s) are engaged in ongoing
violations founded on a claim and/or right arising under the laws of the
United States. Article VI, Paragraph 2 of the U.S. Constitution is
commonly referred to as the Supremacy Clause.  It establishes that the
federal constitution, and federal law generally, take precedence over state
laws, and even state constitutions. It prohibits states
from interfering with the federal government's exercise of its
constitutional powers, and from assuming any functions that are
exclusively entrusted to the federal government. The following ongoing
violations violate Color of Law violations; i. Amendment IV: Search and
Arrest Warrants, ii. Amendment V: Rights in Criminal Cases, iii.
Amendment VI: Rights to a Fair Trial, iv. Amendment VIII: Bails, Fines,
and Punishments, v. Title 42, U.S.C., Section 14141, vi. Title 18, U.S.C.
Section 241 Conspiracy of Rights, vii. Title 18, U.S.C., Section 242
Deprivations of Rights under Color of Law, viii. Title 18, USC, Section 245

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

— Federally Protected Activities, which prohibits unfair or deceptive acts or practices in or affecting United States citizens.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Due to the reckless and unlawful behavior of the law enforcement officers, judicial officers, and court clerks and others described as Respondent(s), I, Abanoob Abdel-Malak, the PETITIONER was falsely arrested; subjected to illegal strip searches; falsely imprisoned for a period in excess of 12 hours, denied food and water during the imprisonment; while falsely imprisoned I was subject to excessive force, assault, battery, and deprived of medical care; falsely charged with criminal offenses, and compelled at considerable expense and personal inconvenience to return to the Superior Court of California - County of Riverside while out of state in fear of RESPONDENT(S) to defend myself of the false and illegal charges and/or possible false arrest warrant arising from Federally Protected Activities.

Moreover, I, Abanoob Abdel-Malak, was the victim of unreasonable and excessive force when Deputies stole my court document's and did not return them, and denied food and water while false imprisoned for over 12 hours during my illegal arrest. In addition, while falsely imprisoned, I was denied the right to call counsel and calls were blocked. I was only released until I begged needing to get the hospital urgently, and inmates had to get Deputies attention to tell them to check on me, because I was ignored by Deputies and locked in a room, **See Exhibit C**.

Following the false arrest and false imprisonment on July 1st, 2019, I had to leave the State of California on July 5th, 2019, and lost my new

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

job I just started on July 1st, 2019. **See Exhibit I and Declaration in Support line 14.**

Currently, Defendant, forged a court document with my signature in which they misspelled my name, falsely arrested and falsely imprisoned me, illegally accessed my medical records to conspire against me, have illegally granted the right to record my communications and monitor my internet for 5 years.

Due to Respondent(s)' pattern and practice of color of law violations and past unlawful conduct, I have not been able to receive calls from important attorney's that would be able to assist me with this matter. I have no privacy whatsoever.

**Below will demonstrate hate crimes against the PETITIONER because of his race of being , name, ethnicity, and gender, all resulting in Color of Law violations during federally protected activities, as: The six enumerated 'federally protected activities' are: '(A) enrolling in or attending any public school or public college; (B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof; (C) applying for or enjoying employment,...; (D) serving...as grand or petit juror; (E) traveling in or using any facility of interstate commerce,...; (F) enjoying the goods [or] services [of certain places of public accommodation].' 18 U.S.C. § 245(b)(2).]**

## A. PRIOR TO THE FALSE ARREST AND FALSE IMPRISONMENT – HATE CRIMES AND COLOR OF LAW VIOLATIONS

On or about January 31st, 2019, Officer #1356 Detective David Johansen of Riverside Police Department who is 115 Qualified and Supervising Officer #0152 Robert Tipre opens false police reports to begin framing me for my ex-girlfriend's Dad, David Pierce. The police reports

*EX-PARTE* APPLICATION

1  are needed and in accordance with getting a Criminal Protective Order
   and/or V.A.W.A. Stalking to try and get me in jail by opening a criminal
2  case against me. An investigation began on me around this time without
   my consent or any probable cause. This is the beginning of Invasion of
3  Privacy.
        A. Stalking
4       B. Corporal Injury to a Spouse

5       On February 8th of 2019, PETITIONERs Desiree Pierce and David
   Pierce refused to enter into a legal agreement, a mutual joint stipulation,
6  that would have served the same purpose as a restraining order. This
   mutual joint stipulation could have satisfied strongly represents the
7  corruption stemming from RESPONDENT(S)"s color of law violations.

8       On February 12th, 2019, Officer #1356 Detective David Johansen of
   Riverside Police Department who is 115 Qualified and Supervising Officer
9  #0152 Robert Tipre reopens false police reports to begin framing me for
   my ex-girlfriend's Dad, David Pierce. The police reports are needed and in
10 accordance with getting a Criminal Protective Order and/or V.A.W.A.
   Stalking to try and get me in jail by opening a criminal case against me.
11 An investigation began on me around this time without my consent or any
   probable cause. This is once again an Invasion of Privacy.
12      A. Stalking
        B. Corporal Injury to a Spouse
13
        On February 21st, 2019, I, was the Petitioner, filed a domestic
14 violence prevention order in the Superior Court of California in San
   Bernardino, to restrain Desiree Pierce from further contact or
15 communication with me, in order to prevent David Pierce from forcing his
   daughter Desiree Pierce to file a restraining order against me. Such a
16 restraining order, a false allegation which would appear on my record,
   would negatively impact my "character and fitness" to become an attorney
17 and my future job prospects. I am still in fear of and am fighting against
   the assassination of my character, in light of the theft-by-extortion of my
18 relationship with Desiree Pierce, and the ongoing aggressive and
   fraudulent actions taken against me, by David Pierce, court clerks, and
19 law enforcement to cover their pattern and practice of Color of Law
   violations. This is the beginning of where my due process and equal
20 protection is denied and 6th Amendment of Rights to a Fair Trial is
   violated.
21
        On March 12, 2019 or March 13, 2019, Deputy F. Wilkerman from
22 San Bernardino County Sheriff Department and personnel from Riverside
   County Sheriff Department invade my privacy and illegally hear my
23 conversation with the court clerk about what day I should have my
   continued hearing, April 2, 2019, April 3, 2019, or April 4, 2019; invasion
24 of privacy once again and intentional infliction of emotional distress. This
   was a clear disregard to my due process and equal protection of the law,
25 beginning from this incident until today I have been stripped of physical
   liberty, (2) due process, and (3) fundamental fairness under the
26 Constitution of United Stated.

27      On March 13, 2019, Officer #1356 Detective David Johansen of
   Riverside Police Department who is 115 Qualified and Supervising Officer
28 #0152 Robert Tipre reopen false police reports to begin framing me for my
   ex-girlfriend's Dad, David Pierce. The police reports are needed and in

- 28 -

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

## EX-PARTE APPLICATION

1   accordance with getting a Criminal Protective Order and/or V.A.W.A.
    Stalking to try and get me in jail by opening a criminal case against me.
2   An investigation began on me around this time without my consent or any
    probable cause. This is the beginning of Invasion of Privacy.
3        A. Stalking
         B. Corporal Injury to a Spouse
4
5   On March 14th, Bailiff F. Wilkerson, Court Reporter Karen Diggs #7789,
    and forged my signature on a "Stipulation for Judge Pro Temp" and filed
6   it at the San Bernardino Family Court House, case FAMSS 1901320. The
    fact that the forged signature is on the right side of the form raises the
7   suspicion that the forged signature may be intended to be transferred to
    other different documents, and suggests why the Riverside County Family
8   Courthouse refuses to allow me to purchase a certified copy of the
    document. **This is a clear example of conspiring against Federally**
9   **Protected Activities.**

10  Sometime between March 14, 2019 – July 2019, I go to the Rancho
    Cucamonga County Law Library and call 911 and/or Rancho Cucamonga
11  police department to make a report about the forged document and
    fraudulent action on behalf of the County San Bernardino, the Unknown
12  Officer or Deputy was a Hispanic woman from San Bernardino County
    Sheriff Department and refused to allow me to make a police report,
13  instead attempted to accuse me of being under the influence, and once I
    stated to her you can speak to my attorney, she left me alone. The Rancho
14  Cucamonga Police Department who is contracted with San Bernardino
    County Sheriff owed me a duty to make a police report.

15  Sometime between March 14, 2019 – July 2019, I call 911 in the City of
    Fontana  and make police reports with the City of Fontana about the
16  incidents that have been occurring and request them to investigate the
    forged document, the officer's explain to me that I need to present the
17  document to Commissioner Gassner. Prior to this incident, I attempted
    numerous times with Riverside Police Department, but they deny helping
18  me in any way.

19  The false and/or altered restraining order AND CRIMINAL
    PROTECTIVE ORDER wasn't on file until the 3rd of April, which would
20  explain why they refused to give me certified copies of it, refused to allow
    me to issue subpoenas, and on that same day forged my signature on a
21  "Stipulation for the Appointment of Court Commissioner as Judge Pro
    Tem." I need legal counsel to properly explain how important the forged
22  Stipulation is in my claim.

23  On April 2nd, 2019, the Petitioner's Father, David Pierce, pushes my
    sister and scares my mom while walking between my sister, and mother
24  at 8:28 a.m., 2 minutes before our scheduled hearing for my DV case
    FAMSS 1901320, at 8:30 a.m. at the San Bernardino Court House in front
25  of courtroom S55. Due to David Pierce harassing and scaring my Mother
    & Sister, I refused to bring them to my hearing as witnesses on April 3rd.
26  2019 as well as speak out loud regarding the evidence I have of Parent
    Abuse. My sister went to file a Police Report, # 801900050. The police
27  report did not describe what the real incident was. The Reporting Officer
    wrote the wrong information and stated the crime was an "incident".
28  Officer J.G. Medrano of the San Bernardino County Sheriff Department
    fabricates the police report.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1

2  On April 17th, 2019, alleged PETITIONER Desiree Pierce finally signs the "Stipulation for the Appointment of Court Commissioner as Judge Pro Tem."

3

4  On or around May 9th, 2019, I visit the San Bernardino Sheriff's office to purchase a certified copy of the police report of when David Pierce pushed my sister inside the courthouse. The police report was inaccurate of what

5  occurred. I decided to report this to the FBI along with the forged court document with signature and report that officer's **refused to allow me**

6  **to make a police report**.

7  On or around May 9th, 2019, I visited the FBI-West Covina satellite office to make a report of the false police reports and corruption going on with

8  my case, specifically the forged signature and fabricated police reports from the RESPONDENT(S)s'. The agent makes a copy of the document's I

9  provided her with as well as David Pierce pushing my mom and sister, along with him chasing me in his truck on March 27th, 2019.

10

11  On June 28th, 2019, I notified Mario Rivas, the attorney of Desiree and David Pierce, that I would file in person for an Ex-Parte on July 1st, 2019 at or around 7:30 a.m. at the Riverside Family Courthouse located at 4175

12  Main Street, Riverside, California and in accordance with Court rules.

13        B. JULY 1ST, 2019, DATE OF FALSE ARREST AND FALSE IMPRISONMENT – HATE CRIME AND COLOR OF LAW VIOLATION

14

15  On July 1st, 2019, as I stood in line to file for an Ex-Parte hearing at the Riverside Family Court, I was falsely arrested by Riverside County Sheriff Bailiff H. Lopez (and four other Deputies), for "trespassing" and

16  "contempt of court," in order to prevent me from filing my court documents. In the process of the arrest, the bailiff confiscated my Ex-

17  Parte application. I was detained at the Riverside County Jail until around 10:00 pm that evening. The arrest caused me to lose my new job

18  and suffer injuries to my heart, resulting in a trip to urgent care. (I also have a video that I can provide as evidence.) **SEE EXHIBIT N OF THE**

19  **COURT FILINGS PETITIONER WAS PREVENTED FROM FILING AND INSTEAD FALSELY ARRESTED IN LINE TO OBSTRUCT**

20  **JUSTICE. THE COURT DOCUMENT'S WERE DESTROYED AND TAKEN AWAY FROM ME, SEE BOOKING INTAKE RECEIPT: "NO**

21  **OTHER ITEMS" AS SEEN IN EXHIBIT C.**

22

23        Title 42, U.S.C., Section 14141 makes it unlawful for state or local law enforcement agencies to allow officers to engage in a pattern or practice of conduct that deprives persons of rights protected by the

24  Constitution or U.S. laws. This law, commonly referred to as the Police Misconduct Statute, gives the Department of Justice authority to seek

25  civil remedies in cases where law enforcement agencies have policies or practices that foster a pattern of misconduct by employees. This action is

26  directed against an agency, not against individual officers.

27        Title 18, USC, Section 241 – Conspiracy Against Rights

28  This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same). It further makes it unlawful for two or more persons to go in disguise on the highway or on the premises of another with the intent to prevent or hinder his/her free exercise or enjoyment of any rights so secured.

On July 1st, 2019 **Deputies assaulted me inside the facility and attempted to place Methamphetamine on my clothes and medical report I denied. I am detained all day and Deputies attempt to place Meth on a medical test I denied. A bail of $50,000.00 is placed for alleging the charge of "Contempt of Court" and "Trespass" at 4075 Main Street, Riverside, CA. But, I was at 4175 Main Street, Riverside, CA, and my car was parked in the parking lot of Riverside Family Court House. See Booking Intake Receipt, and my court documents we're taken from me. A criminal case was for "Trespassing" and "Contempt of Court" with a case hearing scheduled on July 17, 2019. I notified my employer via email explaining that this was the soonest I could contact them, in which July 1st, 2019 was my first day at my new job after being unemployed for months and searching for employment.**

While I was detained inside the jail facility, I attempted to call the FBI – West Covina office to get emergency assistance, but the Riverside County Sheriff Department blocked my call.

While I was detained inside the jail facility, I attempted to call various attorney's of number's I had memorized to get emergency assistance, because the Riverside Sheriff deputies would not give me my cell phone to get my Attorney contacts, but the Riverside County Sheriff Department blocked my call.

While I was detained, I was assaulted, denied medical care requesting to get to a hospital as soon as possible, denied food and water all day. I was subject to deputies attempting to place Methamphetamine on my clothes and a medical test, in which I denied to take the medical test.

Once I was finally released, I was only released because I needed to get to a hospital, my court document's were not returned to me. See Booking Intake Receipt regarding my Items list, **Exhibit C.**

C. POST FALSE ARREST AND FALSE IMPRISONMENT – HATE CRIME AND COLOR OF LAW VIOLATION

On July 2nd, 2019; my employer terminates my employment due to the false arrest & false imprisonment and trauma, damaging my career and licensing requirements. The False Arrest and False Imprisonment caused me to lose my new job later in November 2019.

On July 2nd, 2019, from 5:39 p.m. – 7:20 p.m. I visit the FBI West Covina office in person, once again, to report the false arrest and provide them with detail's of what occurred inside the jail facility and informed them I attempted to call them from inside the cell but the officer's blocked the calls I attempted to make. I spoke to duty agents, Shane and Sabrina. While speaking to Shane and Sabrina, they refused to listen to a suspicious voicemail I received and refused to stay on the phone while I call them regarding the call, I received from a Rachel from Lawyer Letter.

EX-PARTE APPLICATION

After speaking with Shane & Sabrina, they said they were going to investigate my claim, but the body language and meeting only placed me in fear, and the "duty agents" refused to let me speak with the FBI agent I spoke with back in May, 2019. My gut told me, that the duty agents and some FBI employees were going to conspire against me to cover up the corruption.

On July 5th, 2019, **in fear and under Post Traumatic Stress Disorder**, I fly out of the state of California after the ongoing harassment and in fear of Riverside County Sheriff. halt the harassment and misuse of CLETS by the County of Riverside and/or County of San Bernardino, I moved out of the State of California in fear of law enforcement attempting or attempting to fabricate more evidence against me to put me in jail.

On July 17th – 29th, 2019, while living in North Carolina, I had to go to the hospital and the medical staff found that my heart was losing Enzymes, so I was admitted to different hospital to monitor my heart and perform more chest test. I need legal counsel to investigate my medical reports and incident with certain events at the hospital. Since a Judge and Law Enforcement do not need to abide by HIPPA, I can prove that law enforcement, whether it was the FBI in West Covina or any law enforcement from California.

On July 30, 2019, I notarized a court document, Electronically Filed, I receive a Notice of Return.

On August 8, 2019, my ex-attorney and court clerks file a Substitution of Attorney, I terminated him over a month ago.

Sometime between August 8, 2019 – September 9, 2019, Ryan Nevans of Riverside City contacts Hoke County Sheriff's Office in Raeford, North Carolina, and to ask me police questioning, Investigating Deputy, Quiles, Phone Number, (910) 875-5111. Hoke County Sheriff go visit my sister in person at her home residence to ask about me.

On September 9, 2019, Commissioner Wendy Harris denies my "power of attorney" document while I was out of state for my sister to appear for me while I was in Georgia. After my sister tells me she denied the Power of attorney, and said the hearing was cancelled because I was not present. I finally call "Detective" Ryan Nevans. He begins asking me questions such as:
i.      "Did you send a package to Gail O'Rane?"
ii.     "Why did you send a package to Gail O'Rane?"
iii.    "Do you intend to return to California?"
iv.   **"You're located in Hinesville, Georgia, huh?"**

Attempting to use police questioning to have a reason to arrest me, using the strategy in Miranda v. Arizona, 1966. I told him I would sue for the continued harassment and false arrest and to leave me and my family alone.

On September 20, 2019, I filed court documents with the Los Angeles Federal Courthouse requesting an attorney to assist me with a Notice of Removal. The original Judge, advises the case to ADR. I requested a Motion to Appoint Legal Counsel and was offer ADR but then the case was randomly assigned to a corrupt Judge who helps Riverside

- 32 -

*EX-PARTE* APPLICATION

County Sheriff department with their corruption. The Judge David O Carter was in Orange County in which he has no jurisdiction regarding the matter. I would like to emphasize, my notice of removal was not correctly filed with the Federal Court because Riverside Family Court refuses to give me certified copies, in which a Notice of Removal requires all court documents and proceedings to be attached to a "Notice of Removal".

On September 23, 2019, the case is randomly assigned to District Judge David O. Carter who was in Orange County and he remands the case back to the State Court, Riverside Family Court House where I was falsely arrest and stripped of my court documents. He has also remanded other court cases for Civil Rights the statement of facts against Riverside County Sheriff Department.

On October 22, 2019, I visit the FBI West Covina satellite office for the third and last time, telling them they need to do something about what has occurred and the false arrest and false imprisonment from what occurred on July 1st, 2019.

On November 20, 2019, I request a change of venue for the following reasons: The current Judge, (and Bailiff), and court house exhibits Prejudice against the me. I am requesting a Judge over a Commissioner. The court house does not have any qualified Judges for this complex case. Commissioner Wendy Harris is Caucasian and so is the Petitioner, I feel due the type of name and ethnic background, I am at a disadvantage. As well as, because Gail O'Rane will be in trouble for allowing her Bailiff H. Lopez to falsely arrest me on July 1st, 2019, she has a vested interest to help her friend Gail O'Rane from law school in Pepperdine. Bailiff Ryan Evans harassed my sister Mary Roman while in North Carolina sending Hoke County Police to my sister's house to attempt to get me to for "police questioning". I also do not know how Riverside County Sheriff retrieved my sister's home address in North Carolina. On September 9th, 2019: Hearing was dismissed. Commissioner Wendy Harris disapproved of my power of attorney document my sister presented when I was out of state in Georgia, and had no money to return to California for that hearing.

On November 21, 2019: **court clerks refuse to allow me to file an ex-parte once again before my hearing**. Because of once again being denied to file and Ex-Parte as a Self-Represented Indigent Defendant, I request Commissioner Wendy Harris to recuse herself as allowed by California Family Law Court Rules. she refuses to recuse herself after I orally request my first request to have a judge removed from my case. I orally stated to recuse herself pursuant to California Code of Civil Procedure §170.6 and that she is bias because she has not appointment me legal counsel, or issued me any subpoena's to at least one witness from my witness list of 15+ witness I intended to call.

On November 22, 2019: Commissioner Wendy Harris refuses to give me her California State Bar License Number. I explained to her that my health is not fit to provide my defense to this case as I desperately need an attorney and that I already suffered a heart from the false arrest by the bailiff's in the court room. She refused to provide me with everyone's name inside the court room. She stated she does not practice law in California. And practices outside the state of California. She grants the Criminal Protective Order for 5 years, allowing the same law enforcement

EX-PARTE APPLICATION

1   agency who arrested me to continue to record my communications and
2   monitor my internet, in which they can arrest me without notice.

3   From January 14, 2020 – until now I have been attempting to
    appeal the decision. The court clerks refuse to accept my electronic filing
4   and now have altered the case summary and fabricated information that
    is crucial to my appeal. If I cannot file court documents, purchase certified
5   copies, and I was falsely imprisoned for attempting to file an Ex-Parte
    resulting in my heart to suffer, I fear I will suffer another heart condition
6   from the stress and corruption to conspire against me.

7   Due to the false arrest and false imprisonment, I am in fear of going
    in person to file court documents or pick up court documents as I am in
8   the Court of Appeals now. As well as, due to my lack knowledge in the
    legal field, I do not know what exact documents to draft and file, as well
9   as, I do not have experience with electronic filing.

10  Petitioner/Plaintiff filed the original complaint against
    Respondent/Defendant(s) on February 18, 2020, only in order to satisfy
11  court rules and procedures for an ex-parte application and temporary
    restraining order for injunctive relief. In addition, Magristrate Judge
12  Kenly Kiya Kato was the same Magistrate Judge that preformed
    "discovery pursuant to General Order No. 05-07 on 5:19cv1808 in order to
13  get the case randomly assigned to Honorable District Judge David O
    Carter, in which she is a Respondent/Defendant I plan to bring suit
14  against in this action. Under General Order No. 05-07, it states that
    "District judges in the Central District of California refer all discovery-
15  related motions to the "Assigned Magistrate Judge", and in this matter,
    the original "Assigned Magistrate Judge" was Honorable Alka Sagar, not
16  Magistrate Judge Kenly Kiya Kato.
    This case was original filed and labeled with LACV20-01570-CJC-
17  ASx, and after searching online all day yesterday and today for my case
    with the case title and name, I discovered that the case is labeled
18  EDCV20-00322-CJC-KKk. This is different from what I received from the
    court clerk yesterday at 3:23 p.m., and not the original filing of court
19  documents and not the Conformed Copies Honorable District Judge
    Cormac J. Carney's rules and procedures request. In six minutes,
20  Magristrate Judge Kenyl Kiya Kato participated in an activity to change
    the filing time stamp and name. Once again, a court tactic that is out of
21  my hands and placing me under an immense amount of stress.
    The court filings, was scanned to alter my evidence. My evidence
22  was in part in color, but was scanned in black and darkened so much that
    my evidence detail's was permanently damaged. In addition, the Exhibit's
23  A – K, were so important for my Ex-Parte Application and can be deemed
    as why all my orders were denied, my evidence was damaged and lost.
24  The Chamber's office of District Judge Cormac J. Carney have also
    recycled my Exhibit's and the court no longer has hard physical copies of
25  what I filed and only have the electronic PDF of evidence that has been
    blackened and darkened.
26  Abanoob Abdel-Malak, filed the original complaint and ex-parte
    application with Exhibits A - K on February 18, 2020 at 3:23 p.m., only in
27  order to satisfy court rules and procedures for an ex-parte application and
    temporary restraining order for emergency injunctive relief. This case was
28  originally filed and labeled with LACV20-01570-CJC-ASx, I discovered
    that the case was altered and was refiled WITHOUT MY CONSENT
    labeled EDCV20-00322-CJC-KKk on February 18, 2020 at 3:30 p.m. and I

- 34 -

*EX-PARTE* APPLICATION

1   was never notified of the change until I attempted to register for E-Filing
    and staff found no such case labeled LACV20—01570-CJC-ASx. This is
2   different from what I received from the court clerk and not the original
    filing of court documents and not the Conformed Copies Honorable
3   District Judge Cormac J. Carney's rules and procedures request. In six
    minutes, Magristrate Judge Kenyl Kiya Kato and/or the court clerk's
4   participated in an activity to change the filing time stamp and name.
    Once again, a court tactic that is out of my hands and placing me under
5   an immense amount of stress.
         Following the discovery of the altered case number, I was forced to
6   File a Motion to Disqualify Judges, but it not have evidence attached,
    because the evidence I attached was altered and destroyed. On February
7   21, 2020, the court clerk made an error and it was never filed until Mr.
    Powers reached out to me and we discussed all the errors and issues with
8   my initial filing. Not until March 26 or 27, 2020 was my Motion to
    Disqualify Judges finally filed. The errors caused me to have an unfair
9   trial and no irreparably injury by my orders all being denied and evidence
    being altered and damaged.
10        Sadly, these errors were more than just a mistake in my opinion,
    based on my previous filing in September 20, 2019, case number 5:19-cv-
11  01808. The court filings, was scanned to alter my evidence. My evidence
    was in part in color, but was scanned in black and darkened so much that
12  my evidence detail's was permanently damaged. In addition, the Exhibit's
    A – K, were so important for my Ex-Parte Application and can be deemed
13  as why all my orders were denied, my evidence was damaged and lost.
         The Chamber's office of District Judge Cormac J. Carney have also
14  recycled my Exhibit's and the court no longer has hard physical copies of
    what I filed and only have the electronic PDF of evidence that has been
15  blackened and darkened. Petitioner/Plaintiff was not compensated for
    these unlawful takings of his private property. SEE EXHIBIT 4.
16        Due to each and every Respondent/Defendants atrocious actions,
    Petitioner/Plaintiff has suffered extensive physical injuries.
17  Petitioner/Plaintiff's injuries continue and he requires ongoing medical
    treatment.
18        During the entire incidents and each and every
    Respondent/Defendant mentioned herein, Petitioner/Plaintiff was
19  unarmed, defenseless, and made no furtive movements or gestures
    whatsoever.
20        The Respondent/Defendants' brutal treatment and extortion of
    Petitioner/Plaintiff caused him to fear for his life and caused
21  Petitioner/Plaintiff serious physical injury.
         Respondent/Defendants, and each of them, acted under color of state
22  law as law enforcement officers of the Riverside Sheriff's Department.
         The Respondent/Defendants' actions were reckless and callously
23  indifferent to the Petitioner/Plaintiff's federal and state protected rights.
         The use of force against the Petitioner/Plaintiff was the result of the
24  policy, practice and custom of the each Respondent/Defendant's
    Department to inadequately supervise and discipline law enforcement
25  officers who use excessive force, including deadly force.
         The inadequate supervision and discipline of Sheriff's deputies by
26  the County of Riverside, County of San Bernardino, and County of Los
    Angeles, and F.B.I., has led to the unnecessary and illegal use of excessive
27  force, including deadly force.
         The policy, practice and custom of the Respondent/Defendants' each
28  and every one of them is that when deputies use excessive force, other
    officers do not intervene to prevent the use of the illegal force, do not

- 35 -

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

1   arrest the officer engaging in the illegal activity, and. do not report the illegal activity.

2       The policy, practice and custom of the County of Riverside with respect to allegations of excessive force reported by citizens, is to conduct

3   a minimal investigation designed to exonerate the officer involved rather than discover the true facts of the incident.

4       As a result of this code of silence adhered to by Riverside County Sheriff's Deputies and the inadequate investigation of allegations of the

5   use of excessive force, deputies reasonably conclude that their use of excessive force will not result in discipline, termination, or criminal

6   prosecution against them.

    The above policies and practices have resulted in a culture of

7   violence in which the use of excessive force is an accepted and customary part of police work in the County of Riverside.

8

**A. Respondent/Defendants/Respondents:**

9

10      **Ryan Nevins, David Johansen, Robert Tipre, Teresa Jones, Kathy David, Graciela Miera, Kamari Williams, Tiffany, Jill**

11  **Williams, R. Gill, Wendy Harris, H. Lopez, Carter, Juan Munoz, Estrada R. Guerrero, Sergio Mercado, Robert Deller, and Carlos F.**

12  **Flores, Gail O Rane** (together, "Respondent(s)") are current or former officers and employees of the Riverside County Sheriff's Department

13  and/or the County of Riverside, California. Respondent(s) participated in the investigation and/or conspired and/or prosecution about the

14  misconduct alleged in this Ex-Parte Application.

15      Respondent(s)', **DAVID GARY PIERCE, MARIO RIVAS,** and **ROBERT DELLER,** participated in the investigation and/or conspired

16  and/or prosecution about the misconduct alleged in this Ex-Parte Application

17      State of California: County of Riverside: City of Riverside: Riverside Sheriff Department: **Deputy: H. Lopez**; – Initial arresting officer on July

18  1st, 2019 and on Booking Receipt. 1 of 4 deputies who arrested me inside the Superior Court of California – Riverside Family Law Courthouse at

19  4175 Main Street, Riverside, CA 92501. He was also the Bailiff in my case and he is Gail O'Rane's bailiff for courtroom F301. **Location**: Outside the

20  Riverside Family Law Courthouse on the back side next to the gate. He also denied to make a police report regarding the incident on March 21,

21  2019 with K. Williams refusing to let me purchase certified copies. **Deputy: Unknown #1:** Caucasian Male – Short and Overweight (he was

22  the Deputy that actually arrested me). **Deputy: Unknown #2;** Caucasian Male – Tall drove me to the Riverside Detention Center with H. Lopez

23  sitting in the passenger seat. 1 of 4 deputies who arrested me inside the Superior Court of California – Riverside Family Law Courthouse at 4175

24  Main Street, Riverside, CA 92501. He knows David Pierce and Sherrie Pierce. **Deputy: Unknown #3;** Caucasian and/or Hispanic – Female and

25  wore glasses. 1 of 4 deputies who arrested me inside the Superior Court of California – Riverside Family Law Courthouse at 4175 Main Street,

26  Riverside, CA 92501; **Deputy: Unknown #4;** Caucasian Male, He attempted to put "Meth" on my clothes, a medical test I denied, and later

27  when I was detained inside the detention center; **Deputy: Unknown #5;** Caucasian and/or Hispanic Male, with a dark black mustache. He

28  attempted to put "Meth" on my clothes, a medical test I denied, and later when I was detained inside the detention center. **Deputy: Unknown #5;**

*EX-PARTE* APPLICATION

1   Caucasian and/or Hispanic Male, with a dark black mustache. He
attempted to put "Meth" on my clothes, a medical test I denied, and later
2   when I was detained inside the detention center. **Deputy: Ryan Nevans**;
Acted as a Detective and harassed me with police questioning, Bailiff in
3   my case. Riverside Police Department: **Officer #1356, David Johansen
(he made false police reports with David Pierce and Sherrie
4   Pierce)** Officer #0152, Robert Tipre; Officer #1881, Ricardo Guerrero-
Estrada; Officer #1082, Juan Munoz; Superior Court of California –
5   County of Riverside – Riverside Family Law Court: Court Clerks:

6        County of San Bernardino: San Bernardino Sheriff Department:
Deputy: F, Wilkerman; forged my signature on the Stipulation on March
7   14, 2019. Attempted to arrest me on March 27, 2019 while distracting me
when I was filling out my court forms trying to file an Ex-Parte regarding
8   the forged stipulation, Deputy: J.G. Medrano; he fabricated the police
report regarding the Dad David Pierce when he pushed my sister, mother,
9   and me on April 2nd, 2019 right before the hearing at 8:30 a.m. at S55 at
Superior Court of California located at San Bernardino Family
10  Courthouse. Superior Court of California – County of San Bernardino -
San Bernardino District Family Law Court Clerk, Court Clerk: Karen
11  Diggs; Rancho Cucamonga Police Department: City of Rancho
Cucamonga: Government Code § 910, 910.2, Fontana Police Department:
12  City of Fontana: Government Code § 910, 910.2,

13       And, Defendant Unknown Officers of the San Diego Police
Department participated in the misconduct alleged in this Ex-Parte
14  Application.

15       Defendant Unknown Officers of the Riverside County Sheriff's
Department participated in the misconduct alleged in this Ex-Parte
16  Application. Defendant Unknown Officers of the Riverside Police
Department participated in the misconduct alleged in this Ex-Parte
17  Application. Defendant Unknown Officers of the San Bernardino County
Sheriff's Department participated in the misconduct alleged in this Ex-
18  Parte Application.

19       Defendant Unknown Officers of the Rancho Cucamonga Police
Department, in which the Rancho Cucamonga City is contracted with San
20  Bernardino County Sheriff's Department, participated in the misconduct
alleged in this Ex-Parte Application.
21
         Defendant Unknown Officers of the Riverside County Sheriff's
22  Department participated in the misconduct alleged in this Ex-Parte
Application.
23
         Defendant Unknown Officers of the Riverside Police Department
24  participated in the misconduct alleged in this Ex-Parte Application.

25       Defendant Unknown Officers of the Fontana Police Department
participated in the misconduct alleged in this Ex-Parte Application.
26
         Defendant Unknown Officers of the San Bernardino County Sheriff's
27  Department participated in the misconduct alleged in this Ex-Parte
Application.
28

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

Each Defendant, known or unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Unless otherwise noted, Respondent(s) are sued in their individual and official capacity.

PETITIONER is unaware of the true names and capacities of those Respondent(s) named herein as RESPONDENT(S). PETITIONERs will amend this Ex-Parte Application to allege said Respondent(s)' true names and capacities when that information becomes known to PETITIONERs; and based on the decision of the Ex-Parte Application. PETITIONERs are informed and believes, and thereon alleges that RESPONDENT(S) are legally responsible and liable for the incident, injuries, and damages hereinafter set forth, and that each of said Respondent(s) proximately caused the injuries and damages by reason of negligent, careless, deliberately indifferent, intentional, willful, or wanton misconduct, including the negligent, careless, deliberately indifferent, intentional, willful, or wanted misconduct in creating in creating and otherwise causing the incidents, conditions, and circumstances hereinafter set forth, or by reason of direct or imputed negligence or vicarious fault or breach of duty arising out of the matters herein alleged. PETITIONERs will seek to amend this Ex-Parte Application to set forth said true names and identities of the unknown named DOE Respondent(s) when they are ascertained.

## C. Respondent(s)' Pattern and Practice and Past Unlawful Conduct

A. Respondent(s)' **SUPERIOR COURT OF CALIFORNIA – RIVERSIDE, COUNTY OF RIVERSIDE, RIVERSIDE POLICE DEPARTMENT, RIVERSIDE COUNTY SHERIFF DEPARTMENT'S** will be labeled as **RIVERSIDE.**

**The 1997 Preliminary Injunction:** In Watson v. County of Riverside, the PETITIONER police officer was ordered to write a report about an incident in which he was accused of using excessive force. He requested a consultation with an attorney prior to writing the report, but his request was denied. He was ultimately fired. The officer filed suit and obtained a preliminary injunction to prevent the county from using his

*EX-PARTE* APPLICATION

1  report during the administrative appeal of his termination. the

2  preliminary injunction provided the entire injunctive relief the

3  PETITIONER sought: his report was excluded from the administrative

4  proceeding. This is an example of the Defendant's pattern and practice is

5  disobeying the United States Constitution towards non-white's, hence the

6  Preliminary Injunction was granted against the County for denying the

7  PETITIONER his constitutional rights and due process. Watson v. County

8  of Riverside (C.D.Cal. 1997) 976 F.Supp. 151.

9         After the former deputy sheriff made an arrest in which he struck

10  suspects with his baton, the deputy's superior officers were aware that the

11  arrest was likely to give rise to a criminal investigation and an internal

12  administrative disciplinary proceeding affecting the deputy's employment.

13  Upon returning to the sheriff's station, the deputy was ordered to prepare

14  a report concerning the pursuit and arrest. The deputy was denied the

15  opportunity to consult with his attorney prior to writing the report.

16  Although the deputy's Fifth Amendment privilege against self-

17  incrimination was not violated where the deputy's job required him to

18  write the report, the court granted the deputy's motion for a preliminary

19  injunction prohibiting the introduction of the report at any administrative

20  hearing concerning the deputy's discharge. The court determined that the

21  deputy had a fair chance of proving that he was deprived of his right to

22  due process by the denial of counsel under circumstances where there was

23  a substantial risk that the deputy could be erroneously deprived of his

24  interest in not being fired and not being prosecuted for criminal offenses.

25  (Watson v. County of Riverside (C.D.Cal. 1997) 976 F.Supp. 951, 952.)

26         The court granted a preliminary injunction prohibiting the county

27  and individual officers from introducing in any administrative proceeding

28

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  concerning the former deputy sheriff's discharge a report that the deputy

2  prepared regarding a particular pursuit and arrest. (Watson v. County of

3  Riverside (C.D.Cal. 1997) 976 F.Supp. 951, 952.)

4  **Controversial shooting death of Tyisha Miller: In 1998**, the

5  **RIVERSIDE**'s four Riverside police officers, three white and one

6  Hispanic, arrived and tried to wake the woman as she sat in her locked

7  Nissan Sentra with the windows rolled up. A few moments later, Ms.

8  Miller was dead. Family members said her body and car were riddled with

9  as many as two dozen bullets. A 19-year-old black woman was killed here

10  in a hail of police bullets as she sat in her disabled car, a gun in her lap,

11  early Monday, leading family members to accuse the officers of murder

12  and local civil rights officials to ask for calm. Reforms were ordered after

13  Miller was shot to death by officers who saw her passed out in a car with a

14  gun on her lap. A state investigation revealed widespread civil rights

15  violations by police officers and concluded that the department had failed

16  to uniformly enforce the law

17

18  **The Cloud case: In 2008**, the **RIVERSIDE** once again violated

19  Federal laws, as officer, David Johansen, of Riverside Police Department,

20  shot and killed an unarmed man resulting in a $800,000 settlement

21  (Douglas Steven Cloud v. County of Riverside).  The Riverside Police

22  Department fulfilled its court-ordered reforms prompted by the

23  controversial shooting death of Tyisha Miller in 1998. The reforms were

24  ordered after Miller was shot to death by officers who saw her passed out

25  in a car with a gun on her lap. A state investigation revealed widespread

26  civil rights violations by police officers and concluded that the department

27  had failed to uniformly enforce the law.

28

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

**The Perrin case: In 2011**, **RIVERSIDE** was once again performing a pattern and practice by acting under color of law. A Pepsi driver was awarded more than $325,000 for a false arrest incident that occurred in 2004 (Perrin v. County of Riverside). The jury's malicious prosecution verdict ruled in favor of Perrin was supported by substantial evidence. A reasonable jury could have concluded that Deputies intentionally submitted false reports about Perrin's arrest and that the prosecutor relied entirely on those reports in filing charges. See Blankenhorn v. City of Orange, 485 F.3d 463, 483-84 (9th Circuit 2007); Awabdy v. City of Adelanto, 368 F.3d 1062, 1067-68 (9th Cir.2004). Evidence of other acts by a defendant is admissible to prove discriminatory motive or intent, Fed.R.Evid. 404(b), and the district court concluded that the other act at issue was sufficiently similar to the one before the court as to be probative intent and found discriminatory intent. (Perrin v. County of Riverside (9th Cir. 2014) 555 F.App'x 702.)

**The Johnson case: In 2013**, **RIVERSIDE** beat a man to death costing the COUNTY to reach a settlement for $1.1 million (Johnson v. County of Riverside). A group of Riverside County sheriff's deputies allegedly beat Raymond Johnson to death in a Burger King drive-through lane in October 2013. Johnson's killing gave rise to two civil lawsuits filed by his surviving spouse and other family members against the County of Riverside, the City of Moreno Valley, and several individual officers. The cases contend Respondent(s) violated various provisions of the federal Constitution and California tort law. Respondent(s) admit the central issue in this case -- whether the beating amounted to excessive force -- cannot be resolved without a trial, but have moved for partial summary judgment or adjudication on the claims that (1) Respondent(s) unlawfully

EX-PARTE APPLICATION

detained and arrested Johnson before the fatal application of force; (2) two of the later-arriving officers are liable for their conduct; and (3) the municipalities caused Johnson's death. (Johnson v. County of Riverside (C.D.Cal. Feb. 17, 2015, No. EDCV 14-00013-VAP (DTBx)) 2015 U.S.Dist.LEXIS 192459, at *4.) (Johnson v. Cty. of Riverside (C.D.Cal. May 13, 2015, No. EDCV 14-00013-VAP (DTBx)) 2015 U.S.Dist.LEXIS 192358.)

**The Smith case: 5:16-cv-00227:** In February 2019, a jury awarded a mother $2.5 million for Riverside County Sheriff in a fatal shooting for the death of a mentally ill man (Smith v. County of Riverside).

**The Roberts case: 5:19-cv-018778: In October 2019**, Horace Roberts sues County of Riverside for false imprisonment for over 20 years (Harris v. County of Riverside).  PETITIONER Horace Roberts was a forty-year-old U.S. Marine Corps veteran, hardworking professional, and father of two young children when Respondent(s) framed him for the 1998 murder of Terry Cheek. In 1999, PETITIONER was wrongly convicted. He spent two decades in prison. This is nearly the same incident I have undergone with Riverside Superior Court.

**County of Riverside Misuse of CLETS: In 2017**, in Riverside County more law enforcement employees resigned or were fired --  than in any other county in California -- for abusing a statewide electronic database that contains people's personal information collected during routine police work. Out of 16 investigations, five Riverside County employees resigned or were terminated last year after it was found abuse had occurred, according to data collected by the California Department of Justice. Law enforcement agencies across the state reported a total of 143 investigations resulting in 22 staff being terminated or resigning in 2017

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

for abusing the California Law Enforcement Telecommunications System (CLETS). Even though Riverside County, with a population of 2.4 million, accounts for about six percent of the total population of California, almost a quarter of all CLETS abuse firings or resignations came from the county.

Misuse of **V.A.W.A. Funding and Technology in the Hands of Law Enforcement with CLETS Misuse and Color of Law Violations:** Defendant, **RIVERSIDE's**, acts and omissions constitute unfair practices in violation of color of law and hate crimes by Respondent(s). In addition to putting the public at serious risk of further hate crimes. Respondent(s) have thereby placed American citizens and California citizens in jeopardy of other serious harms, such as the loss of employment and employment opportunities. Law enforcement officers and other officials like judges and prosecutors have been given tremendous power by local, state, and federal government agencies—authority they must have to enforce the law and ensure justice in our country. These powers include the authority to detain and arrest suspects, to search and seize property, to bring criminal charges, to make rulings in court, and to use deadly force in certain situations.

Such as the V.A.W.A. Interstate Stalking funding from other Respondent(s) and resources that were and are being used against me because of my gender, race, and ethnicity and denying me equal protection and due process of the law. RIVERSIDE has been monitoring my internet, communications, and harassing me while out of state in North Carolina and Georgia, sending Fontana Police Department to my home, in order to cover up the false arrest and false imprisonment, in

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  addition to color of law violations. This is a clear indication of why I am in

2  fear of Respondent(s).

3       The Riverside Police Officer, David Johansen, the same officer,

4  Detective David Johansen who opened and investigated false police

5  reports against me, a friend of David Pierce and Sherrie Pierce. He is the

6  Detective and Officer who made the false police reports, same officer from

7  the Johnson case. An officer who has killed someone and is still employed,

8  demonstrates the lack of policies and practices of **RIVERSIDE**.

9       HATE CRIMES AGAINST PETITIONER BECAUSE OF RACE,

10  NAME, ETHNICITY, AND GENDER, CONSPIRACY OF CIVIL RIGHTS,

11  FEDERAL PROTECTED ACTIVITIES. WHEN TECHNOLOGY AND

12  POWERFUL RESOURCES ARE IN THE HANDS OF BAD GUYS.

13  OPENING FALSE POLICE REPORTS AND GETTING V.A.W.A

14  STALKING AND CORPORAL INJURY TO A SPOUSE AGAINST AN

15  INNOCENT PERSON. DETECTIVE DAVID JOHANSEN.

16

17       **D. Agency and Concert of Action**

18       At all times herein mentioned, Respondent(s), and each of them,

19  hereinabove, were the agents, servants, employees, partners, aiders and

20  abettors, co-conspirators, and/or joint venturers of each of the other

21  Respondent(s) named herein and were at all times operating and acting

22  within the purpose and scope of said agency, service, employment,

23  partnership, enterprise, conspiracy, and/or joint venture, and each

24  Defendant has ratified and approved the acts of each of the remaining

25  Respondent(s). Each of the Respondent(s) aided and abetted, encouraged,

26  and rendered substantial assistance to the other Respondent(s) in

27  breaching their obligations to the PETITIONER, as alleged herein. In

28  taking action to aid and abet and substantially assist the commission of

    these wrongful acts and other wrongdoings complained of, as alleged

    herein, each of the Respondent(s) acted with an awareness of his/her/its

- 44 -

*EX-PARTE* APPLICATION

1   primary wrongdoing and realized that his/her/its conduct would
2   substantially assist the accomplishment of the wrongful conduct, wrongful
3   goals, and wrongdoing.

**STATEMENT OF FACTS**

### Prevailing Party

U.S. Supreme Court Defines Prevailing Party for § 1988 Purposes

The U.S. Supreme Court held that the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner that Congress sought to promote in the fee statute. This action was brought by Texas' Garland Education Association, alleging that school policies infringed upon Teachers' rights to engage in speech and activities related to employee organization and union activities.

The action resulted in materially altering the school district's policy limiting the teachers' rights, but also resulted in the teachers losing on several issues. See: Texas State Teachers Association v. Garland Independent School District, 777 F.2d 1046 (1985), cert denied; 479 U.S. 801, 107 S.Ct. 41, 93 (Ed. 2d 4 (1986)). The teachers then moved for an award of attorneys' fees as the prevailing party. The Texas District Court recognized the teachers achieved "partial success," but indicated that "in this circuit the test for prevailing party status is whether the plaintiff prevailed on the central issue by acquiring the primary relief." The court held the teachers did not prevail on the central issue and denied an attorney fee award. The court of Appeals affirmed. See: 837 F. 2d 190 (1988).

The Supreme Court said, "the search for 'central' and 'tangential' issues in the lawsuit, or for the 'primary,' as opposed to the 'secondary,' relief sought, much like the search for the golden fleece, distracts the district court from the primary purposes behind [42 U.S.C.] D1988 and is essentially unhelpful in defining the term prevailing party."

The Court held the plaintiff is prevailing party if there is "success" on "any significant issue in litigation which achieved some of the benefit the parties sought in bringing the suit." At a minimum, the plaintiff must be able to point to a resolution of the dispute that changes the legal relationship between itself and the defendant. If a plaintiff's success on a legal claim can be characterized as purely technical or de minimus, a district court would be justified in concluding the "generous formulation"

*EX-PARTE* APPLICATION

1   has not been satisfied. The Court held the teachers were prevailing
2   parties and reversed the lower courts' judgment. See: Texas State
3   Teachers Association v. Garland Independent School District, 489 U.S.
    782, 109 S. Ct. 1486, 103 (Ed. 2d 866 (1988)).

4
5   Prevailing party status requires a material alteration of the legal
    relationship between the parties that was judicially sanctioned. *Li v.*
6   *Keisler*, 505 F.3d 913, 917 (9th Cir. 2007) (order) (citing *Buckhannon Bd.*
    *and Care Home, Inc. v. West Virginia Dep't of Health and Human Res.*,
7   532 U.S. 598, 604-05 (2001). "[T]he petitioner's success in obtaining the
    desired relief from the federal court is critical to establishing prevailing
8   party status under *Buckhannon*, regardless of whether the federal court's
    order addressed the merits of the underlying case." *Id.* The court has
9   held that a Circuit Mediator's remand order satisfies this standard. *Id.* at
    918.

10  When a petitioner has obtained a remand for further consideration,
    he or she is a prevailing party. *Rueda-Menicucci v. INS*, 132 F.3d 493,
11  495 (9th Cir. 1997). *See also Carbonell v. INS*, 429 F.3d 894, 899-902 (9th
    Cir. 2005) (holding that a district court's order incorporating a voluntary
12  stipulation to a stay of deportation materially altered the relationship
    between Carbonell and the government, and that the alteration was
13  judicially sanctioned, making the applicant a prevailing party); *Perez-*
    *Arellano v. Smith*, 279 F.3d 791, 795 (9th Cir. 2002) (holding that
14  applicant who was granted naturalization at the administrative level
    while the federal court action was held in abeyance was not a prevailing
15  party because he "unmistakably did not gain a change in his legal
    relationship with the INS by judgment or consent decree").

16
17  A "prevailing party" is one who "has been awarded some relief by a
    court." Bukhannon Board of Care & Home Inc. v. West Virginia
18  Department of Health and Human Resources, 532 U.S. 598, 603 (2001).
    Petitioner is a prevailing party because he received the relief he sought,
19  namely the granting of his petition for review and a remand of the matter
    to the BIA.

20
21  "In order to qualify as a prevailing party, a plaintiff must have
    succeeded  on the merits of at least some of its claims." *Parks Sch. of Bus.,*
22  *Inc. v. Symington,* 51 F.3d 1480, 1489 (9th Cir. 1995); *see also Sole v.*
    *Wyner,* 551 U.S. 74, 82 (2007); *Hewitt v. Helms,* 482 U.S. 755, 759-60
23  (1987); *Cummings v. Connell,* 402 F.3d 936, 946 (9th Cir. 2005). "In short,
    a plaintiff 'prevails' when actual relief on the merits of [the plaintiff's]
24  claim materially alters the legal relationship between the parties by
25  modifying the defendant's behavior in a way that directly benefits the
    plaintiff." *Farrar v. Hobby,* 506 U.S. 103, 111-12 (1992); *see also Sole,* 551
26  U.S. at 82-83; *Tex. Teachers Ass 'n v. Garland Indep. Sch. Dist.,* 489 U.S.
27  782, 791-92 (1989); *Gerling Global Reinsurance Corp. of Am. v.*
28  *Garamendi,* 400 F.3d 803, 806 (9th Cir.), *amended by* 410 F.3d 531 (9th

*EX-PARTE* APPLICATION

Cir. 2005) (order); *Friend v. Kolodzieczak,* 72 F.3d 1386, 1389 (9th Cir. 1995) (order). "Success is [also] measured ... in terms of the significance of the legal issue on which the plaintiff prevailed and the public purpose the litigation served." *Morales v. City of San Rafael,* 96 F.3d 359, 365 (9th Cir. 1996), *amended by* 108 F.3d 981 (9th Cir. 1997) (order); *see also McCown v. City of Fontana,* 565 F.3d 1097, 1103 (9th Cir. 2009) (holding "that attorney's fees awarded under 42 U.S.C. § 1988 must be adjusted downward where the plaintiff has obtained limited success on his pleaded claims, and the result does not confer a meaningful public benefit."); *Hashimoto v. Dalton,* 118 F.3d 671, 678 (9th Cir. 1997).

This change of status must be "judicially sanctioned" in the form of a judgment or consent decree; voluntary changes in behavior are insufficient. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep 't o fHealth & Human Res.,* 532 U.S. 598, 604-05 (2001); *see also Watson v. Cty. of Riverside,* 300 F.3d 1092, 1096 (9th Cir. 2002) (explaining that a "preliminary injunction issued by a judge carries all the 'judicial imprimatur' necessary to satisfy *Buckhannon.");* *Labotest, Inc. v. Banta,* 297 F.3d 892, 895 (9th Cir. 2002) (holding that "a plaintiff who obtains a court order incorporating an agreement that includes relief the plaintiff sought in the lawsuit is a prevailing party entitled to attorney's fees under 42 U.S.C. § 1988.").

A plaintiff who wins only nominal damages may be a prevailing party under § 1988. *See Farrar,* 506 U.S. at 112; *Klein v. City of Laguna Beach,* 810 F.3d 693, 699-700 (9th Cir. 2016) (recovery of nominal damages by activist who sought no compensatory damages, did not preclude attorney fee award); *Guy v. City of San Diego,* 608 F.3d 582, 588 (9th Cir. 2010); *Mahach-Watkins v. Depee,* 593 F.3d 1054, 1059 (9th Cir. 2010); *Benton v. Or. Student Assistance Comm 'n,* 421 F.3d 901, 904 (9th Cir. 2005); *Cummings,* 402 F.3d at 946; *Friend,* 72 F.3d at 1390 n.1; *Wilcox v. City of Reno,* 42 F.3d 550, 554 (9th Cir. 1994). If the plaintiff sought compensatory damages, and only received nominal damages, however, an attorney's fee award may be inappropriate. *See Farrar,* 506 U.S. at 115; *Guy,* 608 F.3d at 588-89; *Mahach- Watkins,* 593 F.3d at 1059; *Benton,* 421 F.3d at 904-06; *Cummings,* 402 F.3d at 946- 47; *Romberg v. Nichols,* 48 F.3d 453, 455 (9th Cir. 1994); *Wilcox,* 42 F.3d at 554-55.

Where the plaintiff sought primarily injunctive relief, the lack of a monetary judgment does not mean that the plaintiff is not a prevailing party. *See Friend,* 72 F.3d at 1390; *see also Gerling Global Reinsurance Corp.,* 400 F.3d at 806 (holding that plaintiffs were prevailing party because they obtained all the relief  they sought in their lawsuit- a permanent injunction"); *Watson,* 300 F.3d at 1095-96 (explaining that a plaintiff who obtains a preliminary injunction but fails to prevail on his or her other claims is a prevailing party for purposes of § 1988 because relief in the form of a permanent injunction had become moot). However, a

- 47 -

EX-PARTE APPLICATION

1   plaintiff is not a prevailing party if the "achievement of a preliminary
2   injunction ... is reversed, dissolved, or otherwise undone by the final
    decision in the same case." *Sole,* 551 U.S. at 83.
3
            Where a declaratory judgment affects the behavior of the defendant
4   towards the plaintiff, it is sufficient to serve as the basis for an award of
5   fees. *See Rhodes v. Stewart,* 488 U.S. 1, 4 (1988) (per curiam). "[A]
    favorable judicial statement of law in the course of litigation," however, is
6   insufficient "to render [the plaintiff] a 'prevailing party.'" *Hewitt v. Helms,*
7   482 U.S. 755, 763 (1987); *see also Farrar,* 506 U.S. at 110. "Litigation that
    results in an enforceable settlement agreement can confer 'prevailing
8   party' status on a plaintiff." *La Asociacion de Trabajadores de Lake Forest*
9   *v. City ofLake Forest,* 624 F.3d 1083, 1089 (9th Cir. 2010). To determine
    whether a settlement agreement confers prevailing party status on a
10  plaintiff, the court has "used a three-part test, looking at: '(l) judicial
11  enforcement; (2) material alteration ofthe legal relationship between the
    parties; and (3) actual relief on the merits of [the plaintiff's] claims.'" *Id.*
12  (quoting *Saint John's Organic Farm v. Gem Cty. Mosquito Abatement*
13  *Dist.,* 574 F.3d 1054, 1059 (9th Cir. 2009)).

14          Where the plaintiff is successful on only some claims, the court must
    determine whether the successful and unsuccessful claims were related.
15  *See Tutor-s Saliba Corp. v. City ofHailey,* 452 F.3d 1055, 1063 (9th Cir.
16  2006); *Dang v. Cross,* 422 F.3d 800, 812-13 (9th Cir. 2005); *O'Neal v. City*
    *ofSeattle,* 66 F.3d 1064, 1068 (9th Cir. 1995). If the claims are unrelated,
17  then the fee award should not include time spent on unsuccessful claims;
18  if the claims are related. "then the court must ... [determine] the
    'significance of the overall relief obtained by the plaintiff in relation to the
19  hours reasonably expended.'" *O'Neal,* 66 F.3d at 1068- 69 (citations
20  omitted); *see also Webb v. Sloan,* 330 F.3d 1158, 1168 (9th Cir. 2003).
    "Claims are related where they involve 'a common core of facts' or are
21  'based on related legal theories.' '[T]he test is whether relief sought on the
22  unsuccessful claim is intended to remedy a course o f conduct entirely
    distinct and separate from the course o f conduct that gave rise to the
23  injury upon which the relief granted is premised.'" 0 *'Neal,* 66 F.3d at
24  1069 (quoting *Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1499 (9th Cir.
25  1995)); *see also Thomas v. City of Tacoma,* 410 F.3d 644, 649 (9th Cir.
    2005); *Webb,* 330 F.3d at 1168-69.
26
    **PROTECTED CLASS UNDER**
27          Historically and statistically, there have been identifiable groups
28  within our society that have received unfavorable treatment with regard

EX-PARTE APPLICATION

to housing. They have been rejected or prevented from renting or buying real property, given different terms, paid higher rents or security deposits, or experienced a lower level of service during tenancy than other groups of people.

**Do "protected classes" get special rights?**

No, the intention of federal and state fair housing laws is to require that ALL persons be given the same treatment, the same services, and offered an equal opportunity to live in a home of their choice—in other words, the same rights as everyone else. The only exceptions to this that persons with disabilities have been given several special rights (the right of reasonable accommodation and reasonable modification) in order to establish equal opportunity. (Note: If, for some reason, you must deviate from your normal procedures, be sure to document the situation; who, when, what, and why.)

**Are "protected classes" the same throughout the U.S.?**

The protected classes have been identified at the federal, state, and in some cases, local levels of government. There are some variations that allow for differences in the make-up of individual communities.

*At the federal level,* there are seven classes: race, color, religion, sex, national origin, familial status, and handicap (referred to as disability in California).

*At the state level*, California has added marital status, sexual orientation, age, ancestry, source of income, medical condition, gender, gender identity and expression, genetic information, citizenship, immigration status, primary language and military and veteran status.

*At the local level*, some cities have added their own additional protected classes, such as the inclusion of "height and weight or body size" in both San Francisco and Santa Cruz, and "students" in Berkeley.

Which group experiences the most incidences of discrimination?

The majority of discrimination cases filed throughout the United States are filed on the basis of disability. Second is race/color and third is familial status.

A few things you should know about several of the "protected classes"

- *Color*: There can be many shades of skin color within a race and many people are combinations of multiple races; therefore, although color is a separate and distinct protected class, race and color are often combined in a complaint. Persons with darker skin tend to experience more frequent incidences of discrimination in housing, as well as in many other day-to-day situations.

EX-PARTE APPLICATION

- *Sex:* Sexual harassment is covered in this protected class, in which there is a growing awareness of discrimination. In California, this category also includes pregnancy, childbirth or medical conditions related to pregnancy or childbirth.
- *Familial status:* Any household that includes persons under the age of 18 is protected under familial status. Pregnancy is also included in this category. Only bona fide senior housing can exclude children.
- *Handicap/Disability:* This group covers medical conditions, mental or psychological and physical disabilities. The two special rights extended to the disabled include: 1) the right to make reasonable modifications to a dwelling to enable them to live there comfortably, and 2) the responsibility of management to make reasonable accommodations in order to allow the disabled person to fully enjoy their tenancy. An accommodation, in most cases, involves modifying a policy, procedure, service or rule, such as allowing assistive animals when no pets are allowed, or assigned special parking spaces.
- *Ancestry*: Going beyond national origin, rental decisions should not be based on someone's ancestry. This often includes name profiling, wherein the landlord avoids renting to someone whose last name appears to be "foreign" even if the person's family may have been in the U.S. for many generations.
- *Source of income*: Don't require or imply that applicants should be employed in order to qualify to rent. Their income or financial resources only need to be legal and verifiable. As of January 1, 2020, Section 8 and VASH vouchers (in addition to other federal, state, and local public assistance or rental subsidies) are considered a protected source of income under state law.
- *Gender/Gender Identity/Gender Expression*: California's Unruh Civil Rights Act defines gender as "sex and includes a person's gender identity and gender expression. Gender expression means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth." Discrimination involving gender identity and expression are on the rise. In the context of rental housing, an applicant or resident may prefer to be called by a name or a gender pronoun that is not consistent with the applicant's assigned sex at birth. Some applicants or residents identify as "gender neutral" or "non-binary" and may prefer you to use the pronouns "them/them/their" instead of the more common male or female pronouns. If you are unsure how to

- 50 -

*EX-PARTE* APPLICATION

handle a situation involving gender identity or expression, get help from a fair housing knowledgeable attorney.

In California, which is often on the cutting edge of legal issues, two additional concepts have been added that pertain to protected classes: *perception and association*.

- *Perception:* If someone discriminates against a person, thinking that he or she is from a protected class, but the person isn't from that protected class, it is considered an act of discrimination.
- *Association:* Discriminating against someone because his or her friends or guests are from protected classes is also a violation.

Additionally, in California, *arbitrary discrimination* is considered to be a violation. This means that when management deliberately or arbitrarily discriminates against a person or group of persons based on personal characteristics, they are violating fair housing laws. This might include persons with tattoos, numerous body piercings, unusual hair styles, overweight persons, etc.

Technically, we all belong to several of these protected classes by virtue of just being male or female, married or unmarried, of a particular race, color, nationality, etc. If owners and leasing professionals/managers treat EVERYONE who comes in the door, calls on the phone, emails or contacts them via the internet with equal courtesy and provides the same opportunities to EVERYONE, the need for "protected classes" could ultimately be a thing of the past.

Petitioner Plaintiff, **ABANOOB ABDEL-MALAK** ("Abanoob"), is an individual and first generation born citizen of the United States of America residing in Norwalk, California. Plaintiff **ABANOOB ABDEL-MALAK,** is an unemployed individual because of the Defendants' false arrest and unlawful takings of his court documents on his first day of his new start in his career; and an ex- law student and ex-commercial real estate appraiser trainee and a resident of Los Angeles County, California.

Plaintiff is a 28-year-old, first-generation loving son to a widowed mother. Plaintiff, **ABANOOB ABDEL-MALAK**, is Coptic Orthodox, a Christian minority in Egypt whose parent's fled Alexandria, Egypt to avoid persecution. Plaintiff is now fighting for his life and career with no money and medical debt incurred from the Defendants. After one year of fighting to not be framed because of being a male, a middle eastern with a "terrorist" profile and name of "**ABANOOB MOUNIR RAGHEB ABDEL MALAK**" and for speaking "Arabic", and for not being white and not a local resident of the County of Riverside, I am a Protected Class under the

- 51 -

EX-PARTE APPLICATION

1  Ralph Act and a surviving victim of the most brutal HATE CRIMES.
2  Plaintiff has olive skin and dark facial hair with curly dark brown hair,
   and is a minority and non-white, and was called a "**sand nigger**" by
3  Defendants'. I was stereotyped as an "aggressive middle eastern/Arab
4  man who abuses women".

5      Plaintiffs' company **SINAI ACQUISITIONS LLC**, ("**Sinai**"), is a
   California Limited Liability Company with its' principal place of business
6  in Fontana, County of San Bernardino, California. Directly and through
7  its' networking, would acquire real estate acquisitions and develop and/or
   invest in joint venture investments. But directly due to Defendants'
8  conduct, the company has lost a $125,000.00 profit and its' future earning
9  capacity due to injuries and damages suffered from Defendants' Hate
   Crimes and corruption. Plaintiff, **SINAI ACQUISITIONS LLC,**
10 ("**Sinai**"), is a California real estate limited liability company authorized
11 to do business in the United States with its' principal business place of
   business located at 4863 Ravenwood Court, Fontana, California. **SINAI**
12 **ACQUISITIONS LLC**'s agent for service of process is Mark Lansing Esq.
13 located at 685 Sawyer Place, Upland, California 91786.

14     • ☐

15 **[a] Privacy as Fundamental Interest**
16 In Roe v. Wade (1973) 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147, reh'g
   denied, 410 U.S. 959, 93 S. Ct. 1409, 35 L. Ed. 2d 694, the Supreme Court
17 examined the constitutionality of a Texas statute that prohibited
18 abortions unless they were undertaken on medical advice for the purpose
   of saving the mother's life. The Court held that the statute violated the
19 due process clause of the Fourteenth Amendment. The basis for its
20 holding was its view that a right of personal privacy or guarantee of
21 certain zones of privacy exists under the federal Constitution, particularly
   as part of the concept of liberty guaranteed by the first section of the
22 Fourteenth Amendment, which provides that no state may deprive any
23 person of life, liberty, or property without due process of law. This right of
   privacy, as the Court pointed out, is applicable to activities relating to
24 marriage, procreation, contraception, family relationships, child rearing,
25 and education; but it applies only to personal rights which can be deemed
   fundamental or "implicit in the concept of ordered liberty." The Court
26 concluded that the right of privacy is broad enough to encompass a
27 woman's decision to terminate her pregnancy. Thus, the statute in
28 question could be justified only if it served a compelling state interest and

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  was narrowly drawn to express only the legitimate state interests at
2  stake; and the statute could not satisfy these criteria.
   Roe treated privacy as a fundamental interest for purposes of due process
3  analysis rather than equal protection analysis. However, in a subsequent
4  decision, the Court cited Roe without further discussion as an example of
   classifications subject to strict scrutiny under the equal protection clause
5  because they impermissibly interfered with the exercise of a fundamental
6  right [Massachusetts Bd. of Retirement v. Murgia (1976) 427 U.S. 307,
   312, 96 S. Ct. 2562, 49 L. Ed. 2d 520; see Skinner v. Oklahoma (1942) 316
7  U.S. 535, 541–542, 62 S. Ct. 1110, 86 L. Ed. 1655 (set out in
8  § 35A.36[4][a], decided before the right of privacy cases but dealing with
9  one aspect of that right—procreation—as an equal protection issue)].
   In Long Beach City Employees Assn. v. City of Long Beach (1986) 41 Cal.
10 3d 937, 227 Cal. Rptr. 90, 719 P.2d 660, a subdivision of defendant city
11 began requiring its employees to undergo polygraph examinations after
   money was stolen from the bureau operations. Plaintiff filed a complaint
12 for a temporary restraining order and injunctive relief to prevent
13 administration of the examinations, claiming that the compulsory
14 polygraph examinations were unconstitutional. The trial court denied the
   relief. Plaintiff appealed.
15 The California Supreme Court reversed, based on its finding that the
16 examinations were a violation of the employees' privacy rights. Cal.
   Const., art. I, § 1, specifies privacy as an inalienable right. The Court
17 observed that if there is a quintessential zone of human privacy it is the
18 mind (41 Cal. 3d 937, 943–944). Although the Court did not characterize
19 the test as one of "strict scrutiny," its opinion made it clear that strict
   scrutiny was the appropriate test before interfering with the fundamental
20 right of privacy. Because the Court found that polygraph examinations
21 impinged on the fundamental right of privacy, a rational relationship was
   not enough. Defendant had the burden of demonstrating that its
22 classifications of which employees were required to take the examination
23 were justified by a compelling governmental interest and that the
   distinctions drawn were necessary to further that purpose (41 Cal. 3d 937,
24 948). The Court noted that public employees are trustees of the public
25 interest and thus owe a special duty of integrity. Nevertheless, the Court
   found that this duty alone, without more, did not provide a compelling
26 justification for such an inherent intrusion on an ordinary public
27 employee's fundamental right of privacy, particularly when less intrusive
28 means to investigate alleged wrongdoing are available (41 Cal. 3d 937,

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

952). The Court found that defendant had failed to meet its burden (41 Cal. 3d 937, 956).

- **[b] Elements of Privacy**

In Carey v. Population Serv. Int'l (1977) 431 U.S. 678, 97 S. Ct. 2010, 52 L. Ed. 2d 675, the Supreme Court held that a New York statute which controlled the sale and distribution of contraceptives violated the constitutional right to privacy. The Court affirmed its conclusion in Roe v. Wade (1973) 410 U.S. 113, 152, 93 S. Ct. 705, 35 L. Ed. 2d 147, reh'g denied, 410 U.S. 959, 93 S. Ct. 1409, 35 L. Ed. 2d 694 [set out under § 35A.41[3][a]], that the right of personal privacy is one aspect of the "liberty" protected by the due process clause of the Fourteenth Amendment and it protects personal decisions relating to marriage, procreation, contraception, child rearing, and education from unjustified governmental interference. The Court noted that the outer limits of this right of privacy had not yet been determined.

The factual background of Roe v. Wade (1973) 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147, reh'g denied, 410 U.S. 959, 93 S. Ct. 1409, 35 L. Ed. 2d 694, is discussed in § 35A.41[3][a].

In American Academy of Pediatrics v. Lungren (1997) 16 Cal. 4th 307, 66 Cal. Rptr. 2d 210, 940 P.2d 797, after concluding that a statute impinging on the fundamental autonomy privacy right of a minor or an adult must be evaluated under the compelling interest test, the California Supreme Court declared unconstitutional a statute requiring pregnant minors to secure either parental consent or judicial authorization before obtaining an abortion. The Court made clear that statutory intrusion on an autonomy privacy interest of a fundamental nature may not be justified simply by showing that the statute serves a legitimate competing interest sufficient to justify an impingement on a less central privacy interest. Though a statute's relationship to minors is properly employed in the constitutional calculus in determining whether an asserted state purpose or interest is compelling, because the statute's impact on minors is taken into account in assessing the importance of the state interest ostensibly served by the infringement, it is inappropriate additionally to lower the applicable constitutional standard under which the statute is evaluated simply because the privacy interests at stake are those of minors (16 Cal. 4th 307, 341–342).

☐ **[4] Additional Authorities**

- **[a] Privacy as Fundamental Interest**

Yohner v. Cal. Dept. of Justice (2015) 237 Cal. App. 4th 1, 187 Cal. Rptr. 3d 550 was an action to prevent the California Department of Justice (the

*EX-PARTE* APPLICATION

Department) from listing his name and information concerning a sexual offense that he committed on its Megan's Law Internet Web site. Plaintiff suffered a conviction for committing a lewd act on his stepgranddaughter in violation of of <u>Pen. Code § 288(a)</u>. <u>Penal Code Section 290.46</u> mandated that the Department post information concerning sex offenders and their crimes on an Internet Web site. When specified criteria were met, the victim's parent, stepparent, sibling, or grandparent could apply for and receive an exclusion from the Web site [see <u>Pen. Code § 290.46(e)(2)(D)(i)</u>]. The Department denied plaintiff's application for exclusion from the Web site on the ground that he was the victim's stepgrandparent, rather than her grandparent, and he was not eligible for the exclusion. Plaintiff then filed a petition for writ of mandate in the trial court in which he requested that the trial court direct the Department to exclude him from the Web site, which the trial court denied (237 Cal. App. 4th <u>supra at 4–6</u>). The Court of Appeal affirmed. The court first held that "grandparent" in <u>Pen. Code § 290.46</u> did not encompass stepgrandparents (<u>Yohner, supra, at 6–12</u>). The court then held that <u>Pen. Code § 290.46(e)(2)(D)(i)</u> is constitutional in its exclusion of stepgrandparents. The rational relationship test applied, because the statute did not implicate the fundamental right to privacy. The court then found that stepgrandparents and grandparents were not similarly situated. A grandparent has a biological tie to the child, and the law has long recognized the distinction between those having biological ties to a child and those whose relationship is premised on marriage. However, assuming grandparents and stepgrandparents were sufficiently similarly situated to warrant equal protection scrutiny, the limitation of the exclusion to grandparents was clearly rationally related to a legitimate governmental objective. The Legislature could have rationally concluded that a victim's relationship with a biological grandparent was likely to be of greater permanence than a relationship with a stepgrandparent based on marriage, and, the public safety benefits to be gained by disclosure on the Website outweighed any potential family preservation goals fostered by the exclusion (<u>Yohner, supra, at 12–14</u>).

- ☐

## [a] Personal Liberty as Fundamental Interest
The factual background of <u>People v. Olivas (1976) 17 Cal. 3d 236, 131 Cal. Rptr. 55, 551 P.2d 375</u>, is discussed in <u>§ 35A.20[3][e]</u>. The defendant in that case argued that former Welf. & Inst. Code § 1731.5 violated his guarantee of equal protection under the laws because under its provisions

EX-PARTE APPLICATION

an individual between the ages of 16 and 21 could be committed to the youth authority and serve a potentially longer term than the maximum jail sentence imposed for the same offense on persons who were 21 or older. The Supreme Court agreed with defendant's contention and declared the law unconstitutional. The Court determined that the interest involved was personal liberty, an interest which has origins in Anglo-American legal history and is reflected in the constitutional guarantee of the right to a fair trial for those accused of a crime. It concluded that personal liberty is a fundamental interest which, in the words of the Court, is second only to life itself as an interest protected under both the state and federal Constitutions.

Olivas is an interesting decision because of the approach taken to determine, for the first time in California, whether personal liberty represented an interest which was fundamental for purposes of equal protection analysis. The Court noted that courts in other states and lower federal courts had reached conflicting conclusions. It then reviewed the legal precedents for the personal liberty concept beginning with the Magna Carta. It examined in particular the various guarantees of due process which exist largely because of a great concern in our system of justice for procedures which may result in deprivations of personal liberty. The fact that the California Constitution requires a unanimous jury verdict manifests an even stronger concern for unwarranted deprivations of personal liberty by the state than can be found in the due process clause of the Fourteenth Amendment. The Court concluded that if the United States and California Constitutions were vigilant through their due process clauses in protecting against the initial deprivation of personal liberty, they could be no less vigilant in protecting through their equal protection clauses against continuing deprivations of liberty.

Counsel will note, however, that the interest in personal liberty is not necessarily infringed by all classifications which affect the possible loss of freedom. Thus, the California Supreme Court declined to apply strict scrutiny in In re Mitchell P. (1978) 22 Cal. 3d 946, 950 n.3, 151 Cal. Rptr. 330, 587 P.2d 1144, on the ground that disparity in evidentiary rules governing juvenile and criminal proceedings is not a classification directly affecting the liberty interest.

Counsel will note that in regard to the individual's interest in a unanimous jury verdict, an interest closely related to personal liberty, the California Supreme Court has commented that the individual's right to a unanimous verdict in a criminal case is a fundamental interest for the purposes of equal protection analysis [People v. Olivas (1976) 17 Cal. 3d

EX-PARTE APPLICATION

236, 246, 131 Cal. Rptr. 55, 551 P.2d 375; People v. Superior Court (1967) 67 Cal. 2d 929, 932, 64 Cal. Rptr. 327, 434 P.2d 623; see Cal. Const., art. I, § 16]. Further, the Court has held that the individual's right to a unanimous verdict is also a fundamental interest in civil commitment proceedings [People v. Feagley (1975) 14 Cal. 3d 338, 356, 121 Cal. Rptr. 509, 535 P.2d 373 (denial of unanimous jury verdict requirement to persons committed under the mentally disordered sex offender law while it is provided to persons committed as mentally disordered persons not justified by compelling state interest)]. Nevertheless, the practical necessity for this latter principle is questionable in view of the rulings which interpret Cal. Const., art. I, § 16 to guarantee a unanimous jury verdict not only in criminal cases but also in the civil commitment proceedings for alleged mentally disordered sex offenders and narcotics addicts even though the constitutional provision does not by its terms apply to "civil" actions [see People v. Thomas (1977) 19 Cal. 3d 630, 641–644 fn. 12, 139 Cal. Rptr. 594, 566 P.2d 228].

• [b] Considerable Restraint as Sufficient

The factual background of People v. Olivas (1976) 17 Cal. 3d 236, 131 Cal. Rptr. 55, 551 P.2d 375, is discussed in § 35A.20[3][e]. In that case, the Supreme Court was required to determine whether commitment to a youth authority institution could be viewed as a restraint on personal freedom. The Court admitted that youth authority wards may experience greater freedom than individuals confined in state prisons or mental hospitals but concluded that any institutional process which involved physical restraint of the person was an infringement of personal liberty. In fact, in the Court's view, the types of limitations and controls which accompany an individual's release on parole also exert a comparable restraint on personal liberty because they amount to a considerable limitation on the freedom of action which all other citizens possess.

□ [4] Additional Authorities

• [a] Personal Liberty as Fundamental Interest

In Humphrey v. Cady (1972) 405 U.S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394, the Supreme Court held that a statute which permitted the "massive curtailment of liberty" involved in compulsory confinement for psychiatric treatment violated the equal protection clause because it denied a jury trial on the issue of whether or not commitment standards had been met even though a different state law permitted a jury trial in essentially equivalent situations. The Court did not discuss the nature of personal liberty as a constitutionally protected interest and had no occasion to

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

invoke the strict scrutiny test since it believed that the differential statutory treatment was arbitrary.

In O'Connor v. Donaldson (1975) 422 U.S. 563, 95 S. Ct. 2486, 45 L. Ed. 2d 396, the Supreme Court held that a state which confines an individual who is not dangerous and is capable of surviving freely and safely either by himself or with the help of family or friends violates the individual's constitutional right to "freedom." This case was an action for damages under 42 U.S.C. § 1983 for deprival of constitutional rights under color of state law, and the Court did not discuss the right to personal freedom in terms of equal protection analysis.

**First Amendment Guarantees as Fundamental Interests**

In Police Dep't v. Mosley (1972) 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212, the United States Supreme Court examined the validity of a Chicago ordinance that made it a criminal offense to picket within 150 feet of a school building while school was in session but exempted peaceful picketing of a school involved in a labor dispute. Because the ordinance divided picketing into two classes, the Court analyzed the ordinance in terms of the equal protection clause and held the ordinance unconstitutional because it made an impermissible distinction between labor picketing and other peaceful picketing. The Court's analysis in effect treats First Amendment guarantees like other fundamental interests that are subject to strict judicial scrutiny. It first noted that the equal protection claim was closely intertwined with First Amendment interests. Under the equal protection clause, as well as the First Amendment itself, the government may not grant the use of a forum to people whose views it finds acceptable but deny use to those wishing to express less favored or more controversial views. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone. The Court cited Niemotko v. Maryland (1951) 340 U.S. 268, 273, 71 S. Ct. 325, 95 L. Ed. 267, which held that the completely arbitrary and discriminatory refusal to grant a permit for use of a public park was a denial of equal protection, as its principle authority.

Second, the Court pointed out that it is not the case that all picketing must always be allowed. Under an equal protection analysis, there may be sufficient regulatory interests justifying selective exclusions or distinctions among pickets. And the state may have a legitimate interest in prohibiting some picketing to protect public order. But these justifications for selective exclusions from a public forum must be

EX-PARTE APPLICATION

carefully scrutinized. Because picketing plainly involves expressive conduct within the protection of the First Amendment, discrimination among pickets must be tailored to serve a substantial governmental interest.

Mosley was followed by a California court of appeal in Ghafari v. Municipal Court (1978) 87 Cal. App. 3d 255, 265–266, 150 Cal. Rptr. 813 (statute prohibiting appearance in public with face concealed violated equal protection).

Thereafter, four justices of the United States Supreme Court applied the principles of Mosley in Young v. American Mini Theatres (1976) 427 U.S. 50, 63–73, 96 S. Ct. 2440, 49 L. Ed. 2d 310. Although the issue was whether a statutory classification in a city zoning ordinance which differentiates between motion picture theaters which exhibited sexually explicit adult movies and those which did not was constitutional, the basis for the opinion's equal protection analysis is not clear. The opinion asserts that even though Mosley said that selective exclusion from a public forum may not be based on content alone, material with an erotic content may be placed in a different classification from nonerotic forms of expression. It then proceeded to determine whether the classification which regulated the geographic localities in which such movies could be exhibited but did not suppress or greatly restrict access to the movies was justified by the city's interest in preserving the character of its neighborhoods, and concluded that because the city's interest in the present and future character of its neighborhoods adequately supports its classification of motion pictures, the ordinance did not violate the equal protection clause.

☐ **Employment as Fundamental Interest**

In Hardy v. Stumph (1978) 21 Cal. 3d 1, 145 Cal. Rptr. 176, 576 P.2d 1342, plaintiff petitioned for a writ of mandate to challenge the City of Oakland's physical agility test for female police officers which she had failed. The trial court denied the petition and plaintiff appealed to the California Supreme Court which affirmed on the ground that use of the test did not constitute a denial of equal protection or a violation of the Civil Rights Act of 1964. One of plaintiff's arguments was that the test, which disqualified a disproportionate number of female applicants, abridged the fundamental right of women to pursue employment. The Court rejected this contention because the right to pursue a lawful occupation is fundamental only if the employment sought is a common occupation within the community. It cited a dictim in D'Amico v. Board of Medical Examiners (1974) 11 Cal. 3d 1, 18, 112 Cal. Rptr. 786, 520 P.2d

*EX-PARTE* APPLICATION

10 [set out in § 35A.20[3][d]], for the rule that an individual does not possess a fundamental right to pursue an occupation wherein technical complexity and intimate relationship to the public interest and welfare counsel deference to legislative judgment. On these criteria, law enforcement is hardly a common occupation.

The factual background of Sail'er Inn, Inc. v. Kirby (1971) 5 Cal. 3d 1, 95 Cal. Rptr. 329, 485 P.2d 529, is discussed in § 35A.20[3][a]. In that case, petitioners challenged on equal protection grounds a statute which restricted the employment of women bartenders. The Supreme Court in declaring the statute unconstitutional held that application of the strict standard of review was necessary, not only because the statutory classification was based on sex but because the statute limited the fundamental right of one class of persons to pursue the lawful profession of bartending. The Court relied for this conclusion principally on the rule in both Purdy & Fitzpatrick v. California (1969) 71 Cal. 2d 566, 578, 79 Cal. Rptr. 77, 456 P.2d 645, which held that any limitation on the opportunity for employment impedes the achievement of economic security which is essential for the pursuit of life, liberty, and happiness and can only be sustained after careful scrutiny, and Truax v. Raich (1915) 239 U.S. 33, 41, 36 S. Ct. 7, 60 L. Ed. 131, in which the United States Supreme Court stated that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Fourteenth Amendment to secure.

☐ [b] Expansion of Principle

Although there is language in Sail'er Inn which suggests that an individual has a fundamental right to pursue any lawful occupation, the Court disavowed such broad language in Hardy v. Stumph, discussed above. It is not possible to determine whether the decisions of the United States Supreme Court would support the reasoning in Hardy because the Court has not ruled explicitly on employment as a fundamental interest for the purposes of equal protection analysis. In Examining Bd. v. Flores de Otero (1976) 426 U.S. 572, 603–604, 96 S. Ct. 2264, 49 L. Ed. 2d 65 [set out in § 35A.31[3][a]], the Court quoted the rule of Truax that the right to pursue a common occupation of the community was fundamental; but referred repeatedly throughout the opinion to employment in a "lawful occupation" and struck down, as a violation of equal protection, restrictions on the practice of engineering and architecture which conceivably are not common occupations under the standard of Hardy. Nevertheless, the primary reason for the result in Examining Bd. was

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  discrimination against aliens in these occupations. It is also true,
2  however, that one of the cases relied on by Truax describes the right of
3  citizens to earn a livelihood by any lawful calling and to pursue any
   livelihood or avocation as a liberty interest protected by the <u>due process
4  clause of the Fourteenth Amendment</u> [<u>Allgeyer v. Louisiana (1896) 165
   U.S. 578, 589, 591, 17 S. Ct. 427, 41 L. Ed. 832</u>, questioned on another
5  point in Lincoln Fed. Labor Union No. 19129, <u>American Fed. of Labor v.
6  Northwestern Iron & Metal Co. (1948) 335 U.S. 525, 535, 69 S. Ct. 251, 93
   L. Ed. 212</u>]. But this case also refers to the privilege of pursuing an
7  ordinary calling or trade. Arguably, Sail'er Inn is authority for the
8  additional proposition that a classification which burdens the right to
9  pursue any employment—common or not—is subject to strict scrutiny
   where the basis for the burden is a suspect category such as sex or race.
10
11      • ☐
    **Right to Travel Is Fundamental Interest**
12  In <u>Memorial Hosp. v. Maricopa County (1974) 415 U.S. 250, 94 S. Ct.
13  1076, 39 L. Ed. 2d 306</u>, a county refused to pay for nonemergency
14  hospitalization of or medical care for an indigent who did not meet the
    one-year county residence requirement created by an Arizona statute. The
15  United States Supreme Court held that this durational residence
16  requirement was an infringement on the right to travel. As such, it could
    only be justified by a compelling state interest, and in this case, the state
17  could not provide a justification.
18  The factual background of <u>In re King (1970) 3 Cal. 3d 226, 90 Cal. Rptr.
19  15, 474 P.2d 983</u>, cert. denied, <u>403 U.S. 931 (1971)</u>, is discussed in
    § 35A.20[3][d]. Petitioner sought to invalidate a child support statute that
20  placed a higher penalty on nonsupporting fathers who lived outside
21  California. The state argued that the enhanced penalty facilitated its
    legitimate interest in enforcing child support obligations because it
22  "encouraged" absent fathers to move to and remain in California. The
23  Court responded that even if the statute was rationally related to the
    state's interest, it violated the individual's constitutional right to travel.
24  The Court noted that even though the right to travel from one state to
25  another is not explicitly mentioned in the United States Constitution, it
    was firmly established and repeatedly recognized. The Court noted
26  further that it was not necessary to determine whether former Penal Code
27  § 270 as an infringement of the fundamental constitutional right to travel
28  could be justified by a compelling government interest, since the basic

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

objective of the law—to induce nonsupporting fathers to come to California—was not constitutionally legitimate.

• [b] Scope of Right to Travel

The factual background of In re King (1970) 3 Cal. 3d 226, 90 Cal. Rptr. 15, 474 P.2d 983, cert. denied, 403 U.S. 931 (1971), is discussed in § 35A.20[3][d]. Petitioner sought to invalidate a child support statute that placed a higher penalty on nonsupporting fathers who lived outside California. The California Supreme Court, in declaring the statute unconstitutional as a violation of equal protection under the federal Constitution, held that the constitutional right to travel embodies more than merely the right to cross state lines and move about the country; it includes as well the right of the individual freely to choose a state of residence. It thus encompasses a statutory provision which penalizes the decision to reside in a state other than California.

• [c] Durational Residence Requirement Is Burden on Right to Travel

The factual background of Memorial Hosp. v. Maricopa County (1974) 415 U.S. 250, 94 S. Ct. 1076, 39 L. Ed. 2d 306, is discussed in § 35A.37[3][a]. The United States Supreme Court held that durational residence requirements were not, per se, unconstitutional as an infringement on the right to travel, but that a requirement that penalized the exercise of the right to travel by restricting the ability to obtain such necessities of life as medical care, food, or shelter must be justified by a compelling state interest. The Court held that the state could not provide such a justification.

Counsel will note that the Supreme Court has declined to view durational residence requirements in suits for dissolution of marriage as an unconstitutional infringement on the right to travel. The Court stated that a state's interest in the regulation of domestic relations provided a much stronger justification for those requirements than administrative convenience proposed as a justification in Memorial Hosp. [see Sosna v. Iowa (1975) 419 U.S. 393, 416–417, 95 S. Ct. 553, 42 L. Ed. 2d 532].

In Somers v. Superior Court (2009) 172 Cal. App. 4th 1407, 1414–1416, 92 Cal. Rptr. 3d 116, an individual who was born in California in 1941, was issued a California birth certificate, which identified her sex as male. In 2005, she underwent gender reassignment surgery. She subsequently obtained an order from a court in Kansas, where she resided, legally changing her name, and then a Kansas driver's license, reflecting her new name, and indicating her sex as female. She also obtained a Medicare card reflecting her new name and gender. She was advised by two Kansas attorneys regarding changing her birth certificate that Kansas law did not

EX-PARTE APPLICATION

permit issuance of a new birth certificate to reflect a change of gender. She filed a petition under Health & Safety Code § 103425 in a California Superior Court for change of gender and issuance of new California birth certificate. She included a declaration from her physician indicating that she had undergone gender reassignment surgery, and a copy of the Kansas order for name change. She also filed her declaration and the declaration of one of her Kansas attorneys, indicating that she could not obtain the relief sought in Kansas. The trial court denied the petition on the basis that she was not a resident of California (172 Cal. App. 4th 1407, 1410–1411). The Court of Appeal held that the statutory requirement that she file her petition for new California birth certificate under Section 103425 in her county of residence, when she resided outside California, violated her equal protection rights under the Fourteenth Amendment and the California Constitution. The court found first that a birth certificate is a vital, primary source of personal identification, necessary to obtain other forms of identification such as a Social Security card or passport (172 Cal. App. 4th 1407, 1411). The court then found that the trial court had jurisdiction to grant the petition. The court had subject matter jurisdiction to order issuance of a new California birth certificate to reflect the gender reassignment of an individual born in California pursuant to the statutory scheme, and it had personal jurisdiction over the individual, who consented to the court's jurisdiction by voluntarily filing the petition and personally appearing at the hearing (172 Cal. App. 4th 1407, 1411–1412). The court then held that the statutory requirement that an individual filing a petition under Health & Saf. Code § 103425 for issuance of a new California birth certificate file in the county of his or her residence was a violation of the equal protection and clause as applied to nonresident transgender individuals who were born in California. The court first determined that strict scrutiny was the appropriate standard to apply, given that the classification implicated the constitutionally guaranteed right of interstate travel because it penalizes California-born transgender individuals for moving to a state outside of California (172 Cal. App. 4th 1407, 1413–1415). Further, on review of the legislative history of Section 103425, the court found no reason for the requirement that individuals seeking issuance of a new California birth certificate file the petition in their county of residence. Thus, the court could discern no compelling state interest in treating California-born transgender individuals who reside out of state differently from California-born transgender individuals who reside in California when either class seeks issuance of a new California birth certificate under § 103425 (172 Cal.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

App. 4th 1407, 1415). The court also found that even if constitutional rights were not implicated by the classification, there was no rational basis for the disparate treatment. Accordingly, the requirement that a petitioner under Health & Safety Code § 103425 file the petition in the county of his or her residence denied California-born transgender individuals residing outside California the same rights that California-born transgender individuals residing in California had under Section 103425 (172 Cal. App. 4th 1407, 1415–1416).

☐ [4] Additional Authorities
  • [a] Right to Travel Is Fundamental Interest

Shapiro v. Thompson (1969) 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600, is the seminal decision describing the fundamental right of travel. In Shapiro, the United States Supreme Court held that state statutes requiring one year of residence as a condition precedent for receipt of state welfare funds violated the equal protection clause of the Fourteenth Amendment by impinging on the constitutional right to travel freely from state to state. The Court reasoned that the nature of the federal union and the constitutional concepts of personal liberty both require that all citizens be free to travel throughout the nation uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement. Even though the right to travel is not explicitly mentioned in the federal Constitution, the Court found no need to locate a particular constitutional provision granting it. It is sustained, instead, as a constitutional right by its obvious necessity to creation of a strong union and its long recognition as a basic right under the federal Constitution. The statutes may not be justified on the ground that they discourage the poor from travel to a state; that kind of discouragement directly chills the assertion of a constitutional right by penalizing those who choose to exercise it.

  • ☐
  **Right to Acquire Property as Fundamental Interest**

In Shelley v. Kraemer (1947) 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161, the petitioners were individuals who had bought a house in Missouri which was subject to a restrictive agreement that no part of the property be occupied by a person not of the "Caucasian race." Other parties to the agreement, who were owners of property in the area, sued to restrain petitioners, who were black, from taking possession. The trial court denied relief, but the Missouri Supreme Court reversed. The United States Supreme Court then granted certiorari and reversed the Missouri Supreme Court on the ground that judicial action enforcing the restrictive

*EX-PARTE* APPLICATION

1   agreements was state action for purposes of the <u>Fourteenth Amendment</u>
2   and discriminated on the basis of color in the enjoyment of property
3   rights. Although the Court was not required to determine whether
    property rights were fundamental interests for purposes of analysis under
4   the two-tier standard, it stated that, without doubt, the rights to acquire,
    enjoy, own, and dispose of property were among the civil rights intended
5   to be protected from discriminatory state action by the <u>Fourteenth</u>
6   <u>Amendment</u>. Equality in the enjoyment of property rights was regarded
    by the framers of the amendment as an essential precondition to the
7   realization of other basic civil rights and liberties which the amendment
8   was intended to guarantee.
9   The factual background of <u>Fujii v. California (1952) 38 Cal. 2d 718, 242</u>
    <u>P.2d 617</u>, is discussed in <u>§ 35A.30[3][a]</u>. In that case, the California
10  Supreme Court held that the state's former Alien Land Law [Stats. 1921,
11  p. 1xxxiii, as amended] violated the <u>equal protection clause of the</u>
    <u>Fourteenth Amendment</u> because it discriminated on the basis of
12  nationality in regard to the right of owning property. The Court pointed
13  out that, unquestionably, the rights to acquire, enjoy, own, and dispose of
14  property are among the civil rights intended to be protected from
    discriminatory state action by the <u>Fourteenth Amendment</u> and that the
15  power of a state to regulate the use and ownership of land must be
16  exercised subject to the controls and limitations of that amendment.
    ☐  [4] Additional Authorities
17      •  [a] Right to Acquire Property as Fundamental Interest
18  In <u>Mulkey v. Reitman (1966) 64 Cal. 2d 529, 50 Cal. Rptr. 881, 413 P.2d</u>
    <u>825</u>, aff'd, <u>387 U.S. 369, 87 S. Ct. 1627, 18 L. Ed. 2d 830 (1967)</u>, plaintiffs,
19  a black couple, brought an action for violation of the Unruh Civil Rights
20  Act [<u>Civ. Code § 51</u>] on account of discrimination in housing. The trial
21  court granted defendants' motion for summary judgment on the ground
    that former Cal. Const., art. I, § 26, incorporated into the Constitution as
22  a result of the voter's approval of Proposition 14 in 1964, nullified the
23  application of the Act to housing discrimination by prohibiting the state
    from limiting the right of individuals to dispose of real property in any
24  way they chose. Plaintiffs appealed to the California Supreme Court. The
25  Supreme Court reversed, finding that Proposition 14 violated the <u>equal</u>
    <u>protection clause of the Fourteenth Amendment</u>. The Court held the role
26  of the state in encouraging private discrimination was state action which
27  denied the guarantee of equal protection because it failed to protect the
28  individual's right to acquire, enjoy, own, and dispose of property which is

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  essential to the realization of other basic rights and liberties which the
2  Fourteenth Amendment was intended to guarantee.

3  **Right to Acquire Property as Fundamental Interest**
4  In People v. Delacy (2011) 192 Cal. App. 4th 1481, 122 Cal. Rptr. 3d 216,
   defendant was charged with four counts of unlawful possession of
5  firearms under Pen. Code § 12021(c)(1), based on convictions within the
6  past 10 years of misdemeanor battery under Pen. Code § 242, one of the
   misdemeanors enumerated in § 12021(c)(1), and one count of unlawful
7  possession of ammunition under Pen. Code § 12316(b)(1). The firearms
8  and ammunition charges were tried separately. Prior to trial in the
9  firearm case, defendant moved to dismiss the information on the ground
   Pen. Code § 12021(c)(1) violated the Second Amendment right to bear
10  arms, as interpreted in the United States Supreme Court's decision in
11  District of Columbia v. Heller (2008) 554 U.S. 570, 128 S. Ct. 2783, 171 L.
   Ed. 2d 637. The trial court denied the motion, relying on People v. Flores
12  (2008) 169 Cal. App. 4th 568, 86 Cal. Rptr. 3d 804, in which the court
13  rejected a post-Heller challenge to Pen. Code § 12021(c)(1) (People, supra,
14  at pp. 1485–1486).
   Defendant appealed, challenging the constitutionality of Pen. Code
15  § 12021(c)(1) as a violation of the Second Amendment right to bear arms
16  and equal protection. With regard to equal protection, defendant argued
   that § 12021(c)(a) violates equal protection because it prohibits firearm
17  possession by persons convicted of the California misdemeanors specified
18  in the statute, but not by persons convicted of similar offenses in other
   jurisdictions. By contrast, Pen. Code § 12021(a)(1), which bars firearm
19  possession by convicted felons, applies to any person convicted of a felony
20  "under the laws of the United States, the State of California, or any other
   state, government, or country" (192 Cal. App. 4th 1481 at 1493). The
21  Court of Appeal affirmed the convictions. In the absence of a suspect class
22  or a fundamental right, the equal protection challenge to § 12021(c)(1) was
23  to be evaluated under the rational basis test. The Court of Appeal had
   applied a rational basis level of scrutiny to a previous challenge to Pen.
24  Code § 12021(c)(1) in In re Evans (1996) 49 Cal. App. 4th 1263, 1269–
25  1274, 57 Cal. Rptr. 2d 314, challenging the aspect of § 12021(c)(1) that
   permitted certain individuals to seek relief from the statute's prohibition
26  on firearm possession. The Evans court refused to apply strict scrutiny
27  because the classification of misdemeanants did not involve a typically
28  suspect classification such as race or sex and the private right to bear
   arms was not a fundamental right under the Second Amendment.

EX-PARTE APPLICATION

1  However, the United States Supreme Court's recent Second Amendment
2  jurisprudence called into question the conclusion that the private right to
   bear arms is not a fundamental right. Following its determination in
3  Heller that the right to bear arms is a private right guaranteed by the
4  Second Amendment, the Court held in McDonald v. City of Chicago (2010)
   561 U.S. 742, 130 S. Ct. 3020, 3036, 3050, 3059, 177 L. Ed. 2d 894 that
5  this right is "fundamental" for purposes of the Due Process Clause of the
6  Fourteenth Amendment (plur. opn. of Alito, J. and conc. opn. of Thomas,
   J.). In United States v. Vongxay (9th Cir. 2010) 594 F.3d 1111, 1118–
7  1119, in which the defendant raised an equal protection challenge to the
8  federal felon-in-possession statute, the Ninth Circuit Court of Appeals
9  court rejected the defendant's argument that strict scrutiny should apply,
   reasoning the statute did not affect a fundamental right because the
10 defendant belonged to the class of persons who may be disqualified from
11 exercising Second Amendment rights under Heller, in which the Supreme
   Court purposefully differentiated the right to bear arms generally from
12 the more limited right held by felons. The Vongxay court accordingly
13 applied pre-Heller case law, specifically Lewis v. United States (1980) 445
14 U.S. 55, 100 S. Ct. 915, 63 L. Ed. 2d 198, that established rational basis as
   the standard of scrutiny for equal protection challenges relating to the
15 right to bear arms. The Court of Appeal found the Vongxay analysis
16 persuasive and followed it. Thus, the court held that because
   misdemeanants subject to Pen. Code § 12021(c)(1) were disqualified to the
17 same extent as felons from exercising Second Amendment rights, they
18 could claim no "fundamental" right that would invoke elevated scrutiny
   under the Equal Protection Clause, and the statute was subject only to a
19 rational basis analysis.
20 The court then found two separate rational bases for the failure of Pen.
21 Code § 12021(c)(1) to include out-of-state misdemeanants. By carefully
   enumerating the particular misdemeanors that disqualified a person from
22 weapons possession, the Legislature made a judgment that all crimes
23 serious enough to be classified as felonies are serious enough to justify
   depriving persons committing those crimes of the right to bear arms and
24 recognized that not all misdemeanors, which vary widely in substance and
25 seriousness, suggest that the violator cannot responsibly possess weapons.
   The concern that other jurisdictions might not treat misdemeanor crimes
26 with the same level of due process afforded in California justified the
27 differential treatment, and that as a practical matter it would be difficult
28 for the Legislature to extend § 12021(c)(1) to misdemeanor crimes
   committed in other states in a fair and equitable manner constituted

- 67 -

EX-PARTE APPLICATION

legitimate governmental concerns sufficient to justify the Legislature's decision not to include out-of-state misdemeanants under § 12021 (People, supra, at pp. 1493–1498).

## RULES FOR FILING COURT DOCUMENTS

**PRO SE INDIGENT LITIGANT DOES NOT HAVE ACCESS TO E-FILE AND IS MISTREATED BY JUDGES, COURT STAFF, ETC.**

- • 
  - ○ **Access to Courts as Fundamental Interest**

In Boddie v. Connecticut (1971) 401 U.S. 371, 91 S. Ct. 780, 28 L. Ed. 2d 113, a group of welfare recipients challenged the constitutionality of certain state procedures for the commencement of divorce proceedings, as the procedures had been applied to them, including the requirement of payment of court fees and costs for service of process. The Supreme Court held that withholding access to the courts on the basis of indigency when the purpose was to obtain a divorce violated the due process clause of the Fourteenth Amendment. Although the Court framed its views in terms of the due process clause, the test of constitutionality which it used is comparable to the strict scrutiny test in equal protection analysis. The Court stated first that due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims through the judicial process must be given a meaningful opportunity to be heard. Second, a statute or rule may be constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity is beyond question. The Court added that although it cannot be said that access to the courts for all individuals under all circumstances is guaranteed by the Fourteenth Amendment, such access was required in this case.

In Payne v. Superior Court (1976) 17 Cal. 3d 908, 132 Cal. Rptr. 405, 553 P.2d 565, an indigent prisoner's request to attend the trial of a civil case in which damages were sought against him was denied by state prison authorities. The Supreme Court held that the dual deprivation of appointed counsel and the right to personal presence is an unconstitutional violation of the prisoner's rights under the due process and equal protection clauses of both the state and federal Constitutions. The Court first noted that none of the constitutionally guaranteed freedoms would be secure if a person could be deprived of possessions

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

without an opportunity to defend them at a meaningful time and in a meaningful manner, and that the right of access to the courts included access to all courts, both state and federal, without regard to the type of petition or relief sought. When indigent prisoners are denied access to a court to defend a civil suit while free citizens and prisoners possessing the means to hire counsel possess such a right, the Court found that an equal protection question is raised in addition to that of due process. The Court concluded that since the right of access is one of fundamental constitutional dimension, its denial by the state must be supported by a compelling state interest. In this case, the state could not provide such a justification.

○ **[b] Denial of Indigent's Ability to Obtain Divorce**

The factual background of Boddie v. Connecticut (1971) 401 U.S. 371, 91 S. Ct. 780, 28 L. Ed. 2d 113, is discussed in § 35A.43[3][a]. Prior to rebutting the arguments put forth by the state to support its fee and cost requirements, the Supreme Court pointed out that since access to courts was the only way to obtain a divorce, refusal to admit indigents unless they pay the required costs was equivalent to denying them an opportunity to be heard on their claimed right to dissolution of their marriages, which in the absence of sufficient countervailing justification would be a denial of due process.

Subsequently, in Ortwein v. Schwab (1973) 410 U.S. 656, 658–659, 93 S. Ct. 1172, 35 L. Ed. 2d 572 and United States v. Kras (1973) 409 U.S. 434, 443–444, 93 S. Ct. 631, 34 L. Ed. 2d 626, the Supreme Court declined to extend the principle of *Boddie* to attempts by indigents to challenge administrative decisions affecting welfare benefits and to file a petition for bankruptcy, respectively, without payment of filing fees on the ground that the individual's interest in a bankruptcy discharge or increased welfare benefits is not of the same constitutional significance as the individual interest in the marital relationship. In California, however, the courts have an inherent power to waive filing fees for indigents and the California Supreme Court has ruled that whenever a motion to proceed in forma pauperis is supported by an affidavit sufficient on its face to show indigency, the court must grant the motion unless it has good reason to doubt the truthfulness of the factual allegations in the affidavit, or in unusual circumstances, order a hearing for the purpose of inquiring into the matter [Earls v. Superior Court (1971) 6 Cal. 3d 109, 114, 98 Cal. Rptr. 302, 490 P.2d 814]. Although the Court has commented that the rule assists indigents in securing their fundamental rights, the legal basis for the judicial power is common law usage [*see* Earls v. Superior Court

EX-PARTE APPLICATION

(1971) 6 Cal. 3d 109, 117, 98 Cal. Rptr. 302, 490 P.2d 814; Ferguson v. Keays (1971) 4 Cal. 3d 649, 653, 656 fn. 6, 94 Cal. Rptr. 398, 484 P.2d 70].

- **[c] Denial of Prisoners' Access to Legal Resources**

In Bounds v. Smith (1977) 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72, a group of prison inmates filed a law suit alleging that they were denied their rights under the Fourteenth Amendment when the state failed to provide legal research facilities. The district court held that this failure constituted a violation of the prisoners' rights both to access to the courts and to equal protection of the laws. The Supreme Court affirmed. In the course of its opinion, the Court emphasized that the constitutional right of access to the courts for prisoners has been established beyond doubt. The states must insure that such access is adequate, effective, and meaningful. Since prisoners are entitled to a reasonably adequate opportunity to present claims that their fundamental constitutional rights have been violated, the Court reasoned that states may even have to shoulder affirmative obligations to assure all prisoners meaningful access to the courts. It concluded that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.

- **[d] Denial of Prisoner's Ability to Defend Civil Suit**

The factual background of Payne v. Superior Court (1976) 17 Cal. 3d 908, 132 Cal. Rptr. 405, 553 P.2d 565, is discussed in § 35A.43[3][a].

"...**it is settled law that delivery of a pleading to a proper official is sufficient to constitute filing thereof.**" *United States v. Lombardo*, 241 U.S. 73, 36 S. Ct. 508, 60 L. Ed. 897 (1916); *Milton v. United States*, 105 F.2d 253, 255 (5th Cir. 1939). In *Greeson v. Sherman*, 265 F. Supp. 340 (D.C.Va.1967) it was held that a pleading delivered to a deputy clerk at his home at night was thereby "filed." (*Freeman v. Giacomo Costa Fu Adrea*, 282 F. Supp. 525 (E.D.Pa. 04/5/1968).)

FRCP Rule 5(d)(2): "**A paper is filed by delivering it: (A) to the clerk**"• FRCP Rule 77 (a) "When Court Is Open. Every district court is considered always open for filing any paper, issuing and returning process, making a motion, or entering an order."• **[emphasis added**.]

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

"The duty of the clerk is to make his record correctly represent the proceedings in the case."• (***Wetmore v. Karrick***, 27 S. Ct. 434, 205 U.S. 141 (U.S. 03/11/1907).) **Failing to file documents presented and reflect the documents on the docket is a failure to perform the ministerial duties of the Clerk of the Court. [emphasis added.]**

"...his [Clerk of the Court] job is to file pleadings and other documents, maintain the court's files and inform litigants of the entry of court orders." ***Sanders v. Department of Corrections***, 815 F. Supp. 1148, H49(N.D. Ill. 1993). (***Williams v. Pucinski***, 01C5588 (N.D.Ill. 01/13/2004).)

**The clerk of a court**, like the Recorder i**s required to accept documents filed**. It is not incumbent upon him to judicially determine the legal significance of the tendered documents. ***In re Halladjian***, 174 F. 834 (C.C.Mass.1909); ***United States, to Use of Kinney v. Bell***, 127 F. 1002 (C.C.E.D.Pa.1904); ***State ex rel. Kaufman v. Sutton***, 231 So.2d 874 (Fla.App.1970); ***Malinou v. McElroy***, 99 R.I. 277, 207 A.2d 44 (1965); ***State ex rel. Wanamaker v. Miller***, 164 Ohio St. 176, 177, 128 N.E.2d 110 (1955).) (***Daniel K. Mayers Et Al., v. Peter S. Ridley Et Al***. No. 71-1418 (06/30/72, United States Court of Appeals for the DC Circuit.) **[emphasis added.]**

The specific allegation in Mr. Snyder's complaint is that Mr. Nolen, acting as the Circuit Court Clerk, refused to file or actually removed already filed papers from the court's docket. Under Illinois law, **the clerk simply has the ministerial duty to file papers** that conform to the technical rules of court. See ***In re Estate of Davison***, 430 N.E.2d 222, 223 (Ill. App. Ct. 1981) ("Delivery alone has been held to constitute filing since the person filing has no control over the officer who receives documents. Subsequent ministerial tasks of the clerk evidence the filing of a document but are not essential to its perfection." (internal citation omitted)); ***Roesch-Zeller, Inc. v. Hollembeak***, 124 N.E.2d 662, 664 (Ill. App. Ct. 1955) ("**The duty of the clerk to file the document on the date it was presented to him was a ministerial act**, the performance of which could be compelled by writ of mandamus."). (***Snyder v. Nolen***, 380 F.3d 279 (7th Circuit, 08/13/2004).) **[emphasis added.]**

**The word "filed"** the Act uses, is, as applied to court proceedings, a word of art, having a long established and well understood meaning, deriving from the practice of filing papers on a string or wire. It **requires of one**

*EX-PARTE* APPLICATION

**filing a suit, merely the depositing of the instrument with the custodian for the purpose of being filed**. Except where some specific statute otherwise provides, and none such is present here, it charges him with no further duty, subjects him to no untoward consequences as a result of the failure of the custodian to do his duty, by placing the instrument on the file, or as in modern practice placing his file mark on the instrument. Collected in vol. 3 ***Words and Phrases***, First Series, pp. 2764-2770, inclusive; vol. 2 Words and Phrases, Second Series, pp. 531, 534, may be found cases from many jurisdictions, all to the same effect, that **the filing of a paper is the delivery of it to the officer at his office**, to be kept by him as a paper on file, and that the file mark of the officer is evidence of the filing, but it is not the essential element of the act. A paper may be filed without being marked or endorsed by the clerk, ***In re Conant's Estate***, 43 Or. 530, 73 P. 1018; ***Holman v. Chevaillier***, 14 Tex. 337; ***Eureka Stone Co. v. Knight***, 82 Ark. 164, 100 S.W. 878; ***Darnell v. Flynn***, 69 W.Va. 146, 71 S.E. 16. Perhaps the best statement of the meaning and consequences of filing is to be found in the ***Chevaillier*** case, supra. "Though the ancient mode of filing papers has gone into disuse, the phraseology of the ancient practice is retained, in the common expressions 'to file,' 'to put on file,' 'to take off the file,' &c., from 'filum' the thread, string, or wire used in ancient practice, for connecting the papers together. The term 'file' is also used to denote the paper placed with the Clerk, and assigned by the law to his official keeping. A file is a record of the Court.(1 Litt., 112; Burr. L.D. tit. File.) It is the duty of the Clerk, when a paper is thus placed in his custody or 'filed' with him, to endorse upon it the date of its reception, and retain it in his office, subject to inspection by whomsoever it may concern; and that is what is meant by his 'filing' the paper. But **where the law requires or authorizes a party to file it, it simply means that he shall place it in the official custody of the Clerk**. That is all that is required of him; and if the officer omits the duty of endorsing upon it the date of the filing, that should not prejudice the rights of the party. And hence it is the common practice, where that has been omitted, for the officer, with the sanction of the Court, to make the endorsement now for then; the doing of the act now, that is, at the time when it is actually done, being allowed to operate as a substitute and equivalent for doing it then, or when it should have been done. And acts thus allowed to be done by the Clerk of the Court, with the sanction of the Court, have the same effect as if they had been done at the proper time. (1 Stra. 639; 2 Tidd's Pr. 932.) It was the filing of the affidavit and certificate by the party, under the statute, and not the

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

endorsement of the date of their reception, or the filing by the Clerk, which was a condition precedent to the issuing of the execution in this case. The object of the motion to obtain the authority of the Court for the filing of the clerk now for then was that the Court might receive evidence of the time of the actual filing by the party, in order that the filing by the Clerk might relate back, and take effect from that period, as though it had been done then, when it should have been done. (***Milton v. United States***., 105 F.2d 253 (5th Cir. 07/06/1939).) ***Johansson v. Towson***, 177 F. Supp. 729 (M.D.Ga. 02/17/1959). [**emphasis added**.]

The Federal Rules of Civil Procedure provide that 'The district courts shall be deemed always open for the purpose of filing any pleading * * *' Rule 77(a); that 'The clerk's office with the clerk or a deputy clerk in attendance shall be open during business hours on all days except Sundays and legal holidays * * *', Rule 77(c); that 'A civil action is commenced by filing a complaint with the court', Rule 3 and that 'The filing of pleadings and other papers with the court as required by these rules shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with him, in which event he shall note thereon the filing date and forthwith transmit them to the office of the clerk.' Rule 5(e), 28 U.S.C.A. The tracing of our word 'file' to the Latin word 'filum' and its reference to the ancient practice of placing papers on a thread or wire for safekeeping and later reference is done in many cases, notably in ***United States v. Lombardo***, 1916, 241 U.S. 73, 36 S. Ct. 508, 60 L. Ed. 897 and more recently in ***Milton v. United States***, 5 Cir., 1939, 105 F.2d 253, 255. The latter case points out that **all that is required on the part of a person filing a paper with an official is 'merely the depositing of the instrument with the custodian for the purpose of being filed'.** (See ***Palcar Real Estate Co. v. Commissioner of Internal Revenue***, 8 Cir., 1942, 131 F.2d 210; ***Schultz v. United States***, Ct.Cl.1955, 132 F.Supp. 953, 955; ***McCord v. Commissioner of Internal Revenue***, 1941, 74 App.D.C. 369, 123 F.2d 164, 165; ***Central Paper Co. v. Commissioner of Internal Revenue***, 6 Cir., 1952, 199 F.2d 902, 904. (***Johansson v. Towson***, 177 F. Supp. 729 (M.D.Ga. 02/17/1959).) [**emphasis added**.]

**The filing of a paper takes place upon the delivery of it to the officer at his office.** ***Milton v. United States***, 5th Cir. 1939, 105 F.2d 253; ***Poynor v. Commissioner***, 5th Cir. 1936, 81 F.2d 521. When the mails are utilized for the purpose of filing an instrument, the filing takes

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

1  place upon delivery at the office of the official required to receive it.
2  *Wampler v. Snyder*, 1933, 62 App. D.C. 215, 66 F.2d 195. (*Phinney v.*
   *Bank of Southwest National Association*, 335 F.2d 266 (5th Cir.
3  08/05/1964).) (See also *United States v. Missco Homestead Ass'n Inc.*,
4  185 F.2d 283 (8th Cir. 11/01/1950).) (*Dienstag v. St. Paul Fire &*
   *Marine Ins. Co.*, 164 F. Supp. 603 (S.D.N.Y. 11/18/1957); *Thorndal v.*
5  *Smith, Wild, Beebe & Cades*, 339 F.2d 676 (8th Cir. 01/04/1965); *Lone*
6  *Star Producing Co. v. Gulf Oil Corp.*, 208 F. Supp. 85 (E.D.Tex.
7  07/17/1962).) [**emphasis added**.]

8  Although Lombardo was decided before the Federal Rules of Civil
9  Procedure were promulgated, courts have relied on it and *Federal Rules*
   *of Civil Procedure* 3, 5(e), and 77 for the same proposition. See, e.g.,
10 *Milton v. United States*, 105 F.2d 253, 255 (5th Cir. 1939)("**The word**
11 **'filed' . . . requires of one filing a suit, merely the depositing of the**
   **instrument with the custodian for the purpose of being filed.**
12 **Except where specific statute otherwise provides, and none such**
13 **is present here, it charges him with no further duty, [and]**
   **subjects him to no untoward consequences.**"); *Greeson v. Sherman*,
14 265 F.Supp. 340, 342 (W.D. Va. 1967)("[I]f rule 3 is read in conjunction
15 with Rule 5(e) . . . [a complaint is filed when] the complaint is delivered to
   an officer of the court who is authorized bo receive it."); *Freeman v.*
16 *Giacomo Costa Fu Andrea*, 282 F.Supp. 525, 527 (E.D.Pa. 1968)("[I]t is
17 settled law that delivery of a pleading to a proper official is sufficient to
18 constitute filing thereof.") In *Cintron v. Union Pacific R. Co.*, 813 F.2d
   917, 920 (9th Cir. 1987), the court said: The consensus is that "[p]apers
19 and pleadings including the original complaint are considered filed when
20 they are placed in the possession of the clerk of the court." C. Wright & A.
   Miller, *Federal Practice and Procedure* Â§ 1153 (1969). See *United*
21 *States v. Dae Rim Fishery Co.*, 794 F.2d 1392, 1395 (9th Cir. 1986). The
22 court then discussed earlier cases, including *Loya v. Desert Sands*
   *Unified School Dist.*, 721 F.2d 279 (9th Cir. 1983)â€¦. (*Stone Street*
23 *Capital, Inc. v. McDonald's Corp.*, 300 F.Supp.2d 345 (D.Md.
24 11/06/2003).) [**emphasis added**.]

25 **Filing is complete once the document is delivered to and received**
26 **by the proper official.** *United States v. Lombardo*, 241 U.S. 73, 76, 36
27 S.Ct. 508, 60 L.Ed. 897 (1916). Although *Lombardo* was decided before
   the Federal Rules of Civil Procedure were promulgated, courts have relied
28 on it and Federal Rules of Civil Procedure 3, 5(e), and 77 for the same

EX-PARTE APPLICATION

1   proposition. See, e.g., **Milton v. United States**, 105 F.2d 253, 255 (5th
2   Cir. 1939); **Greeson v. Sherman**, 265 F. Supp. 340, 342 (W.D.Va. 1967)
3   ("If Rule 3 is read in conjunction with Rule 5 (e) . . . [a complaint is filed
    when] the complaint is delivered to an officer of the court who is
4   authorized to receive it."); **Freeman v. Giacomo Costa Fu Andrea**, 282
5   F. Supp. 525, 527 (E.D.Pa. 1968) ("[I]t is settled law that delivery of a
    pleading to a proper official is sufficient to constitute filing thereof.").
6   **(Central States, SE & SW Pension v. Paramount Liquor,** 34
7   F.Supp.2d 1092 (N.D.Ill. 02/09/1999).) [**emphasis added**.]

8   **The docketing of filed documents is a ministerial act that the
    Office of the Clerk is obligated to perform**. (See **Ray v. United
9   States**, 57 S. Ct. 700, 301 U.S. 158 (U.S. 04/26/1937).) [**emphasis
10  added**.]

11  **Equal Protection Analysis**
12
13  Before decided the level of scrutiny to apply, the court must consider
    whether two groups or more groups are sufficiently similar to require
14  some level of scrutiny to determine whether a distinction is justified. The
15  court then decides the level of scrutiny to apply to determine whether the
    distinction is justified [see, e.g., Taylor v. County of San Diego (9th Cir.
16  2015) 800 F.3d 1164, 1167–1171 (sexually violent predators are not
17  similarly situated to other civilly committed offenders); Litmon v. Harris
    (9th Cir. 2014) 768 F.3d 1237, 1243–1244 (sexually violent predators are
18  not similarly situated to either mentally disordered offenders or mentally
19  disordered sex offenders, and California legislature had rational basis for
20  imposing more frequent reporting requirements on sexually violent
    predators); People v. Castel (2017) 12 Cal. App. 5th 1321, 1326, 219 Cal.
21  Rptr. 3d 829 (parolees and other supervised persons not similarly situated
22  for purposes of revocation procedures); People v. Superior Court (2017) 12
    Cal. App. 5th 687, 721, 220 Cal. Rptr. 3d 1 (minors who committed
23  offenses before and after effective date of Proposition 57 are similarly
24  situated; state has rational basis for justifying prospective application of
    law); People v. Dunley (2016) 247 Cal. App. 4th 1438, 1447–1453, 203 Cal.
25  Rptr. 3d 335 (mentally disordered offenders, sexually violent predators,
26  and persons found not guilty by reason of insanity are similarly situated
    for purposes of testimonial privilege, and strict scrutiny applied); People
27  v. Moreno (2014) 231 Cal. App. 4th 934, 941–943, 180 Cal. Rptr. 3d 522
28  (denying criminal defendant who had successfully petitioned to reduce

EX-PARTE APPLICATION

1 two prior felonies to misdemeanors and dismiss them right to petition for
2 certificate of rehabilitation, while allowing felons to petition did not
3 violate equal protection, where felons who have had crimes reduced to
misdemeanors and dismissed are not similarly situated to those
4 remaining felons following completion of probation or parole); Finberg v.
5 Manset (2014) 223 Cal. App. 4th 529, 535, 167 Cal. Rptr. 3d 109 (natural
parents and nuclear families with adoptive parent who was formerly
6 stepparent were sufficiently similar and treated differently under Fam.
7 Code § 3104(b)(5), governing grandparent visitation)].

8 The United States Supreme Court and the California Supreme Court
9 follow a so-called "two-tier" approach to equal protection challenges. At a
minimum, a statutory classification or other form of state action must
10 bear some rational relationship to a legitimate state purpose [In re King
11 (1970) 3 Cal. 3d 226, 232, 90 Cal. Rptr. 15, 474 P.2d 983, cert. denied, 403
U.S. 931 (1971)]. Statutes that classify and impose differing procedural
12 requirements on litigants are generally valid if the classification is
13 supported by a rational basis [Fitzgerald v. Racing Ass'n of Central Iowa
14 (2003) 539 U.S. 103, 123 S. Ct. 2156, 2159–2161, 156 L. Ed. 2d 97
(difference in state tax rates between slot machines at race tracks and slot
15 machines on riverboats is subject to rational basis review); People v.
16 Turnage (2012) 55 Cal. 4th 62, 74–75, 144 Cal. Rptr. 3d 489, 281 P.3d 464
(conviction under Pen. Code § 148.1 for placing false or facsimile bomb,
17 without finding of sustained fear, did not violate equal protection despite
18 finding of sustained fear requirement in Pen. Code § 11418.1 for
19 conviction of false or facsimile weapon of mass destruction, where
legislative view of false weapons of mass destruction differently than false
20 bombs was rationally based); People v. Health Laboratories of North
21 America, Inc. (2001) 87 Cal. App. 4th 442, 449, 104 Cal. Rptr. 2d 618
(exemption in Code Civ. Proc. § 425.16(d) of public prosecutors'
22 enforcement actions from anti-SLAPP motions bears directly on
23 furthering state's legitimate interest of allowing prosecutors to pursue
actions to enforce laws unencumbered by delay, intimidation, or
24 distraction)].

25 Equal protection claims may be brought by a "class of one" when the
26 plaintiff alleges that he or she was intentionally treated differently from
27 others similarly situated and there is no rational basis for the difference
in treatment [Village of Willowbrook v. Olech (2000) 528 U.S. 562, 564,
28 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (per curiam); see Genesis

EX-PARTE APPLICATION

Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist. (2003) 113 Cal. App. 4th 597, 604–608, 6 Cal. Rptr. 3d 574 (plaintiff sufficiently alleged equal protection claim for class of one by alleging plaintiff was treated differently from similarly situated persons, difference in treatment was intentional, and there was no rational basis for difference in treatment)]. Although the latitude given state economic and social regulation is necessarily broad, when the classifications employed in state action approach sensitive and fundamental personal rights, the courts exercise a stricter scrutiny [Trimble v. Gordon (1977) 430 U.S. 762, 766–767, 97 S. Ct. 1459, 52 L. Ed. 2d 31]. As stated in several cases, if state action classifies individuals on the basis of a suspect category, such as race or ancestry, or infringes a fundamental interest, such as the right to liberty, it is subject to strict judicial scrutiny [see, e.g., Graham v. Richardson (1971) 403 U.S. 365, 371–372, 375–376, 91 S. Ct. 1848, 29 L. Ed. 2d 534; Parents Involved in Community Schools v. Seattle School Dist., No. 1 (9th Cir. 2004) 377 F.3d 949, 960; Hunter v. Regents of the University of California (9th Cir. 1999) 190 F.3d 1061, 1063 (race); In re Marriage Cases (2008) 43 Cal. 4th 757, 783–784, 76 Cal. Rptr. 3d 683 (sexual orientation as suspect class and interest in family relationship as fundamental); People v. Olivas (1976) 17 Cal. 3d 236, 243, 131 Cal. Rptr. 55, 551 P.2d 375]. If a classification is subject to strict scrutiny, the presumption of constitutionality is abandoned and the defenders of state action have the burden of justification. They must show that the state action serves a compelling state interest and that there are no other reasonable, less intrusive means by which the interest can be served [Examining Bd. v. Flores de Otero (1976) 426 U.S. 572, 602, 605, 96 S. Ct. 2264, 49 L. Ed. 2d 65; Parents Involved in Community Schools v. Seattle School Dist., No. 1 (9th Cir. 2004) 377 F.3d 949, 960; Choudhry v. Free (1976) 17 Cal. 3d 660, 664, 131 Cal. Rptr. 654, 552 P.2d 438].

No matter which tier or test is used, the same test must be applied to similarly situated persons [see Cleburne v. Cleburne Living Center (1985) 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (indicating that Equal Protection Clause requires same treatment of "similarly situated" persons); Fajardo v. City of Los Angeles (9th Cir. 1999) 179 F.3d 698, 700 (in determining whether city policy of treating domestic violence 911 calls differently from non-domestic violence calls, critical issue is not whether domestic violence rarely results in death or severe injury, but whether domestic-violence crimes result in severe injury or death less frequently than non-domestic-violence crimes that are considered 911 emergencies);

*EX-PARTE* APPLICATION

People v. Verba (2013) 210 Cal. App. 4th 991, 995–996, 148 Cal. Rptr. 3d 847 (with respect to awarding of conduct credits under Pen. Code § 4019, defendant who committed offense before October 1, 2011, who was treated more harshly was similarly situated with persons whose offenses were committed on or after October 1, 2011, where two groups committed same offenses but were treated differently in terms of earning conduct credit based solely on dates their crimes were committed)].

If the court concludes there has been a violation of equal protection, it has a choice of remedies, including withdrawing treatment or benefits of a statute from the favored group or extending that treatment or benefits to the excluded class, or invalidating a statute or expanding its reach [People v. Hofsheier (2006) 37 Cal. 4th 1185, 1207, 39 Cal. Rptr. 3d 821, 129 P.3d 29; Burnham v. Public Employees' Retirement System (2012) 208 Cal. App. 4th 1576, 1588, 146 Cal. Rptr. 3d 607]. At least one court has held that it cannot include a claim for damages [see Gates v. Superior Court (1995) 32 Cal. App. 4th 481, 38 Cal. Rptr. 2d 489]. The court's primary concern is to ascertain, as best it can, which alternative the Legislature would prefer [People v. Hofsheier (2006) 37 Cal. 4th 1185, 1207, 39 Cal. Rptr. 3d 821, 129 P.3d 29; Burnham v. Public Employees' Retirement System, (2012) 208 Cal. App. 4th 1576, 1588, 146 Cal. Rptr. 3d 607].

## ☐ [1] Introduction to "Rational Relationship" Test

Every classification contained in state action must bear some rational relationship to a legitimate state purpose. The "rational relationship" standard generally defers to state action and is usually employed to justify state action [Fitzgerald v. Racing Ass'n of Central Iowa (2003) 539 U.S. 103, 123 S. Ct. 2156, 2159, 156 L. Ed. 2d 97 (rational basis review especially deferential in context of complex tax laws); Nordlinger v. Hahn (1992) 505 U.S. 1, 11, 112 S. Ct. 2326, 120 L. Ed. 2d 1]. Thus, a classification subjected to the rational relationship test does not deny equal protection if any set of facts may reasonably be conceived in its justification [McGowan v. Maryland (1961) 366 U.S. 420, 426, 81 S. Ct. 1101, 6 L. Ed. 2d 393; Choudhry v. Free (1976) 17 Cal. 3d 660, 131 Cal. Rptr. 654, 552 P.2d 438]. A classification is constitutionally infirm only if so unrelated to the achievement of any combination of legitimate purposes that the courts can only conclude that the legislature's actions were

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

irrational [Conservatorship of Edde (2009) 173 Cal. App. 4th 883, 890–898, 93 Cal. Rptr. 3d 266 (Welf. & Inst. Code § 7275 did not violate equal protection when applied to allow state to seek reimbursement for cost of commitment to state hospital from conservatorship estate of pretrial detainee found not competent to stand trial, even though state could not seek reimbursement for commitment after criminal adjudication, where there was rational basis for distinguishing between them); see also Vance v. Bradley (1979) 440 U.S. 93, 97, 99 S. Ct. 939, 59 L. Ed. 2d 171].

When conducting rational basis review, the court must accept any gross generalizations and rough accommodations the Legislature seems to have made. A classification is not arbitrary or irrational simply because there is an imperfect fit between the means and the ends. Any plausible reason for the distinction made need not exist in every scenario in which the legislation might apply [People v. Turnage (2012) 55 Cal. 4th 62, 77–78, 144 Cal. Rptr. 3d 489, 281 P.3d 464]. Even improvident decisions of a political branch will eventually be rectified by the democratic process so that judicial intervention is generally unwarranted, no matter how unwisely the court may think the political branch has acted [Nordlinger v. Hahn (1992) 505 U.S. 1, 17–18, 112 S. Ct. 2326, 120 L. Ed. 2d 1; County of San Diego v. Brown (1993) 19 Cal. App. 4th 1054, 1081 n.36, 23 Cal. Rptr. 2d 819]. The courts may not properly strike down a statute simply because they disagree with the wisdom of the law or because they believe there is a fairer method for dealing with the problem [Fein v. Permanente Medical Group (1985) 38 Cal. 3d 137, 163, 211 Cal. Rptr. 368, 695 P.2d 665, appeal dismissed, 474 U.S. 892, 106 S. Ct. 214, 88 L. Ed. 2d 215; County of San Diego v. Brown (1993) 19 Cal. App. 4th 1054, 1081 n.36, 23 Cal. Rptr. 2d 819; see also Schweiker v. Wilson (1981) 450 U.S. 221, 235, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (as long as classificatory scheme chosen by legislative body rationally advances reasonable and identifiable governmental objective, court must disregard existence of other methods of allocation that judges, as individuals, would have preferred)].

On the other hand, both the United States and the California Supreme Courts have stated the rational relationship test in what would appear to be more vigorous ways. Several decisions refer to the language of Royster Guano Co. v. Virginia (1920) 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989, which held that a classification must be reasonable, not arbitrary, and must rest on some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly

*EX-PARTE* APPLICATION

circumstanced are treated alike [*see, e.g.*, Eisenstadt v. Baird (1972) 405 U.S. 438, 448, 92 S. Ct. 1029, 31 L. Ed. 2d 349; Brown v. Merlo (1973) 8 Cal. 3d 855, 106 Cal. Rptr. 388, 506 P.2d 212].

While acknowledging that neither California cases nor those of the United States Supreme Court have settled on a particular verbal formula to describe the "restrained" equal protection standard of review, the California Supreme Court has stated that all of the various linguistic formulations of the test require the court to conduct a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals [Cooper v. Bray (1978) 21 Cal. 3d 841, 848, 148 Cal. Rptr. 148, 582 P.2d 604, citing Newland v. Board of Governors of Cal. Community Colleges (1977) 19 Cal. 3d 705, 711, 139 Cal. Rptr. 620, 566 P.2d 254; Fein v. Permanente Medical Group (1985) 38 Cal. 3d 137, 163, 211 Cal. Rptr. 368, 695 P.2d 665, *appeal dismissed*, 474 U.S. 892, 106 S. Ct. 214, 88 L. Ed. 2d 215].

The Equal Protection Clause of the Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time [People v. Floyd (2003) 31 Cal. 4th 179, 191, 1 Cal. Rptr. 3d 885, 72 P.3d 820; People v. Verba (2013) 210 Cal. App. 4th 991, 996, 148 Cal. Rptr. 3d 847; People v. Lynch (2012) 209 Cal. App. 4th 353, 359, 146 Cal. Rptr. 3d 811]. The practical necessity that a statutory change have a beginning provides a rational basis for classifications that fall on either side of the statute's effective date. This rationale does not apply to the operative date of a statute, however. Unlike a statute's effective date, which is determined according to immutable rules written into the state Constitution [*see* Cal. Const., art. IV, § 8], its operative date, the date upon which the directives of the statute are actually implemented, is set by the Legislature in its discretion, which is subject to rational basis review [People v. Verba (2013) 210 Cal. App. 4th 991, 996–997, 148 Cal. Rptr. 3d 847 (increased level of presentence conduct credit applicable only to those who commit their crimes on or after October 1, 2011 had rational basis); *but see* People v. Schoop (2012) 212 Cal. App. 4th 457, 470–474, 151 Cal. Rptr. 3d 200 (defendant who suffered conviction for possession of obscene matter depicting child in sexual conduct was similarly situated with people convicted of other statutes prohibiting production and dissemination of sexual/obscene material, and requiring him to wait 10 years to seek

EX-PARTE APPLICATION

1  certificate of rehabilitation, while allowing others to seek it after seven
2  years, had no rational basis)].

3  The United States Supreme Court has also developed a more assertive
4  interpretation of the rational relationship test in cases involving
   illegitimacy and gender, categories which are similar to a suspect category
5  in terms of immutability and stigma of inferiority; indeed, gender is a
6  suspect category under the California Constitution [see Sail'er Inn, Inc. v.
   Kirby (1971) 5 Cal. 3d 1, 18–20, 95 Cal. Rptr. 329, 485 P.2d 529]. When a
7  classification involves illegitimacy, the Court will give equal consideration
8  to both the legitimate interests promoted by the classification and the
   fundamental personal rights which it endangers, and analyze the state's
9  objectives to see how well they justify the classification under challenge
10 [Trimble v. Gordon (1977) 430 U.S. 762, 773–774, 97 S. Ct. 1459, 52 L. Ed.
11 2d 31; Weber v. Aetna Cas. & Sur. Co. (1972) 406 U.S. 164, 172–173, 92 S.
   Ct. 1400, 31 L. Ed. 2d 768]. When a classification involves gender, it will
12 not withstand a constitutional challenge unless it serves important
13 governmental objectives and is substantially related to achievement of
   those objectives [Craig v. Boren (1976) 429 U.S. 190, 197, 97 S. Ct. 451, 50
14 L. Ed. 2d 397]. It is unclear if the U.S. Supreme Court will expand the
15 cases to which this more assertive standard has been applied. Specifically,
16 the Court has declined to treat age as either a suspect category or one
   subject to its more assertive interpretation of the rational relationship
17 test [see Massachusetts Bd. of Retirement v. Murgia (1976) 427 U.S. 307,
18 312–315, 96 S. Ct. 2562, 49 L. Ed. 2d 520]. Similarly, courts have declined
   to treat homosexuals as a suspect or quasi-suspect class [see Romer v.
19 Evans (1996) 517 U.S. 620, 116 S. Ct. 1620, 1626–1627, 134 L. Ed. 2d 855
20 (applying rational basis review, without specifically determining which
   standard was applicable, in upholding challenge to Colorado's
21 Amendment 2, which prohibited state or local legislative, executive, or
22 judicial action designed to protect homosexuals); Holmes v. California
   Army Nat. Guard (9th Cir. 1997) 124 F.3d 1126, 1132 (applying rational
23 basis review in rejecting challenge under U.S. Const., Amend. V to
24 military's statutory "don't ask/don't tell" policy)].

25 Existence of these various levels of application of the rational relationship
26 test has led to criticism of the Court's two-tier approach [see § 35A.04[4]].

27 □  [2] Effect on Fundamental Interest
28

EX-PARTE APPLICATION

In San Antonio School Dist. v. Rodriguez (1973) 411 U.S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16, the U.S. Supreme Court stated that when a classification impinges upon a fundamental interest, it is subject to strict judicial scrutiny. This language makes it clear that strict scrutiny does not require a total deprival of a fundamental right, but does not explain how great the burden must be before strict scrutiny will be invoked. Some decisions show awareness of the question. For example, in Bullock v. Carter (1972) 405 U.S. 134, 144, 92 S. Ct. 849, 31 L. Ed. 2d 92, the Court noted that not every limitation or incidental burden on the exercise of voting rights would require the more stringent standard of review; a classification must have a real and appreciable impact on the exercise of the franchise [see also Finberg v. Manset (2014) 223 Cal. App. 4th 529, 535–536, 167 Cal. Rptr. 3d 109 (although parents have fundamental right to make decisions concerning care, custody, and control of their children, Fam. Code § 3104(b)(5), regarding grandparent visitation, has only incidental effect on exercise of parental rights)]. In many decisions, however, the extent of the burden required is not clear from the language used. It is arguable that almost any interference is sufficient since courts have stated that strict scrutiny is appropriate if the classification touches on or affects a fundamental interest or has an impact on the ability to exercise it [see McDonald v. Bd. of Election Com. of Chicago (1969) 394 U.S. 802, 807, 89 S. Ct. 1404, 22 L. Ed. 2d 739; People v. Olivas (1976) 17 Cal. 3d 236, 243, 251, 131 Cal. Rptr. 55, 551 P.2d 375]. However, other decisions would appear to require a greater impact and characterize the classification as one that invades, restricts, infringes on, or intrudes on a fundamental interest [see McDonald v. Bd. of Election Com. of Chicago (1969) 394 U.S. 802, 807, 89 S. Ct. 1404, 22 L. Ed. 2d 739; In re Antazo (1970) 3 Cal. 3d 100, 114, 89 Cal. Rptr. 255, 473 P.2d 999].

The forms of points and authorities in this chapter generally use the word "burden" to describe a significant impact on a fundamental interest which is sufficient to require use of the strict scrutiny test unless the decision clearly suggests more specific language. But to fully determine the degree of interference that is required for strict scrutiny, counsel must examine both the language of the decisions and the factual context in which it is applied.

☐ **[3] Based on Suspect Category**

*EX-PARTE* APPLICATION

For a classification to merit some form of heightened scrutiny because of the way it affects individuals with particular personal characteristics, it must in some sense classify them on the "basis" of such characteristics. Thus, in Califano v. Boles (1979) 443 U.S. 282, 293–295, 99 S. Ct. 2767, 61 L. Ed. 2d 541, the majority, noting that proper classification for purposes of equal protection analysis is not an exact science, concluded that the challenged legislation did not discriminate against illegitimate children as a class because the legislation's effect was too speculative and incidental to establish that the class would suffer significant deprivation of a benefit or imposition of a substantial burden [Califano v. Boles (1979) 443 U.S. 282, 293–295, 99 S. Ct. 2767, 61 L. Ed. 2d 541]. In contrast, the minority concluded that the classification in question was "based" on illegitimacy because the statute was designed to aid children, yet totally excluded illegitimate children from its benefits [Califano v. Boles (1979) 443 U.S. 282, 303–304, 99 S. Ct. 2767, 61 L. Ed. 2d 541 (Marshall, J., dissenting)].

When a classification by statute, or the impact of a facially neutral statute by its enactment or enforcement, is alleged to be discriminatory on the basis of the infringement of rights of a suspect class such as race, the plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a "motivating factor" [Village of Arlington Heights v. Metro. Hous. Dev. Corp. (1977) 429 U.S. 252, 265–266, 97 S. Ct. 555, 50 L. Ed. 2d 450; Arce v. Douglas (9th Cir. 2015) 793 F.3d 968, 977]. A plaintiff need provide very little such evidence to raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder [Arce v. Douglas (9th Cir. 2015) 793 F.3d 968, 977–978]. A court should consider the following, non-exhaustive factors in assessing whether a defendant acted with discriminatory purpose [Village of Arlington Heights v. Metro. Hous. Dev. Corp. (1977) 429 U.S. 252, 266–268, 97 S. Ct. 555, 50 L. Ed. 2d 450; Arce v. Douglas (9th Cir. 2015) 793 F.3d 968, 977]:

- (1) The impact of the official action and whether it bears more heavily on one race than another.
- (2) The historical background of the decision.
- (3) The specific sequence of events leading to the challenged action.
- (4) The defendant's departures from normal procedures or substantive conclusions.
- (5) The relevant legislative or administrative history.

EX-PARTE APPLICATION

☐  **[4] Criticism of Two-Tier Model**

The two-tier model which appears to place equal protection cases into one of two distinct categories that dictate the appropriate standard of review has been criticized as too rigid an approach to equal protection analysis [*see* San Antonio School Dist. v. Rodriguez (1973) 411 U.S. 1, 98, 93 S. Ct. 1278, 36 L. Ed. 2d 16, *reh'g denied*, 411 U.S. 959, 93 S. Ct. 1919, 36 L. Ed. 2d 418 (Marshall, J., dissenting)]. The basic criticism is that use of the two-tier test inhibits the growth of the equal protection doctrine and obscures what the United States Supreme Court really does in many equal protection cases. In this view, because the Court by creating a new suspect category or fundamental interest greatly expands the types of state action that are vulnerable to constitutional attack, since strict scrutiny generally leads to invalidation [*see* Massachusetts Bd. of Retirement v. Murgia (1976) 427 U.S. 307, 319, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (Marshall, J., dissenting)], it has shown a marked inhibition to expand the number of protected categories and interests [*see, e.g.*, San Antonio School Dist. v. Rodriguez (1973) 411 U.S. 1, 34–35, 93 S. Ct. 1278, 36 L. Ed. 2d 16, *reh'g denied*, 411 U.S. 959, 93 S. Ct. 1919, 36 L. Ed. 2d 418 (education not fundamental interest); Massachusetts Bd. of Retirement v. Murgia (1976) 427 U.S. 307, 324–325, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (state employment not fundamental interest; age not suspect category)]. On the other hand, it has subjected certain classifications to a level of scrutiny that goes beyond the rational relationship test. Thus, illegitimacy is not a suspect category but the analysis given to classifications affecting illegitimate persons more strictly scrutinizes the classifications than would be true under the rational relationship test [Trimble v. Gordon (1977) 430 U.S. 762, 767, 97 S. Ct. 1459, 52 L. Ed. 2d 31; *see* § 35A.04[1]]. Justice Marshall in dissent claimed that the Court focuses its real analysis not on the two-tier test but on the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification [*see* San Antonio School Dist. v. Rodriguez (1973) 411 U.S. 1, 99, 93 S. Ct. 1278, 36 L. Ed. 2d 16, *reh'g denied*, 411 U.S. 959, 93 S. Ct. 1919, 36 L. Ed. 2d 418 (Marshall, J., dissenting); Massachusetts Bd. of Retirement v. Murgia (1976) 427 U.S. 307, 320, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (Marshall, J., dissenting)].

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

Although the California Supreme Court has not commented on this critical view of the two-tier test, it does not appear to have inhibited the expansion of equal protection analysis in holding state action unconstitutional, because unlike the United States Supreme Court, the state Supreme Court has indicated a willingness to expand the number of protected interests under the two-tier test [*see, e.g.*, Sail'er Inn, Inc. v. Kirby (1971) 5 Cal. 3d 1, 21, 95 Cal. Rptr. 329, 485 P.2d 529 (gender is suspect category); Serrano v. Priest (1976) 18 Cal. 3d 728, 766, 135 Cal. Rptr. 345, 557 P.2d 929, *cert. denied*, 432 U.S. 907 (1977) (education is fundamental interest); Woods v. Horton (2008) 167 Cal. App. 4th 658, 673-679, 84 Cal. Rptr. 3d 332 (gender is suspect class, holding domestic violence programs that provided services to women but not to men violated men's equal protection rights, but men were not similarly situated to women for the purpose of statutorily-based alternative-sentencing and community treatment programs for inmate mothers)].

**Raising Constitutional Issues by Writ of Mandate**

In a proceeding for writ of mandate, the petitioner must be a party beneficially interested in issuance of the writ [Code Civ. Proc. § 1086]. The general rule is that a beneficial interest exists where the writ is necessary to prevent substantial damage to an interest or right of petitioner which is independent of those interests or rights held in common with the public at large [Fuller v. San Bernardino Valley Mun. Wat. Dist. (1966) 242 Cal. App. 2d 52, 56–57, 51 Cal. Rptr. 120]. A separate set of legal principles exists for determining when an individual has standing to challenge the constitutionality of state action for a violation of equal protection. The general rule is that the party attacking the constitutionality of a statute or official action must show an actual or threatened injury, and where a statute discriminates against a class, only a member of the class discriminated against may attack it [Burns v. State Compensation Ins. Fund (1968) 265 Cal. App. 2d 98, 104, 71 Cal. Rptr. 326]. Both these rules have been relaxed in recent years in cases involving public duties and important social consequences [Residents of Beverly Glen, Inc. v. Los Angeles (1973) 34 Cal. App. 3d 117, 121, 109 Cal. Rptr. 724; American Friends Serv. Comm. v. Procunier (1973) 33 Cal. App. 3d 252, 256, 109 Cal. Rptr. 22]. Moreover, California courts are not bound by stricter federal standards of justiciability [see, e.g., White v. Davis (1975) 13 Cal. 3d 757, 764, 120 Cal. Rptr. 94, 533 P.2d 222; McDonald v. Stockton

EX-PARTE APPLICATION

1  Metropolitan Transit Dist. (1973) 36 Cal. App. 3d 436, 440 n.4, 111 Cal.
2  Rptr. 637].

3  The decisions, however, do not explain the relationship between a
4  beneficial interest sufficient to allow a petition for writ of mandate and an
   interest sufficient to support standing to raise a constitutional issue.
5  Some decisions have applied the rule governing standing in nonmandate
6  cases to determine both the existence of a beneficial interest and ability to
   raise a constitutional issue in a petition for mandate [see, e.g., Bozung v.
7  Local Agency Formation Comm'n (1975) 13 Cal. 3d 263, 272, 118 Cal.
8  Rptr. 249, 529 P.2d 1017 (rule of standing under federal Administrative
9  Procedure Act applied in petition for mandate not involving constitutional
   issue); Sail'er Inn, Inc. v. Kirby (1971) 5 Cal. 3d 1, 6 n.1, 95 Cal. Rptr. 329,
10 485 P.2d 529 (rule of standing under federal Constitution applied in
11 petition for writ of mandate involving constitutional issue)]. It would thus
   appear that if a beneficial interest is sufficient to support a petition for
12 writ of mandate, it is sufficient to permit raising the constitutional issue.
13 Mandate is proper to challenge the constitutionality or validity of statutes
   or official acts [Jolicoeur v. Mihaly (1971) 5 Cal. 3d 565, 570 n.2, 96 Cal.
14 Rptr. 697, 488 P.2d 1], and it is unlikely that constitutionality can be
15 questioned in some situations where an individual has a beneficial
16 interest entitling him or her to sue for a writ but not in others. On the
   other hand, in Rubio v. Superior Court (1979) 24 Cal. 3d 93, 101–103, 154
17 Cal. Rptr. 734, 593 P.2d 595, the Supreme Court found that a petitioner
18 who was a person beneficially interested in the issuance of a writ of
   prohibition [see Code Civ. Proc. § 1103] had standing to raise some
19 constitutional issues but not others under the applicable rules of standing
20 to raise constitutional challenges. The import of Rubio is that the Court
   did not foreclose treating the beneficial interest and standing questions as
21 legally distinct if the petitioner's relationship to the constitutional issue is
22 too remote to warrant a challenge.

23 The memoranda of points and authorities in this chapter that describe
24 when a petitioner has a beneficial interest to petition for a writ of
25 mandate raising an equal protection issue rely, where possible, on
   authorities that adjudicate the beneficial interest question and involve a
26 constitutional challenge. If there are none, the memoranda rely on either
27 authorities defining when a beneficial interest exists or authorities that
   do not involve writs of mandate but define when standing to raise a
28 constitutional issue exists.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

## Related Uses

The forms of points and authorities in this chapter may be used with appropriate modification to support claims that equal protection has been denied one who has been restrained or imprisoned in a petition for writ of habeas corpus challenging the constitutionality of the restraint or imprisonment [Penal Code § 1473(a); see, e.g., In re Antazo (1970) 3 Cal. 3d 100, 107–108, 89 Cal. Rptr. 255, 473 P.2d 999; In re Young (1973) 32 Cal. App. 3d 68, 70–71, 107 Cal. Rptr. 915]. Although neither the Code of Civil Procedure nor the California Rules of Court expressly authorize or require that points and authorities be filed in support of a petition for a writ of habeas corpus, it is advisable to file the memoranda when time and circumstances permit.

Moreover, the forms of points and authorities in this chapter may be used with appropriate modifications to support a petition for writ of mandate to review an administrative decision [Code Civ. Proc. § 1094.5]. A constitutional challenge on equal protection grounds to the validity of an agency's enabling act or its application could be the basis for a claim that an agency has proceeded without, or in excess of, jurisdiction, has committed a prejudicial abuse of discretion by not proceeding in the manner required by law, or has unlawfully precluded the petitioner from the use and enjoyment of a right or office to which the petitioner is entitled [see Code Civ. Proc. §§ 1085, 1094.5; see also Walker v. Munro (1960) 178 Cal. App. 2d 67, 74–75, 2 Cal. Rptr. 737 (raising issue of constitutionality of statute enforced by agency to challenge jurisdiction)].

Equal protection claims may also be relevant to actions in state court for declaratory relief [Code Civ. Proc. § 1060] challenging the validity of a statute or ordinance on the ground that it violates the guarantee of equal protection. The points and authorities provided in this chapter could be used with appropriate modifications in such an action to oppose a demurrer or a motion for summary judgment (or comparable motion) arguing that a violation of equal protection has not been shown.

Equal protection may be raised in state court by actions for damages or other forms of relief for deprivation of constitutional rights under two of the post-Civil War civil rights statutes [42 U.S.C. §§ 1983, 1985(3); see Williams v. Horvath (1976) 16 Cal. 3d 834, 837, 129 Cal. Rptr. 453, 548 P.2d 1125]. The points and authorities provided in this chapter which

*EX-PARTE* APPLICATION

interpret the federal Constitution could be used with appropriate modifications in such proceedings to oppose a demurrer or a motion for summary judgment (or comparable motion), arguing that a violation of equal protection has not been shown.

In federal court, an application for a writ of habeas corpus based on the claim that the applicant is in custody in violation of the United States Constitution may raise an equal protection issue. Support of the application by a memorandum of points and authorities, while not required, would be appropriate [see 28 U.S.C. § 2241(c)(3)]. Furthermore, whenever any civil claim based on a denial of equal protection under the federal Constitution is contested by motions for dismissal for failure to state a claim on which relief can be granted, for judgment on the pleadings, or for summary judgment [Fed. R. Civ. P., Rules 12(b)(6), (c), 56], points and authorities in some form opposing such motions are recommended in federal district courts in California [see U.S. Dist. Ct., East Dist. of Cal., Rule 113(e); U.S. Dist. Ct., No. Dist. of Cal., Rule 220-2; U.S. Dist. Ct., Cen. Dist. of Cal., Rule 3(e)(2); U.S. Dist. Ct., So. Dist. of Cal., Rule 3(e)(1)(b) (requiring that such motions be supported by points and authorities)]. The points and authorities provided in this chapter which interpret the federal Constitution could be used with appropriate modifications to oppose any motion which states that a violation of equal protection has not been shown or to support a writ of habeas corpus.

## IV. ARGUMENT

The Respondent(s)' mentioned herein are not immune from any of the claims I am bringing. Although," 'Qualified immunity is an affirmative defense against section 1983 claims. Its purpose is to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." The defense provides immunity from suit, not merely from liability. Its purpose is to spare Respondent(s) the burden of going forward with trial.' Because it is an immunity from suit, not just a mere defense to liability, it is important to resolve immunity questions at the earliest possible stage in litigation. Immunity should ordinarily be

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

resolved by the court, not a jury." (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 342 [54 Cal.Rptr.2d 772], internal citations omitted.). All Respondent(s) acted under color of law and acted under color of state law.

**Government Entity Immunity:** A public entity is absolutely immune, that is, not liable (not legally responsible) for damages caused by any public employee's intentional or negligent misrepresentation (*Government Code* Section 818.8).

**Government Employee Immunity:** Further, the public entity's employee is immune any intentional or negligent misrepresentation unless he or she is guilty of "actual fraud, corruption or actual malice." (*Government Code* Section 822.2).

The employee "immunity afforded by *Government Code* section 822.2 applies unless, in addition to the essentials of common law deceit, a public employee is motivated by corruption or actual malice, i.e., a conscious intent to deceive, vex, annoy or harm the injured party in his business" (*Schonfeld* v. *City of Vallejo* (1975) 50 Cal. App.3d 401, 409-410).

**Defamatory False Statements:** Tort causes of action involving *false statements* based on *reputational* harm (defamation, libel, slander, trade libel, and intentional interference) are not included within the "deceit" rubric identified by the California Supreme Court when it interpreted *Government Code* sections 818.8 and 822.2 because they involve reputational harm for which the legislature did not intend to grant immunity (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 383).

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

The FBI is the lead federal agency for investigating color of law violations, which include acts carried out by government officials operating both within and beyond the limits of their lawful authority. Off-duty conduct may be covered if the perpetrator asserted his or her official status in some way. Those violations include, but are not limited to, the following acts: **1. Excessive force:** In making arrests, maintaining order, and defending life, law enforcement officers are allowed to use whatever force is "reasonably" necessary. The breadth and scope of the use of force is vast—from just the physical presence of the officer to the use of deadly force. Violations of federal law occur when it can be shown that the force used was willfully "unreasonable" or "excessive." **2. Sexual assault:** Sexual assault by officials acting under color of law can happen in jails, during traffic stops, or in other settings where officials might use their position of authority to coerce an individual into sexual compliance. The compliance is generally gained because of a threat of an official action against the person if he or she doesn't comply. **3. False arrest and obstruction of justice:** The Fourth Amendment of the U.S. Constitution guarantees the right against unreasonable searches or seizures. A law enforcement official using authority provided under the color of law is allowed to stop individuals and, under certain circumstances, to search them and retain their property. It is in the abuse of that discretionary power—such as an unlawful detention or illegal confiscation of property— that a violation of a person's civil rights may occur. Fabricating evidence against or falsely arresting an individual also violates the color of law statute, taking away the person's rights of due process and unreasonable seizure. In the case of deprivation of property, the color of law statute would be violated by unlawfully obtaining or maintaining a person's

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

1  property, which oversteps or misapplies the official's authority. **4.**

2  **Deprivation of medical care**: Individuals in custody have a right to

3  medical treatment for serious medical needs. An official acting under color

4  of law who recognizes the serious medical need, but knowingly and

5  willfully denies or prevents access to medical care may have committed a

6  federal color of law violation. **5. Failure to keep from harm:** The public

7  counts on its law enforcement officials to protect local communities. If it's

8  shown that an official willfully failed to keep an individual from harm,

9  that official could be in violation of the color of law statute. "An individual

10  acts under color of state law when he or she exercises power 'possessed by

11  virtue of state law and made possible only because the wrongdoer is

12  clothed with the authority of state law.' " (*Naffe v. Frey* (9th Cir. 2015) 789

13  F.3d 1030, 1036.)

14  

15  In addition, "The Supreme Court has interpreted the phrase 'under

16  "color" of law' to mean 'under "pretense" of law.' A police officer's actions

17  are under pretense of law only if they are 'in some way "related to the

18  performance of his official duties.' " By contrast, an officer who is '

19  "pursuing his own goals and is not in any way subject to control by [his

20  public employer],'' " does not act under color of law, unless he 'purports or

21  pretends' to do so. Officers who engage in confrontations for personal

22  reasons unrelated to law enforcement, and do not 'purport[] or pretend[]'

23  to be officers, do not act under color of law." (*Huffman v. County of Los

24  Angeles* (9th Cir. 1998) 147 F.3d 1054, 1058, internal citations omitted.)

25  "A state employee who is off duty nevertheless acts under color of

26  state law when (1) the employee 'purport[s] to or pretend[s] to act under

27  color of law,' (2) his 'pretense of acting in the performance of his duties . . .

28  had the purpose and effect of influencing the behavior of others,' and (3)

*EX-PARTE* APPLICATION

the harm inflicted on PETITIONER 'related in some meaningful way either to the officer's governmental status or to the performance of his duties,' " (*Naffe, supra*, 789 F.3d at p. 1037, internal citations omitted.)

Respondent(s)', **DAVID GARY PIERCE**, **MARIO RIVAS**, and **ROBERT DELLER** acted under color of law even though, "[P]rivate parties ordinarily are not subject to suit under section 1983, unless, sifting the circumstances of the particular case, the state has so significantly involved itself in the private conduct that the private parties may fairly be termed state actors. Among the factors considered are whether the state subsidized or heavily regulated the conduct, or compelled or encouraged the particular conduct, whether the private actor was performing a function which normally is performed exclusively by the state, and whether there was a symbiotic relationship rendering the conduct joint state action." (*Robbins v. Hamburger Home for Girls* (1995) 32 Cal.App.4th 671, 683 [38 Cal.Rptr.2d 534], internal citations omitted.)

Due to forging my signature on court document's and fabricating false police reports, the, Respondent(s)', **DAVID GARY PIERCE**, **MARIO RIVAS**, and **ROBERT DELLER** acted under color of law, because "Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights. Private parties involved in such a conspiracy may be liable under section 1983." (*United Steelworkers of America v. Phelps Dodge Corp.* (9th Cir. 1989) 865 F.2d 1539, 1540, internal citations omitted.)

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

EX-PARTE APPLICATION

**1. This Court Will Find That The PETITIONER is entitled to Attorney Fees and Costs and Expert Fees and Costs under Both Federal Statutes and California Statutes**

Where California courts have concurrent jurisdiction with federal courts in actions brought under federal statutes to secure federal civil rights, California courts may award attorney fees under the federal statutes, using the federal standards. (Serrano v. Unruh (1982 ) 32 Cal.3d 621 ["Serrano IV"].) The most important federal fee-shifting statute which may be applied in California courts in cases involving cities is the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. §1988), which provides for fee-shifting in actions to secure federal constitutional or statutory rights brought under 42 United States Code section 1983 and other federal civil rights statutes.

As mentioned herein, this is a federal civil rights claim being tried in a case and, thus, there is potential liability for attorney fees under §1988. However, sometimes a constitutional claim is not expressly pled, but a constitutional argument is made. And sometimes there may be an explicit federal constitutional claim pled along with state claims, but only the state claims are litigated and decided in the PETITIONER's favor. In either case, cities may be surprised by a motion for attorney fees under §1988 in addition to or instead of under §1021.5 (or another California fee-shifting statute). Cities may be further surprised when they discover that California courts have awarded attorney fees under §1988 in such cases.

Unlike federal courts, California courts have inherent equitable authority under the "private attorney general" doctrine to award attorney fees to litigants who successfully pursue public interest litigation vindicating important rights. (See, Serrano v. Priest (1977 ) 20 Cal.3d 25 ["Serrano III"]; see also, Alyeska Pipeline Service Co. v. Wilderness Society (1975) 421 U.S. 240, rejecting the equitable private attorney general doctrine in federal courts.) California also recognizes the equitable "common fund" and "substantial benefit" theories, authorizing fee awards in cases that, respectively, create or preserve a fund for the benefit of non-litigants or confer a substantial benefit on members of an ascertainable class. (See, Serrano III, discussing both the "well-established 'common fund' principle," and the "more recent . . . so-called 'substantial benefit' rule.")

The PETITIONER is the prevailing party due to the Hate Crimes suffered and that he is entitled to attorney's fees and costs and expert under § 1988; and subsection 52.1(h), Code of Civil Procedure section 1021.5; Pursuant Government Code §6259, subd. (d): Public Records Act; Government Code §12965, subd. (b): FEHA, etc..

**A. Attorney Fees and Cost and Expert Fees and Costs Pursuant Cal. Civ. Code § 52.1(h) and under Cal. Civ. Code § 51.7(h)**

Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following: (1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.
(2) A civil penalty of $25,000, to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the General, a district attorney, or a city attorney. An action for that penalty brought pursuant to Section 51.7 shall be commenced within three years of the alleged practice. **(3) Attorney's fees**

*EX-PARTE* APPLICATION

1  **as may be determined by the court.** (c) Whenever there is reasonable
cause to believe that any person or group of persons is engaged in conduct
2  of resistance to the full enjoyment of any of the rights described in this
Section, and that conduct is of that nature and is intended to deny the full
3  exercise of those rights, the Attorney General, any district attorney or city
attorney, or any person aggrieved by the conduct may bring a civil action
4  in the appropriate court by filing with it a Ex-Parte Application. The Ex-
Parte Application shall contain the following:
5       (1) The signature of the officer, or, in his or her absence, the
individual acting on behalf of the officer, or the signature of the person
6  aggrieved.
     (2) The facts pertaining to the conduct.
7       (3) A request for preventive relief, including an application for a
permanent or temporary injunction, restraining order, or other order
8  against the person or persons responsible for the conduct, as the
complainant deems necessary to ensure the full enjoyment of the rights
9  described in this Section. (f) Any person claiming to be aggrieved by an
alleged unlawful practice in violation of Section 51 or 51.7 may also file a
10 verified Ex-Parte Application with the Department of Fair Employment
and Housing pursuant to Section 12948 of the Government Code.

11
       **B. Attorney Fees and Cost and Expert Fees and Costs 42**
12  **U.S.C. § 1988(b) and 42 U.S.C. § 1988(c)**
     Section 1988 permits this court, in its discretion, to award
13 reasonable attorney's fees to a prevailing party in an action under 42
U.S.C. § 1983. See 42 U.S.C. § 1988(b). "prevailing party" is one who
14 succeeds on any significant issue in the litigation, resulting in a "material
alteration of the legal relationship of the parties." Tex. State Teacher's
15 Ass'nv. Garland Indep. Sch. Dist., 489 U.S. 782, 792-93 (1989).    The
Bane Act also provides for an award of reasonable attorney's fees to a
16 prevailing PETITIONER. See Cal. Civ. Code § 52.1(h).
     Courts typically determine the amount of a fee award under § 1988
17 in two stages. First, courts apply the "'lodestar' method to determine what
constitutes a reasonable attorney's fee." Gonzalez v. City of Maywood, 729
18 F.3d 1196, 1202 (9th Cir2013) (citations omitted). The Ninth Circuit
"'presum[es]' that the district court accounts for the following factors in
19 the lodestar computation: '(1) the novelty and complexity of the issues, (2)
the special skill and experience of counsel, (3) the quality of
20 representation, (4) the results obtained, and (5) the contingent nature of
the fee agreement.'" Id. at 1209 n.11 (quoting Morales v. City of San
21 Rafael, 96 F.3d 359, 363 & n.9 (9th Cir. 1996)).
     "After making that computation, the the court then assesses
22 whether it is necessary to adjust the presumptively reasonable lodestar
figure on the basis of the Kerr factors that are not already subsumed in
23 the initial lodestar calculation." Morales, 96 F.3d at 363-64.1 The Ninth
Circuit has emphasized that a district court's application of the Kerr
24 factors should reflect the extent to which those factors "bear on the
reasonableness of a fee award."   Id. at 361. "[I]f the district court has
25 'taken [any of the Kerr factors] into account in either the reasonable hours
component or the reasonable rate
26     Those factors include:
     (1) the time and labor required, (2) the novelty and difficulty of the
27 questions involved, (3)     the skill requisite to perform the legal service
properly, (4) the preclusion of other employment by the attorney due to
28 acceptance of the case, (5) the customary fee, (6) whether the fee is
     fixed or contingent, (7) time limitations imposed by the client or the

*EX-PARTE* APPLICATION

1   circumstances, (8) the amount involved and the results obtained, (9) the
2   experience, reputation, and ability of the attorneys, (10) the
    "undesirability" of the case, (11) the nature and length of the professional
3   relationship with the client, and (12) awards in similar cases. Kerr v.
    Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th Cir. 1975).
4        A component of the lodestar calculation,' then it should not again
    reduce the lodestar" based on those factors. Gonzalez, 729 F.3d at 1209
5   n.11 (quoting Morales, 96 F.3d at 363 & n.9).
6        In determining the size of an appropriate fee award, the Supreme
    Court has emphasized that courts need not "achieve auditing perfection"
7   or "become green-eyeshade accountants." Fox v. Vice, 563 U.S. 826, ---,
    131 S.Ct. 2205, 2217 (2011). Rather, because the "essential goal of shifting
8   fees . . . is to do rough justice," the court may "use estimates" or "take into
    account 1[its] overall sense of a suit" to determine a reasonable attorney's
    fee. Id.

9   ### C. Attorney Fees and Cost and Expert Fees and Costs
    ### Pursuant Code of Civil Procedure section 1021.5
10       Code of Civil Procedure section 1021.5 is the codification of the
    private attorney general doctrine recognized in Serrano III.4 Under its
11  express language, attorney fees may be awarded to successful parties in
    public interest litigation only if four requirements are all satisfied,
12  including that the case: 1) "resulted in the enforcement of an important
    right affecting the public interest"; and, 2) conferred "a significant benefit,
13  whether pecuniary or nonpecuniary, on the general public or a large class
    of persons." Because judgments correcting violations of CEQA are
14  generally viewed as vindicating important rights and conferring
    significant benefits, attorney fees are usually awarded to prevailing
15  Petitioners in CEQA cases under §1021.5. Code of Civil Procedure
    §1021.5: public interest litigation
16       Attorney's fees may be awarded to "successful" parties in litigation if
    four statutory conditions are met: 1) the litigation "resulted in
17  enforcement of an important right affecting the public interest"; and 2)
    the litigation conferred "a significant benefit, whether pecuniary or
18  nonpecuniary, on the general public or a large class of persons"; and 3) the
    "necessity and financial burden of private enforcement, or of enforcement
19  by one public entity against another public entity are such as to make the
    award appropriate"; and 4) "such fees should not in the interest of justice
20  be paid out of [any] recovery."

21  ### D. Attorney fees and costs and Expert Fees and Cost
    ### Pursuant Government Code §6259, subd. (d): Public
22  ### Records Act
23       Attorney's fees shall be awarded "should the PETITIONER prevail
    in litigation" under the Act. Any fee award "shall be paid by the public
24  agency" employing the public official who unlawfully withheld the records
    "and shall not become a personal liability of the public official."

25  ### E. Government Code §12965, subd. (b): FEHA
26       A court, "in its discretion, may award . . . reasonable attorney's fees
    and costs, including expert witness fees," to the prevailing party "except
27  where the action is filed by a public agency or a public official, acting in an
    official capacity." Although the court explicitly has discretion to award
28  attorney fees to a prevailing PETITIONER, this discretion is "narrow"'
    and fees should ordinarily be awarded "unless special circumstances

*EX-PARTE* APPLICATION

1 would render such an award unjust." (Steele v. Jensen Instrument Co.
2 (1997) 59 Cal.App.4th 326, 332.)

### F. Conclusion Regarding Entitlement to Enhanced and Advance Reasonable Attorney Fees and Expert Fees

3
4 In sum, PETITIONER qualifies as a party entitled to reasonable attorneys' fees under all of the above statutes.

5 IT IS PROPER FOR THE COURT TO AWARD ATTORNEY'S FEES
6 IN THIS ACTION TO [specify party, e.g., PLAINTIFF] [name] ON THE BASIS OF THE SUBSTANTIAL BENEFIT THEORY, WHEN THE
7 SUBSTANTIAL BENEFIT IS TO THE CITIZENS AND TAXPAYERS. Action Saving Public Funds. Where the proper criteria are met, attorney's
8 fees may be awarded on the basis of the substantial benefit theory where the "substantial benefit" is to the citizens and taxpayers of this state in
9 the form of savings of public funds (Mandel v. Hodges (1976) 54 Cal. App. 3d 596, 623, 127 Cal. Rptr. 244).

10 IT IS PROPER FOR THIS COURT TO AWARD ATTORNEY'S FEES TO
11 [specify party, e.g., PLAINTIFF], [name], AGAINST [specify party, e.g., DEFENDANT], [name], UNDER SECTION 1021.5 OF THE CODE OF
12 CIVIL PROCEDURE, EVEN THOUGH THAT PARTY IS A COURT.
13 Fees Sought Against Court. A court is a public entity, and when it is a
14 real party in interest that does not prevail in a lawsuit, it is not excluded from the legislatively-imposed obligation for attorney's fees under the
15 private attorney general doctrine (Rhyne v. Municipal Court (1980) 113
16 Cal. App. 3d 807, 826–827, 170 Cal. Rptr. 312).

17 ☐ IT IS PROPER FOR THE COURT TO AWARD ATTORNEY'S FEES IN THIS ACTION TO [specify party, e.g., PLAINTIFF] [name] ON THE
18 BASIS OF THE COMMON FUND THEORY, AND SUCH FEES SHOULD BE AWARDED IN THE INTERESTS OF JUSTICE.
19 **A. General Rule.** Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys is left to
20 the express or implied agreement of the parties (Code Civ. Proc. § 1021).
**B. Equitable Exceptions.** The courts have fashioned equitable
21 exceptions to the general rule of Section 1021 of the Code of Civil Procedure. Three such exceptions are the common fund theory, the
22 substantial benefit theory, and the private attorney general doctrine (Serrano v. Priest (1977) 20 Cal. 3d 25, 34, 43, 141 Cal. Rptr. 315, 569
23 P.2d 1303).
**C. Common Fund Theory.** One who expends attorney's fees in winning
24 a suit which creates a fund from which others derive benefits may require the passive beneficiaries to bear a fair share of the litigation costs,
25 including attorney's fees (Serrano v. Priest (1977) 20 Cal. 3d 25, 35, 141 Cal. Rptr. 315, 569 P.2d 1303; Melendres v. Los Angeles (1975) 45 Cal.
26 App. 3d 267, 272–273, 119 Cal. Rptr. 713).
**D. Rationale for Common Fund Exception.** The bases of the common
27 fund exception are: (1) fairness to the successful litigant, who might otherwise receive no benefit because his or her recovery might be
28 consumed by the expenses; (2) correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who

EX-PARTE APPLICATION

1  should bear their share of the burden of its recovery; (3) encouragement of the attorney for the successful litigant to undertake and diligently
2  prosecute proper litigation for the protection or recovery of the fund by assurances of prompt and direct compensation upon success in the
3  litigation (Melendres v. Los Angeles (1975) 45 Cal. App. 3d 267, 273–274, 119 Cal. Rptr. 713).
4  **E. Amount of Fees.** The amount of attorney's fees in such cases rests within the trial court's discretion (Roos v. Honeywell Internat., Inc. (2015)
5  241 Cal. App. 4th 1472, 1488–1497, 194 Cal. Rptr. 3d 735; Mandel v. Hodges (1976) 54 Cal. App. 3d 596, 623, 127 Cal. Rptr. 244), after the
6  court has made certain preliminary determinations (Mandel v. Lackner (1979) 92 Cal. App. 3d 747, 758, 155 Cal. Rptr. 269). A trial court does not
7  abuse its discretion, when awarding a fee from a common fund created or preserved by the litigation, by calculating the fee as a percentage of the
8  fund and checking the reasonableness of the fee with a lodestar calculation (Laffitte v. Robert Half Internat., Inc. (2016) 1 Cal. 5th 480,
9  488-506, 205 Cal. Rptr. 3d 555, 376 P.3d 672).
[Insert other memoranda, as appropriate.]
10  Dated:
Respectfully submitted,
11  [firm name, if any]
By: [signature]
12  [typed name]
Attorney for [party's status and name]
13  ☐ [2] Comments
   • [a] Use of Form
14  This form may be submitted in support of a motion for an award of attorney's fees based on the common fund exception to the general rule
15  against awarding attorney's fees not expressly authorized by statute [Code Civ. Proc. § 1021]. It should be combined with other memoranda, as
16  appropriate, set out in § 60.301 et seq.
   • [b] Argument
17  Counsel should add argument linking the points in this form with the facts of his or her case. Evidence cognizable by the court in such a motion
18  proceeding should be submitted with the memorandum to support its factual statements. A request for judicial notice will support facts subject
19  to such notice [Evid. Code § 450 et seq.]. Otherwise supporting affidavits or declarations under penalty of perjury should be submitted [see Code
20  Civ. Proc. §§ 2009 (affidavits), 2015.5 (declarations)], averring to such facts within the personal knowledge of the affiant or declarant as may be
21  necessary to establish the ground or grounds of the motion [see Code Civ. Proc. §§ 2002(1), 2003; Evid. Code § 702]. For further legal background,
22  research guides, and forms relating to judicial notice and affidavits and declaration, see California Forms of Pleading and Practice, Ch. 15,
23  Affidavits, Certificates, and Declarations, and Ch. 321, Judicial Notice (Matthew Bender).
24  • [c] Related Pleading and Practice Chapters
For forms of notices of motions for attorney's fees with supporting
25  declarations and orders, see California Forms of Pleading and Practice, Ch. 174, Costs and Attorney's Fees (Matthew Bender).
26  • [d] Related Memoranda
Additional memoranda based on the common fund exception are set out in
27  § 60.301 et seq. Memoranda based on other equitable exceptions and statutory bases for an award of attorney's fees are set out in § 60.340 et
28  seq. (substantial benefit exception), § 60.370 et seq. (award based on

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1   private attorney general theory under Code Civ. Proc. § 1021.5), and
    § 60.440 et seq. (award based on contract pursuant to Civ. Code § 1717).
2   For discussion of requirements and considerations for drafting
    memoranda, discussion on how to combine the forms of this publication in
3   drafting, and discussion and general forms for completing a draft
    memorandum, see Ch. 1, Writing Legal Memoranda and Briefs.
4       • [e] Opposing Memoranda
    For opposing memoranda, see § 60.320 et seq.
5   □ [3] Discussion of Authorities
        • [a] General Rule
6   Code Civ. Proc. § 1021 provides that except as attorney's fees are
    specifically provided for by statute, the measure and mode of
7   compensation of attorneys is left to the express or implied agreement of
    the parties.
8       • [b] Equitable Exceptions
    In Serrano v. Priest (1977) 20 Cal. 3d 25, 141 Cal. Rptr. 315, 569 P.2d
9   1303, plaintiffs had brought an action which resulted in a prior Supreme
    Court decision declaring that the existing school finance system was
10  unconstitutional insofar as it operates to deny equality of educational
    opportunity to the school children of the state. Plaintiff's attorneys moved
11  the trial court for an award of attorney's fees against defendants. The
    motions were addressed to the equitable powers of the court and based on
12  three theories: the private attorney general theory, the common fund
    theory, and the substantial benefit theory. The trial court's award of
13  attorney's fees was based on the private attorney general theory only.
    Defendants appealed from the order granting fees, and plaintiffs appealed
14  from the denial of fees on the other two theories and also objected to the
    amount awarded. The Supreme Court affirmed the order awarding fees on
15  the basis of the private attorney general theory, but also discussed the
    other two equitable theories set out in Paragraph B of this form. For a
16  discussion of the substantial benefit and private attorney general
    theories, see §§ 60.340–60.349 and §§ 60.370–60.399.
17      • [c] Common Fund Theory
    The facts and procedural background of Serrano v. Priest (1977) 20 Cal.
18  3d 25, 141 Cal. Rptr. 315, 569 P.2d 1303, are discussed under
    § 60.300[3][b]. In affirming the trials court's order, the Court analyzed the
19  common fund theory. The Court stated that the common fund theory is
    based on the equitable powers of the court and provides that one who
20  expends attorney's fees in winning a suit which creates a fund from which
    others derive benefits may require the passive beneficiaries to bear a fair
21  share of the litigation. However, the trial court properly declined to award
    attorney's fees under this theory as no common fund was created or
22  preserved by the litigation.
    In Melendres v. Los Angeles (1975) 45 Cal. App. 3d 267, 119 Cal. Rptr.
23  713, plaintiff filed a class action on behalf of all police officers and
    firefighters employed by the City of Los Angeles. Subsequently, the Los
24  Angeles Fire & Police Protective League filed a similar action. The cases
    were consolidated and judgment was entered in favor of the entire class.
25  Plaintiff and the league had separate attorneys, and the league had a
    written fee agreement with its attorneys providing for an hourly fee.
26  Attorney's fees were requested by both sets of counsel for plaintiffs and
    the trial court granted the request, awarding the attorneys different
27  percentages of the common fund recovered on behalf of the class. Plaintiffs
    appealed from the order awarding the fees, objecting to the distribution of
28  the fees. Though the court of appeal modified the amounts awarded in the
    order, it approved the common fund theory as the basis of the award

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1   stating that California is in accord with the rule that the attorney whose
    client is the plaintiff in a class action suit is entitled to attorney's fees
2   from all members of the class benefited if a fund is obtained or protected
    and brought into court.
3       • [d] Rationale for Common Fund Exception
    Melendres v. Los Angeles (1975) 45 Cal. App. 3d 267, 119 Cal. Rptr. 713,
4   is discussed in § 60.300[3][c]. In reviewing the development of the common
    fund exception, the court of appeal set out the bases of the rule, citing
5   Estate of Stauffer (1959) 53 Cal. 2d 124, 132, 346 P.2d 748. These bases
    are: (1) fairness to the successful litigant, who might otherwise receive no
6   benefit because the recovery would be consumed by the expenses; (2)
    correlative prevention of an unfair advantage to the others who are
7   entitled to a share in the fund and who should bear their share of the
    burden of its recovery; and (3) encouragement of the attorney for the
8   successful litigant to undertake and diligently prosecute proper litigation
    for protection or recovery of the fund by assurances of prompt and direct
9   compensation upon success in the litigation.
        • [e] Amount of Fees
10  In Laffitte v. Robert Half Internat., Inc. (2016) 1 Cal. 5th 480, 488-506,
    205 Cal. Rptr. 3d 555, 376 P.3d 672, the parties settled a class action
11  employment lawsuit for $19 million with the agreement that class counsel
    would receive no more than one third of the recovery for attorney's fees.
12  Class counsel sought the maximum fee amount. The trial court granted
    the requested fee after considering the hours counsel had worked on the
13  case, applicable hourly rates, the course of the pretrial litigation, and the
    potential recovery and litigation risks involved in the case. An objecting
14  class member argued that the fee award calculated as a percentage of the
    settlement amount violated Serrano v. Priest (1977) 20 Cal. 3d 25, 141
15  Cal. Rptr. 315, 569 P.2d 1303 (Serrano III), in that fee awards must be
    calculated on the basis of time spent by the attorneys on the case.
16  The California Supreme Court first noted that class action litigation can
    result in an attorney's fee award pursuant to a statutory fee-shifting
17  provision or through the common fund doctrine when a class settlement
    agreement establishes a relief fund from which the attorney's fee is to be
18  drawn. The Court described two primary methods of determining a
    reasonable attorney's fee in class action litigation: The percentage method
19  calculates the fee as a percentage share of a recovered common fund or
    the monetary value of the plaintiffs' recovery. The lodestar method
20  calculates the fee by multiplying the number of hours reasonably
    expended by counsel by a reasonable hourly rate. Once the court has fixed
21  the lodestar, it may increase or decrease that amount by applying a
    positive or negative "multiplier" to take into account other factors,
22  including the quality of the representation, the novelty and complexity of
    the issues, the results obtained, and the contingent risk presented
23  (Laffitte, supra, at p. 489). The Court further observed that the lodestar
    method better accounts for the amount of work done, while the percentage
24  of the fund method more accurately reflects the results achieved (Laffitte,
    supra, at p. 489). The Court discussed the history of the two methods in
25  common fund cases, concluding that decisions since Serrano III have
    shown some uncertainty as to the role a percentage-of-the-recovery
26  calculation may play in determining court-ordered attorney's fees, but
    have not established any rule prohibiting such a calculation when the fee
27  is to be drawn from a common fund created by the litigation (Laffitte,
    supra, at p. 503). The Court held that use of the percentage method to
28  calculate a fee in a common fund case, where the award serves to spread
    the attorney's fee among all the beneficiaries of the fund, does not in itself

*EX-PARTE* APPLICATION

1  constitute an abuse of discretion (Laffitte, supra, at p. 503). The Court
   further concluded that a trial court does not abuse its discretion, when
2  awarding a fee from a common fund created or preserved by the litigation,
   by calculating the fee as a percentage of the fund and checking the
3  reasonableness of the fee with a lodestar calculation (Laffitte, supra, at p.
   506).
4  In Roos v. Honeywell Internat., Inc. (2015) 241 Cal. App. 4th 1472, 1488-
   1497, 194 Cal. Rptr. 3d 735, four class members appealed from a trial
5  court's order approving a settlement of a class action and awarding a
   portion of the settlement as fees to class counsel. The settlement
6  agreement provided that the attorneys would be paid no more than 37.5
   percent of the amount recovered. The objecting class members argued that
7  the trial court automatically awarded the attorneys 37.5 percent without
   determining the reasonableness of the fees. The attorneys claimed they
8  submitted a lodestar amount and reduced that amount to meet the 37.5
   percent cap.
9  The court of appeal held that a trial court may approve only a settlement
   of a class action that is fair, adequate, and reasonable (Roos, supra, at p.
10 1482). The court held that in fee-shifting cases, such as a class action,
   requests for attorney's fees are typically measured under the lodestar
11 method; under this method, the trial court multiplies the hours class
   counsel reasonably expended by reasonable hourly rates, and this
12 calculation can be enhanced or reduced by a multiplier depending on a
   number of factors (Roos, supra, at pp. 1490–1491). However, the court
13 noted that in common-fund cases in federal court, requests for attorney's
   fees are often awarded under a percentage-of-recovery method (Roos,
14 supra, at p. 1491). The court observed that both the lodestar method and
   the percentage method have pros and cons (Roos, supra, at pp. 1492–
15 1493). The court held that no matter which method is used, the ultimate
   goal is the award of a reasonable fee to compensate counsel for their
16 efforts (Roos, supra, at p. 1494). The court held that the cap on fees was
   reasonable and that the trial court properly reviewed the attorneys'
17 evidence of the lodestar amount (Roos, supra, at pp. 1494–1496).
   Mandel v. Hodges (1976) 54 Cal. App. 3d 596, 127 Cal. Rptr. 244, is
18 discussed in § 60.340[3][c]. In holding that the amount of attorney's fees
   which was granted by the trial court was not excessive, the court of appeal
19 stated that the amount of an award of attorney's fees rests within the
   sound discretion of the trial court.
20 Mandel v. Lackner (1979) 92 Cal. App. 3d 747, 155 Cal. Rptr. 269, is
   discussed in § 60.430[3][b].

21

22    **4. This Court At Minimum Should Appoint Legal Assistance
      by Limited Scope Representation**

23        I understand that in civil cases, there is no constitutional right to an
      appointed attorney. While the court may appoint an attorney to represent
24    me, it does so only in rare cases, such as case involving Hate Crimes and
      Color of Law Violations, once such has is similar to my situation, except I
25    was not murdered after I was released from jail at night, United States v.
      Price, 383 U.S. 787 (1966). I understand that if the court does not appoint
26    an attorney, I must be prepared to represent myself going forward in this
      case.
27        I understand that in deciding whether to appoint legal assistance,
      the court will consider a variety of factors, including but not limited to the
28    following:

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

**A. the merits of my claims and my ability to present the claims in Pro Se; and**

The merits of my claim rest on one question:

**"Does the PETITIONER know how to spell his own name?"**

PETITIONERs meet the first factor for the purposes of an injunction and temporary restraining order, particularly in these novel circumstances. To demonstrate a likelihood of success, PETITIONERs need not "'show[] a mathematical probability of success'" but rather that they are pursuing challenging, serious legal questions that present a need for a "'more deliberative investigation.'" Jewish War Veterans of U.S., Inc. v. Gates, 522 F. Supp. 2d 73, 76 (D.D.C. 2007) (citing Washington Metro., 559 F.2d at 844).

Moreover, even if PETITIONERs cannot establish a likelihood of success on appeal, where there is a strong showing on irreparable harm, a stay is appropriate if they "have made out a 'substantial case on the merits.'" Ctr. For Int'l Envtl. Law, 240 F. Supp. 2d 21, 22 (D.D.C. 2003) (so holding "although the Court ultimately did not agree with Respondent(s)' position on the merits" (quoting Washington Metro. 559 F.2d at 843)).

Finally, PETITIONERs' will also, at the least, present numerous serious issues related to the statutory construction of Federal Claims and Taking Clause of Private Property from the Fifth Amendments rights that warrant preserving the status quo in order to allow for appellate review of this Court's judgment. The Court of Appeals has not considered the constitutional and statutory interpretation questions implicated in this case since the decision in AFL-CIO v. FEC, 333 F.3d 174 (D.C. Cir. 2003), in which the Court invalidated the FEC's prior disclosure policy and instructed the agency to devise a new policy.

At the very least, these are difficult and novel questions that present "a substantial case" on the merits: again, as this Court observed, there are questions raised by this case that are Honorable Virginia A. Phillips did not rule on the full Motion to Disqualify Judges. Coupled with the prospect of irreparable harm to the PETITIONERs, and the practical result that their appeal will become moot unless an injunction is issued, the circumstances presented here favor the entry of a stay or injunctive relief pending appeal.

In addition to the foregoing, I believe that the court should consider the following additional information: the court document's mailed to Gail O'Rane on August 7, 2019, and in her possession (not admitted into evidence) **Exhibit D for letter and court documents mailed**; and the false arrest and obstruction of justice and intimidation; as I stood in line at the Riverside Superior Court, my court documents were confiscated and I was falsely arrested, prior to attempting to file court documents, I notified the opposing party's counsel of an Ex-Parte on June 28, 2019, and that I would file an Ex-Parte on July 1st, 2019, see booking intake receipt, etc., as **Exhibit C**; and the Minute Order from April 3rd, 2019 stating that one important reason for the Ex-Parte was requesting counsel after discovering a CRIMINAL PROTECTIVE ORDER and CRIMINAL action CASE pending, see **Exhibit E** for some of urgent reasons I attempted to file an Ex-Parte on July 1st, 2019; and the trauma I am undergoing from the false arrest and false imprisonment; see article: "The Psychological and Legal Aftermath of False Arrest and Imprisonment" and Medical visits to the hospital in which I suffered injuries, in **Exhibit F**, and ALL

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

COURT DOCUMENT'S WHETHER ADMITTED INTO EVIDENCE OR NOT for FAMSS19011320, DVRI191830, and 5:19cv1808; and all 911 calls and recordings I made in 2019, and all attempted and completed calls and recordings from when I was falsely imprisoned on July 1st, 2019 by Riverside County Sheriff Department.

This court will find that the total situation, focusing, inter alia, on the merits of the case, and the complexity of the legal issues, and the PETITIONER's inability to represent himself due to matters and actions out of his control. This matter is filed while communication of a Notice of Claim by RESPONDENT(S) and other unknown parties.

**B. the nature and complexity of factual and legal issues in the claims; and**

Under California law, "spoliation of evidence" is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation. *Kearney v. Foley & Lardner, LLP* (9th Cir. 2009) 590 F.3d 638 (applying California law). Spoliation is not a new problem in civil litigation. The destruction may be negligent, willful, or reckless. It could occur under the watch and care of a party, non-party or counsel. From shredding documents to deleting electronic files, the manner of spoliation can vary. However, the effect of destruction of evidence is that it can destroy fairness and justice, increasing the risk of erroneous decisions and possibly increasing litigation costs as parties attempt to reconstruct what is no longer readily available. Further, spoliation offends the notion of fair play and undermines the adversarial system by violating the spirit of liberal discovery.

In response to spoliation, courts have developed several remedies against spoliators including adverse inference jury instructions, monetary or evidentiary sanctions, criminal penalties and possibly a separate spoliation tort. The availability of these remedies varies across jurisdictions and is often discretionary. This article discusses the potential remedies available in California when spoliation occurs.

**i. Spoliation As An Independent Tort?**

California was the first state to recognize the independent tort of spoliation. In *Smith v. Superior Court* (2d Dist. 1984) 151 Cal.App.3d 491 (disapproved of by *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, the court for the first time acknowledged that a cause of action may be stated for intentional destruction of evidence by a defendant in an underlying action. The identified elements of intentional spoliation include: (1) pending or probable litigation involving the PETITIONER; (2) knowledge by the defendant of the existence or likelihood of litigation; (3) intentional "acts of spoliation" on the part of defendant designed to disrupt PETITIONER's case; (4) disruption of PETITIONER's case; and (5) damages proximately resulting therefrom. Shortly after *Smith*, in *Velasco v. Commercial Bldg. Maintenance Co.* (2d Dist. 1985) 169 Cal.App.3d 874, the court recognized that negligent spoliation by a third party could be actionable under appropriate circumstances relying upon Smith and earlier dicta in Williams v. State of California (1983) 34 Cal.3d 18. Although not finding the facts of the particular case actionable, the *Velasco* court analogized negligent spoliation to the recognized tort of negligent interference with prospective economic advantage.

*EX-PARTE* APPLICATION

In 1998, the California Supreme Court overruled Smith and specifically held than an independent tort of intentional spoliation is not cognizable against a party-defendant in the underlying case where the spoliation is or reasonably should have been discovered before the trial or other decision on the merits of the underlying cause of action. *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal. 4th 1. In Cedars-Sinai, the court offered detailed policy reasons for its refusal to recognize an action against a defendant in the primary action, including: strong policy favoring the use of nontort remedies to punish and correct litigation misconduct; prohibition against attacking adjudication on the ground that evidence was falsified or destroyed; uncertainty of harm in spoliation cases and difficulty of proof; direct and indirect costs of risks or erroneous determinations of spoliation harm to private parties and cost to Respondent(s) and courts litigating meritless actions; significant potential for jury confusion and inconsistency where underlying and spoliation claims are tried jointly; and duplicative proceedings without avoidance of the potential for inconsistent results where the actions are pursued separately with requirement of a "retrial within a trial" burdensome both to parties and courts. Just as there is no tort for intentional spoliation committed by a party to underlying litigation, likewise, there is no separate tort cause of action for negligent spoliation of evidence. Given California's non-recognition of spoliation as an independent tort, practitioners should look traditional nontort litigation remedies for spoliation. *Hernandez v. Garcetti* (1998) 68 Cal. App. 4th 675.

### ii. Adverse Inference Jury Instructions

The doctrine of spoliation conceptually encompasses both negligent and deliberate destruction of relevant evidence by a party to litigation. However, California appears to have limited the adverse presumption jury instruction that follows destruction or spoliation of evidence only to situations involving willful destruction or suppression. California trial courts are permitted to instruct juries with a "spoliation inference" that may be used where a litigant is found to have willfully destroyed or concealed evidence during the underlying litigation. See *Cedars-Sinai Center,* 18 Cal.4th at 12. Evidence Code section 413 provides in pertinent part:

In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case.

The Judicial Council of California Advisory Committee on Civil Jury Instructions provides under instruction 204 that the jury may consider whether one party intentionally concealed or destroyed evidence. If the jury decides that a party did so, the jury may decide that the evidence would have been unfavorable to that party. It is prejudicial error to instruct the jury on wilful suppression of evidence when there is no evidence to support the instruction. *County of Contra Costa v. Nulty* (1965) 237 Cal.App.2d 593, 598.

The policy of limiting the adverse inference instruction to intentional acts of destruction flows from the rationale that only intentional destruction supports the inference that the destruction amounts to an admission by conduct of the weaknesses of the case. The implication is that there is a consciousness of guilt that has the potential to saturate the entire case. While some jurisdictions hold that the negligent destruction of relevant evidence can be sufficient to give rise to

*EX-PARTE* APPLICATION

1   the spoliation inference, California only permits the instruction with
2   willful destruction or suppression.

### iii. Sanctions

Courts determine the proper sanction for destruction or suppression
of relevant evidence on a case-by-case basis. *Unigard Security Ins. Co. v.
Lakewood Eng. & Mfg. Corp.* (9th Cir. 1992) 982 F.2d 363, 368.   The
following factors are generally considered in choosing an appropriate
sanction: the degree of fault of the party who altered or destroyed the
evidence; the degree of prejudice suffered by the opposing party; and
whether a lesser sanction will avoid substantial unfairness to the
opposing party and, where the offending party is seriously at fault, will
serve to deter such conduct by others in the future. Prac. Guide Fed. Civ.
Proc. Before Trial (Nat Ed.) Ch. 11(I)-C.

The California Supreme Court instructs that spoliation constitutes a
misuse of the discovery process that is subject to a comprehensive range of
punishment, including monetary, issue, evidentiary, and terminating
sanctions.  See e.g., Cal Code Civ. Proc §§ 2023.010(3), 2023.030(a) to
(d); *Cedars-Sinai Medical Center v. Superior Court*, 18 Cal.4th 1, 12. A
terminating sanction may be appropriate in the first instance without a
violation of prior court orders in egregious cases of intentional spoliation
of evidence.  *R.S. Creative, Inc. v. Creative Cotton Ltd.* (1999) 75
Cal.App.4th 486, 497.  Some jurisdictions have found that once the duty to
preserve evidence has attached, counsel's failure to issue a written
litigation hold letter to a client constitutes gross negligence for sanctions
purposes, "because it is likely to result in destruction of relevant
information."  *Pension Committee of Univ. of Montreal Pension Plan v.
Banc of America Securities, LLC* (S.D. NY 2010) 685 F.Supp.2d 456, 466.
The court may exclude related or derivative evidence offered by a party
who has destroyed evidence while under a duty to preserve it.  *Uniguard
Security Ins. C.*, 982 F.2d 363, 368.

If placed in the situation where evidence may have been destroyed,
it is a good idea to get ahead of the situation as soon as possible.
Recognizing that the implications of spoliation in California litigation
could range from various sanctions (including terminating sanctions) to
adverse jury instructions is important in advising clients about the
significance of document preservation in the first place.  If brought on as
new counsel on a pending matter, consider issuing a litigation hold letter
to your client to be sure that these issues are addressed.  It may not be too
late to exercise these cautions to preserve documents and it could mean
avoiding steep consequences.

### iv. Fraud on the Court.

A second, potentially worse option than your typical Rule 60(b)
motion, is an allegation of fraud on the court. A subset of Rule 60 in
federal court is an action for "fraud on the court," which falls under the
"other powers to grant relief" provision of Rule 60(d). In federal court,
actions for fraud on the court can come in many different forms, there is
no time limit on them, and it is within the inherent power of the court to
vacate a judgment that was obtained by fraud. See Drobny v. C .I.R., 113
F.3d 670, 677 (7th Cir. 1997) ("A] decision produced by fraud on the court
is not in essence a decision at all, and never becomes final."); see also
Wright & Miller,11 Federal Practice & Procedure § 2870 (3d ed.); see also,
e.g., Ala. R. Civ. P. 60(b) (stating the rule "does not limit the power of a

*EX-PARTE* APPLICATION

1    court to . . . set aside a judgment for fraud upon the court"); Fla. R. Civ. P.
2    1.540 ("This rule does not limit the power of a court to entertain an
     independent action to relieve a party from a judgment, decree, order, or
3    proceeding or to set aside a judgment or decree for fraud upon the court.");
     N.J. Ct. R. R. 4:50-3 (same). But see Matthews, Wilson & Matthews, Inc.
4    v. Capital City Bank, 614 F. App'x 969, 971 (11th Cir. 2015) (noting that
     the equitable doctrine of laches "does apply"); N.Y. C.P.L.R. 5015 (treating
5    fraud upon the court under the same provision as regular fraud); Va. Code
     § 8.01-428 (stating that a "motion on the ground of fraud on the court
6    shall be made within two years from the date of the judgment or decree").
7        Given the general flexibility in federal court and in many states
     regarding time limits on bringing such actions along with the offensive
8    nature of such an action—if legitimate—to a court, these allegations can
     be far more worrisome than an average Rule 60(b) motion. The remedy if
     such fraud has indeed occurred is ordinarily to vacate the judgment and
9    deny "the guilty party [of] all relief." Boyer v. GT Acquisition LLC, No.
     106-CV-90-TS, 2007 WL 2316520, at *4 (N.D. Ind. Aug. 9, 2007).
10   Sanctions may be imposed, and the entire cost of the proceedings,
     including attorneys' fees, may be assessed against that party who
11   perpetrated the fraud. See Wright & Miller, 11 Federal Practice &
     Procedure § 2870 (3d ed.).
12       In general, "[f]raud on the court which justifies vacating a judgment
     is narrowly defined as fraud which is directed to the judicial machinery
13   itself and is not fraud between the parties or fraudulent documents, false
     statements or perjury." United States v. Smiley, 553 F.3d 1137, 1144 (8th
14   Cir. 2009) (internal quotation marks and citations omitted). Examples of
     fraud on the court in a settlement context can be seen most clearly in the
15   class action or pro ami context, where court approval is required—as a
     fiduciary for the class or the minor—to settle the action. See, e.g., In re
16   Tremont Sec. Law, State Law, Ins. Litig., No. 08 CIV. 11117, 2013 WL
     795974, at *2 (S.D.N.Y. Mar. 1, 2013) (arguing fraud on the court after
17   approval of settlement through fairness hearing); CA, Inc. v. Wang, No.
     04-CV-2697 TCP, 2011 WL 5401324, at *15 (E.D.N.Y. Nov. 4, 2011)
18   (same). But while those are the most obvious, fraud on the court can
     stretch much farther than just those scenarios in a settlement context.
19   See Burlington N. R. Co. v. Warren, 574 So. 2d 758, 764 (Ala. 1990)
     (holding a consent judgment was fraud on the court and stating, "where
20   fraud is practiced upon a party to induce the party to enter into an
     agreement, and the wrongdoer intends that the court adopt that
21   fraudulent agreement as part of a judgment, then there is fraud upon the
     court."); id. ("[O]nly that species of fraud which does or attempts to, defile
22   the court itself, or is a fraud perpetrated by officers of the court so that the
     judicial machinery can not perform in the usual manner its impartial task
23   of adjudging cases that are presented for adjudication."); R.C. by Alabama
     Disabilities Advocacy Program v. Nachman, 969 F. Supp. 682, 690-91
24   (M.D. Ala. 1997), aff'd sub nom. R.C. v. Nachman, 145 F.3d 363 (11th Cir.
     1998) ("Fraud upon the court is . . . typically confined to the most
25   egregious cases, such as bribery of a judge or juror, or improper influence
     exerted on the court by an attorney, in which the integrity of the court
26   and its ability to function impartially is directly impinged.").
     Luckily, because fraud on the court is so difficult to establish, very
27   few of these actions are successful. See, e.g., In re Sealed Case (Bowles),
     624 F.3d 482, 489 n.4 (D.C. Cir. 2010) ("Appellant's allegations of fraud do
28   not meet the high threshold for showing a fraud on the court."); Dempsey
     v. Arco Oil & Gas Co., 25 F.3d 1043 (5th Cir. 1994) (reviewing district
     court ruling for abuse of discretion and stating that a " reversal will be

- 105 -

*EX-PARTE* APPLICATION

granted only upon a showing of extraordinary circumstances that create a substantial danger that the underlying judgment was unjust" (internal quotation marks and citation omitted)); see also, e.g., Pizzuto v. Ramirez, 783 F.3d 1171, 1180 (9th Cir. 2015) ("[A] party bears a high burden in seeking to prove fraud on the court, which must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." (internal quotation marks and citations omitted)); Matthews, Wilson & Matthews, Inc. v. Capital City Bank, 614 F. App'x 969, 971 (11th Cir. 2015) ("Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court." (internal quotation marks and citation omitted)).

But if successful, a likely result is a reopening of the action and heavy sanctions (both monetary and non-monetary) against the party that committed the fraud. See, e.g., Haeger v. Goodyear Tire & Rubber Co., 813 F.3d 1233, 1237, 1254 (9th Cir. 2016) (affirming monetary and non-monetary sanctions by district court imposed under inherent power because of "deliberate decisions by [Respondent(s)] to delay the production of relevant information, make misleading and false in-court statements, and conceal relevant documents").

### v. Independent Cause of Action for Fraud.

Finally, an opponent can attempt to affirm the settlement and sue for more money by way of an independent action for fraud, much like our example case. Although much more rare, this type of an action could be a tremendous threat, especially given the potential for punitive damages in fraud actions. Although many courts may not permit such an action and may conclude that Rule 60(b) is the only available remedy, some courts have held otherwise. See, e.g., Ex-Parte Caremark RX, Inc., 956 So. 2d 1117, 1125 (Ala. 2006) ("As the Ex-Parte Application is now drafted, [the] only option is to proceed with [the] misrepresentation and suppression claims as a new action."). But see, e.g., Pondexter v. Pennsylvania Human Relations Comm'n, 556 F. App'x 129, 131 (3d Cir. 2014) (dismissing new action with additional Respondent(s)); Villarreal v. Brown Exp., Inc., 529 F.2d 1219, 1221 (5th Cir. 1976) (holding that new Ex-Parte Application filed regarding prior settlement in reality fell under Rule 60(b)); Aldana v. Del Monte Fresh Produce N.A., Inc., 741 F.3d 1349, 1359 (11th Cir. 2014) (stating relief is available under this mechanism only to prevent a grave miscarriage of justice); id. ("The Supreme Court has made clear that such '[i]ndependent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the doctrine of res judicata." (internal quotation marks and citations omitted)). And of course, the worse the conduct appears, the more likely it becomes that a court will find a way to allow the action to proceed, regardless of any Rule 60(b) time limits. After all, as lawyers we have all heard the old adage that "bad facts made bad law," and it unfortunately turns out to be true more often than we would like.

Although "[p]roper resorts to independent actions are rare, Matthews, Wilson & Matthews, Inc. v. Capital City Bank, 614 F. App'x 969, 971 (11th Cir. 2015), if such an action is permitted to proceed, the potential damages could get worse than just sanctions by a court. Not only can the PETITIONERs' recover the difference between what the settlement was and what it would have been had the suppressed or true facts been known, they can recover punitive damages to punish the

- 106 -

*EX-PARTE* APPLICATION

1  Respondent(s) for the fraud and suppression. And in a case like our
2  example case, where the members of the class are painted as innocent
   victims of a fraud, a high jury verdict becomes a very real risk.

3  **C. My diligence in attempting to secure an attorney; and**

4  In support PETITIONER states that I have made a diligent effort to
   employ counsel and contacted the following attorneys: Jon Atabek, Jamon
5  Hicks, Colin Rushovich, Aaron Berger, Mark Lansing, Melissa Mikhail,
   etc. Due to the complex case involving Judicial Officers and their Bailiff's,
6  such as Gail O Rane and her Bailiff H. Lopez, many attorney's have not
   wanted to intervene with my case because of the complexity and my lack
7  of money to pay attorney fees, See **Exhibit G**.

8  PETITIONER states that I made a diligent effort to obtain the
   assistance of counsel by contacting the following legal aid organizations,
   lawyer referral service, or pro bono attorneys: Inland Counties Legal
9  Service, Georgia Legal Aid, Federal Pro Bono Clinic, and ACLU, and
   attendance at the LA County Law Library for their Civil Rights' course on
10 December 13, 2019, **See Exhibit H**.

11 I understand with regard to the first factor, I must show that I have
   made a reasonably diligent effort under the circumstances to obtain an
12 attorney to represent me and that I have fully exhausted my efforts with
   attempting to secure counsel, see **Exhibit G and Exhibit H**.

13 To obtain legal fees or legal assistance, a party must make diligent
   efforts to secure counsel. This typically requires the party to meet with
14 and discuss the case with at least five attorneys. Some of my diligent
   efforts, included contacting and speaking with attorney's already
   litigating against RESPONDENT(S), such as:

15 1. Jamon Hicks from Douglas/Hicks Attorneys at Law, legal counsel
   in a settlement against RESPONDENT(S) for beating a man to death.
16 2. John W. Harris from Harris & Associates, legal counsel from a
   wrongful death case vs RESPONDENT(S).
17 3. Ralph M. Rios from Rios & Associates, legal counsel in the flower
   vendor case vs RESPONDENT(S).
18 4. Jan Stigilitz from the Law Office of Jan Stiglitz, legal counsel in
   the Horace Roberts case.
19 5. Craig S. Benner from the Benner Law Firm, legal counsel in the
   Horace Roberts case.
20 I demonstrate all my efforts within this motion and attached
   documents in **Exhibit G and Exhibit H**.

21 **D. My financial ability to pay an attorney; and**

22 I am financially unable to hire an attorney because I have lost my
23 job due to the court clerk and/or staff's misconduct and false arrest on
   July 1st, 2019 while inside the court house attempting to file an Ex-Parte.
24 I have a video that will be presented at the hearing, in addition view my
   booking intake form, and other relevant document's attached.
25 I, Abanoob Abdel-Malak, the above named PETITIONER, do hereby
   swear that I am unable to pay the costs of said proceeding or give security
26 therefor, that I believe I am entitled to redress because of the color of law
   violations, and that I am unable to litigate this case on my own behalf
27 because I am indigent and that exceptional circumstances are present, for
   example, the Superior Court of Riverside changed the case summary
28 information regarding the Judicial Officer's name being changed to
   another Judicial Officer name, which is false. Honorable Gail O'Rane is

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  the correct Judicial Officer who held all hearings from March 12, 2019 up
2  until August 8, 2019 **(See Exhibit A for the Original Case Summary
   with Gail O Rane)**, NOT Judicial Officer Jennifer Gerard **(See Exhibit
   B for the Altered Case Summary with Jennifer Gerard)**, once I
3  attempted to file my Notice of Appeal on January 14, 2020, was then the
   name of the Judicial Officer name changed from Gail O'Rane to Jennifer
4  Gerard, because of such acts,  a denial of the application will likely result
   in fundamental unfairness impinging on my due process rights. I
5  respectfully request the appointment of counsel.
        PETITIONER has submitted a financial document in a state action,
6  based upon that affidavit, the Court has granted him permission to
   proceed in forma pauperis. The affidavit likewise shows that
7  PETITIONER is financially unable to secure counsel. In the appointment-
   of-counsel context, the pertinent inquiry is whether the party seeking
8  appointment can "meet his or her daily expenses" while also hiring an
   attorney. Given the financial affidavit, the court will find that I, the
9  PETITIONER, have shown that I would be unable to meet my daily, non-
   discretionary expenses am I to hire an attorney. My credit score strongly
10 reflects my inability to afford counsel and explains why the incident of
   July 1st, 2019 directly reflects the proximate cause and damage of why I
11 am unable to afford counsel. Therefore, I am a qualified candidate
   pursuant 28 U.S.C. § 1915(e)(1) and/or other applicable laws under
12 Federal and State Law with exceptional circumstances. See **Exhibit I** for
   financial hardships. Lastly, PETITIONER is using a Fee Waiver.
13      To warrant appointment of counsel, PETITIONER must also
   affirmatively show that he asserts meritorious claims. By being falsely
14 imprisoned and falsely arrested I am able to demonstrate tort claims in
   addition to the color of law violations. I also would be able to provide merit
15 of allegations based on the telephone records of calls I attempted to make
   while detained. If I was given my federally protected right to file the Ex-
16 Parte on July 1st, 2019, purchase certified copies, and have subpoena's
   issued, the outcome of the case would be different.
17      Based on RESPONDENT(S)'s past unlawful actions in federal court
   demonstrate a pattern and practice, and road they have traveled before.
18 The fact that I was released from jail and the criminal charges were
   dropped, show my claim has merit. In addition, my Notice of Claim, shows
19 meritorious claims.
   My claims arise under the laws of the federal laws and state laws, in
20 which tort claims will suffice. Intending to file a Federal Civil Right action
   in this matter pursuant to California Government Code §910.4 the
21 California Tort Claim Act and Federal Tort Claims Act and any other
   applicable state or federal statute or constitutional provision.
22 PETITIONER has suffered harm as a direct and proximate cause of the
   actions and inactions stated in the statement of facts.
23      As a result of the foregoing, Respondent(s) are engaged in ongoing
   violations founded on a claim and/or right arising under the laws of the
24 United States. Article VI, Paragraph 2 of the U.S. Constitution is
   commonly referred to as the Supremacy Clause. It establishes that the
25 federal constitution, and federal law generally, take precedence over state
   laws, and even state constitutions. It prohibits states from interfering
26 with the federal government's exercise of its constitutional powers, and
   from assuming any functions that are exclusively entrusted to the federal
27 government. The following ongoing violations violate Color of Law
   violations; i. Amendment IV: Search and Arrest Warrants, ii. Amendment
28 V: Rights in Criminal Cases, iii. Amendment VI: Rights to a Fair Trial, iv.
   Amendment VIII: Bails, Fines, and Punishments, v. Title 42, U.S.C.,

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1   Section 14141, vi. Title 18, U.S.C. Section 241 Conspiracy of Rights, vii.
    Title 18, U.S.C., Section 242 Deprivations of Rights under Color of Law,
2   viii. Title 18, USC, Section 245 – Federally Protected Activities, which
    prohibits unfair or deceptive acts or practices in or affecting United States
3   citizens.
    The Injuries as a result of illicit acts mentioned in this motion, together
4   between all the parties described in this motion, PETITIONER suffered
    loss of employment, loss of law school scholarship, loss of liberty, great
5   mental anguish, humiliation, degradation, physical and emotional pain
    and suffering, and other grievous and continuing injuries and damages set
6   forth above. The misconduct described in this count was objectively
    unreasonable and was undertaken intentionally and with willful
7   indifference to PETITIONER's constitutional rights.
8           If I am granted a temporary restraining order and preliminary
    injunction. Requiring the following items to be granted, my merit on my
9   claims are more than likely to be successful;
            1. Permanently restraining and enjoining Respondent(s) from
10  destroying, altering, accessing, or concealing documents pertaining to
    PETITIONER's Medical Records.
11          2. Temporarily restraining and enjoining Respondent(s) from
    destroying, altering, or concealing documents pertaining to case DVRI
12  1901830, FAMSS 1901320, 5.
            3. Temporarily restraining and enjoining Respondent(s)' from
13  destroying, altering, or concealing video footage & phone call recordings
    from July 1st, 2019 inside the Riverside Family Court House and
14  Riverside Detention Center when PETITIONER was arrested while in
    line of the court house.
15          4. Temporarily restraining and enjoining Respondent(s)' from
    destroying, altering, or concealing phone calls from the cell where the
16  PETITIONER was detained on July 1st, 2019.
            5. Temporarily restraining and enjoining Respondent(s) from
17  disclosing any Protected Information without first implementing
    reasonable safeguards to maintain and protect the privacy, security,
18  confidentiality, and integrity of such Protected Information;
            6. Temporarily restraining and enjoining Respondent(s) from
19  disclosing or benefiting from any Protected Information that any
    Defendant disclosed prior to date of entry of TRO and without having
20  implemented reasonable safeguards to maintain and protect the privacy,
    security, confidentiality, and integrity of such Protected Information;
21          7. Requiring Respondent(s) and any person hosting or otherwise
    controlling any Internet content, server, or website that contains
22  Protected Information posted by or on behalf of any Defendant to
    immediately take steps to ensure that the Protected Information on any
23  website, blog, or social media service is no longer viewable or accessible by
    persons using the Internet; prevent the alteration, destruction, or erasure
24  of any Internet content, servers, or websites that contain Protected
    Information posted by or on behalf of the Respondent(s); and implement
25  reasonable safeguards to maintain and protect the privacy, security,
    confidentiality, and integrity of any Protected Information;
26          8. Requiring Respondent(s) to provide notification to each person
    whose Protected Information they disclosed without implementing and
27  using reasonable safeguards to maintain and protect the privacy, security,
    confidentiality, and integrity of such Protected Information;
28          9. Restraining and enjoining Respondent(s) and certain third parties
    from destroying or concealing documents;

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

10. Authorizing expedited discovery from Respondent(s) and third parties, for the purpose of discovering information about Respondent(s)' identities, assets, and/or business activities;

11. Requiring Respondent(s) to show cause why this Court should not issue a preliminary injunction extending such temporary relief pending an adjudication on the merits; and

12. Providing the assistance of legal counsel in this highly complexed matter

13. Preventing this filing to be randomly assigned to District Judge David O. Carter and/or any other Judge who has any connection or association with Riverside County.

14. Providing for other equitable relief.

### E. PETITIONER's Capacity to Present Case Without Counsel

In determining whether the case is an exceptional one, the court said that the court should consider: (1) the type and complexity of the case; (2) whether the PETITIONER is capable of adequately presenting his case; (3) whether the PETITIONER is in a position to investigate the case adequately; and (4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross-examination. Id. at 213.

I have no training or experience in cross-examining witnesses or presenting complicated evidence. I have no training in objecting to the tactics of opposing counsel in a trial that will be decided on these complexed issues. Such as particular complexities or difficulties in conducting discovery. to the exceptional circumstances below. I do not have the ability to investigate the crucial facts such as my medical records and court documents, the conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

The factual and legal issues in this civil case do appear to be too complex due to federal and state cases, along with due process and equal protection of the law under V.A.W.A. and color of law violations. In Ulmer, an indigent prisoner brought a suit under 42 U.S.C. § 1983 alleging a violation of his civil rights because of inadequate and unsanitary jail conditions. The court said that although counsel in civil rights cases was required only in exceptional cases, 28 U.S.C. § 1915(d) allows a federal court the discretion to appoint counsel if doing so would advance the proper administration of justice.

Also, to file my Ex-Parte Application in the proper Jurisdiction and Venue for Demanding A Trial By Jury; without Counsel, I am unsure on which Court I am entitled and/or able to file in to get a Fair Trial since Judicial Officer's of California are at the center of this case. The incidents occurred in succession, beginning on or around January 31, 2019 at 1:09:00 p.m. up until now February 2020. Some incidents and injuries occurred in San Bernardino County, California, Riverside County, California, Orange County, California, Los Angeles, County, The State of North Carolina, and The State of Georgia, and back in the State of California. Some witnesses live in New York, North Carolina, and Georgia.

The court found In Jolly v. Wright "due process requires appointment of counsel for indigents in nonsupport civil contempt proceedings only in those cases where assistance of counsel is necessary

*EX-PARTE* APPLICATION

1   for an adequate presentation of the merits, or to otherwise ensure
fundamental fairness".

2   My health and trauma from the July1st, 2019 incident, and for
someone of my age and as healthy as I am to suffer a heart condition like I

3   did in August makes this trial difficult to proceed in Pro Se, and my
trauma and incident is fully demonstrated what the article reflected in

4   **Exhibit F.** I am unemployed and slowly recovering from the trauma.
I am currently in search for employment, so this also limits my

5   capacity to investigate certain issues and draft documents while meeting
my basic needs. I will be starting school soon, as a full-time student

6   beginning around Fall 2020. My time will be limited for the next couple of
years.

7   **Complexed Issue; #1**
If the claim meets this threshold requirement, the court should then

8   consider the indigent's ability to investigate the crucial facts, whether
conflicting evidence implicating the need for cross-examination will be the

9   major proof presented to the fact finder, the indigent's ability to present
the case, the complexity of the legal issues and any special reason in that

10  case why appointment of counsel would be more likely to lead to a just
determination. Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997),

11  quoting Hodge v. Police Officers, 802 F.2d 58, 61-62 (2d Cir. 1986)
My second example, the Superior Court of Riverside changed the

12  case summary information regarding the Judicial Officer's name being
changed to another Judicial Officer name, which is false. Honorable Gail

13  O'Rane is the correct Judicial Officer who held all hearings from March
12, 2019 up until August 8, 2019, NOT Judicial Officer Jennifer Gerard,

14  once I attempted to file my Notice of Appeal on January 14, 2020, was
then the name of the Judicial Officer name changed from Gail O'Rane to

15  Jennifer Gerard, because of such acts, a denial of counsel will likely
result in fundamental unfairness impinging on my due process rights. I

16  respectfully request the appointment of counsel.
My third example; On November 21, 2019: court clerks refused to

17  allow me to file an ex-parte once again before my hearing. Because of once
again being denied to file and Ex-Parte as a Self-Represented Indigent

18  Defendant, I request Commissioner Wendy Harris to recuse herself as
allowed by California Family Law Court Rules. She refused to recuse

19  herself after I orally request my first request to have a judge removed
from my case. I orally stated to recuse herself pursuant to California Code

20  of Civil Procedure §170.6 and that she is bias because she has not
appointed legal counsel in a criminal case action, and/or issued me any

21  subpoena's to at least one witness from my witness list of 15-plus
witnesses I intended to call. In addition, on November 22, 2019:

22  Commissioner Wendy Harris refuses to give me her California State Bar
License Number. I explained to her that my health is not fit to provide my

23  defense to this case as I desperately need an attorney and that I already
suffered a heart condition from the false arrest by the bailiff's in the court

24  room. She refused to provide me with everyone's name inside the court
room. She stated she does not practice law in California. And practices

25  outside the state of California. Commissioner Wendy Harris, grants the
Criminal Protective Order for 5 years, allowing the same law enforcement

26  agency who arrested me to continue to record my communications and
monitor my internet, in which they can arrest me without notice.

27  Key elements in properly showing my claim, rest on Judicial
Immunity by the Judges who violated 18 U.S.C., Section 242 –

28  Deprivation of Rights Under Color of Law. In Dykes v. Hosemann, 776
F.2d 942, 946 (11th Cir.1985) (en banc), the Eleventh Circuit, sitting en

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  banc, held that a judge who conspires to deny a party federal
   constitutional rights is immune from a damage action under section 1983.
2  Dykes, 776 F.2d at 946. "Were we to follow Rankin v. Howard, 633 F.2d
   844, 848-49 (9th Cir.1980), judges, on mere allegations of conspiracy or
3  prior agreement, could be hauled into court and made to defend their
   judicial acts, the precise result judicial immunity was designed to avoid.".
4  The court in Dykes also questioned Rankin's holding that a judge loses
   immunity, regardless of the existence of subject matter jurisdiction, by
5  acting in the absence of personal jurisdiction.  at 948. "We view Rankin as
   contrary to Supreme Court and Eleventh Circuit precedent as well as an
6  unwise restriction of a time-tested doctrine."
           **Complexed Issue; #2**
7          The difficulties with the procedures in a Notice of Claim under the
   California Tort Claims Act and Federal Tort Claims Act Requirements,
8  etc.; A PETITIONER must plead compliance with the Tort Claims Act in
   any action that was subject to the claims presentation requirements.
9  Dujardin v. Ventura County Gen. Hosp., 69 Cal.App.3d 350 (1977). If not
   properly plead, it is subject to attack. Id. Of course, if the PETITIONER
10 complied with the Tort Claims Act but simply failed to plead it, the defect
   may be cured by amendment. Bohrer v. County of San Diego, 104
11 Cal.App.3d 155, 160 (1980).
           The public entity defendant can also plead the failure to comply with
12 the Tort Claims Act as an affirmative defense. Rand v. Andreatta, 60
   Cal.2d 846, 848 (1964). However, a defendant may assert the failure to
13 comply with the Tort Claims Act in a summary judgment motion
   regardless of whether it was pled as an affirmative defense. Redlands
14 High School Dist. v. Superior Court, 20 Cal.2d 348, 358 (1942)(construing
   prior claims law).
15         The public lawyer would be well served to know in detail the
   requirements of the Tort Claims Act. While the procedures in the Tort
16 Claims Act do not present a terribly difficult burden for a claimant with a
   legitimate claim to bear, they do present several legal hurdles which must
17 be met. If a claimant=s tort claim remains defective by the time the case
   is in litigation, cities and other public agencies should invoke the Tort
18 Claims Act as a shield protecting taxpayer dollars and barring a claim
   that is legally insufficient as a matter of law.
19         Attorneys defending cities should review the case for defects with
   the Tort Claims Act from the pleading stage of the case. However, do not
20 hesitate to assert a Tort Claims Act defense whenever a defect becomes
   apparent. Public entities have successfully asserted the defense in nearly
21 every manner of motion and opposition from the beginning of the case to
   the end, including: 1. Demurrer (Fall River, supra, 206 Cal.App.3d 431;
22 Nelson v. State, 139 Cal.App.3d 72, 79 (1982)); 2. Opposition to
   PETITIONER=s motion to amend Ex-Parte Application to add a cause of
23 action (Lopez v. Southern Cal. Permanente Med. Group, 115 Cal.App.3d
   673 (1981)); 3. Motion to strike (PH II, Inc. v. Superior Court, 33
24 Cal.App.4th 1680 (1995) (use of motion to strike generally)); 4. Motion for
   judgment on the pleadings (Hunt v. County of Shasta, 225 Cal.App.3d 432
25 (1990)); 5. Motion for summary judgment (Turner v. State, 232 Cal.App.3d
   883 (1991)); 6. Motion in limine to exclude evidence of facts not alleged in
26 the claim (Turner v. State, supra, 232 Cal.App.3d 883 (excluding such
   evidence at summary judgment)); and 7. Opposition to motion for new
27 trial on a new theory (Hata v. Los Angeles County Harbor/UCLA Med.
   Cntr., 31 Cal.App.4th 1791 (1995)).
28         Tort Liability when multiple parties are involved in HATE CRIMES:

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1    Joint and Several liability exists where two or more negligent acts combine to proximately cause an indivisible harm, making each defendant
2    liable for the entire harm. PETITIONER can recover the entire loss from any defendant, regardless of that defendant's share of the total
3    responsibility. Contribution allows a defendant who pays more than his pro rata share to obtain reimbursement from another defendant.
4    Indemnity is the shifting of responsibility for the entire loss from one defendant to another. Without legal counsel, I am unable to fully prove
5    the liability among multiple Respondent(s).

                **Complexed Issue; #4**

6         Lack of Legal Skills and Understanding on the Rules of Evidence, Special Motions, Legal Writing Needed to meet Court Rules and
7    Procedures, etc.;

       I have a video and audio recordings in which my Ex-Parte
8    Application strongly relies on as proof, but I do not understand and/or have the capacity to properly introduce the evidence with my Ex-Parte
9    Application.

       In addition, expert testimony and witness is needed to prove the
10    fraudulent and forged court document on the Stipulation from March, 14, 2019 and April 17, 2019.
11    Counsel is required in this exceptional circumstance to provide me with: fundamental fairness, equal access to court tactics, courtroom skills to
12    handle the admission of evidence, examinations and cross-examinations and objections at trial, especially in front of a jury.
13         Fundamental fairness of not having not having an attorney in this matter, and where the Tort Claim Act is designed to protect the
14    government from wrongdoings inflicted, even when Federal Civil Rights' violations have occurred, is not only unfair, but denies me equal
15    protection of the law and of equal access to proceeding in court. Counsel is required in this exceptional circumstance to provide me with:
16    fundamental fairness, equal access to court tactics, courtroom skills to handle the admission of evidence, examinations and cross-examinations
17    and objections at trial, especially in front of a jury, in which an ineffective Notice of Claim can affect my Civil Rights action.
18                **Complexed Issue: #4**

Calculation of Damages, Actions and Remedies;
19         I do not understand and/or have the capacity on how to accurately calculate the dollar amount of damages that would be reasonable and
20    sufficient in a Ex-Parte Application, and would need the assistance of legal assistance to accurately calculate a dollar amount for all damages
21    applicable under state and federal law.

Due to the reckless and unlawful behavior of the law enforcement officers,
22    judicial officers, and court clerks and others described above, I, Abanoob Abdel-Malak, the PETITIONER was falsely arrested; subjected to illegal
23    strip searches; falsely imprisoned for a period in excess of 12 hours; while falsely imprisoned I was subject to excessive force, assault, battery, and
24    deprived of medical care; falsely charged with criminal offenses, and compelled at considerable expense and personal inconvenience to return
25    to the Superior Court of California - County of Riverside while out of state to defend myself from false and illegal charges arising from Federally
26    Protected Activities.

       Moreover, I, Abanoob Abdel-Malak, was the victim of unreasonable
27    and excessive force when Deputies stole my court document's and did not return them, and denied food and water while falsely imprisoned for over
28    12 hours during my illegal arrest. In addition, while falsely imprisoned, I was denied the right to call counsel and calls were blocked. I was only

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1   released until I begged needing to get the hospital urgently, and inmates had to get Deputies attention to tell them to check on me, because I was
2   ignored by Deputies and locked in a room.

In addition to the pain, suffering, public humiliation and emotional
3   distress experienced, in consequence of the reckless misconduct of I was then harassed while out of State, disturbing my peace, in addition to
4   further stressing me out while under Post Traumatic Stress Order from the False Arrest and False Imprisonment.

5   **Complexed Issue; #5**

The Importance of Understanding The "Stipulation for Judge Pro
6   Tem", forged with my signature in San Bernardino Superior Court, Case #: FAMSS1901320. On March 14th, Bailiff F. Wilkerson, Court Reporter
7   Karen Diggs #7789, and Amber Bouchard and/or my ex-girlfriend (all from the Superior Court of California, San Bernardino), participated in
8   actions and forged my signature on a "Stipulation for Judge Pro Temp" and filed it at the San Bernardino Family Court House, case FAMSS
9   1901320.

The individuals who participated in the forged document, misspelled
10   my name and hand-wrote "ABANOOD MALAK v. DESIREE N PIERCE." (See attached court transcript and document.) My name is spelled
11   "ABANOOB ABDEL-MALAK," as it is spelled on all other court documents. The forged stipulation form was filled out in handwriting that
12   is obviously not my own, even using a date convention that I do not customarily use.

13   Lastly, the fact that the forged signature is on the right side of the form raises the suspicion that the forged signature was intended to be
14   transferred to other different documents, and suggests why the Riverside County Family Courthouse refuses to allow me to purchase a certified
15   copy of the document.

This is a clear example of RESPONDENT(S)'S acting in bad faith.
16   The assistance of counsel will allow me to subpoena and properly express my claim and how important this document and others are to my claim
17   and why Riverside County Family Courthouse refused to allow me to file and Ex-Parte on July 1st, 2019 and instead arrested me and took my
18   court documents. [FAMSS 1901320]. This is a huge factor of why I was not allowed to file my Ex-Parte on July 1st, 2019.

19   **Complexed Issue; # 9:**

Charges I was facing in Riverside Superior Court, Case #:DVRI
20   1901830, the same pattern and practice from fabricating and withholding crucial evidence, as in 1998 & 1999 with Horace Roberts.

21   In October 2019, Horace Roberts filed a Ex-Parte Application against the County of Riverside for false imprisonment for over 15 years
22   (Harris v. County of Riverside). Horace Roberts was a forty-year-old U.S. Marine Corps veteran, hardworking professional, and father of two young
23   children when Respondent(s) framed him for the 1998 murder of Terry Cheek. In 1999, Horace Roberts was wrongly convicted due to
24   RESPONDENT(S)'s actions and conduct. He spent two decades in prison. This is nearly the same incident I have undergone with Riverside
25   Superior Court, but not with the same alleged crime.

In the case filed against RESPONDENT(S), PETITIONER Horace
26   Roberts has four attorneys to help with his Ex-Parte Application and action against RESPONDENT(S). I am unable and uncapable to
27   successfully litigate this case on my own, but am forced to litigate a case to prevent a false warrant for an arrest and regain my physical liberty
28   and privacy. This court will find that the Horace Roberts' case has extremely similar facts to my action against RESPONDENT(S).

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

**EXCEPTIONAL CIRCUMSTANCE**:
Physical and Mental Health from the Stress; Due to my current physical and psychological condition, I am unable to properly represent myself, and need legal assistance because of the heart condition I suffered in 2019 and trauma I have when I think about the incident's that have occurred. I AM AT RISK OF ANOTHER HEART INJURY.

For example, I am in constant fear of answering my cell phone because of RESPONDENT(S)'s previous actions and current order of being allowed to record my communications and monitor my internet, and monitor my physical location throughout the United States. I have chronic insomnia from the incidents and I have certain panic attacks. I am also blind in my left eye, so, under the stress involved with this legal matter, I am at risk to my eye vision further worsening. My heart is also at risk of another heart injury because of current harassment and fear of law enforcement.

## V. Ralph Civil Rights Act of 1976

Under the **Ralph Civil Rights Act of 1976**, all persons within the jurisdiction of California have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their political affiliation, or on account of any characteristic listed or defined in *Civ. Code § 51(b)* or *(e)*, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics [*Civ. Code § 51.7(b)*; for discussion of *Civ. Code § 51(c)*, *(d)*, see *Ch. 116, Civil Rights: Discrimination in Business Establishments, § 116.12*; for discussion of waiver of rights under *Civ. Code § 51.7*, see [3], *below*]. The identification of these particular bases of discrimination is illustrative rather than restrictive [*Civ. Code § 51.7(b)*; see *McCalden v. California Library Ass'n (9th Cir.) 955 F.2d 1214, 1221*, cert. denied sub nom. *Simon Wiesenthal Ctr. for Holocaust Studies v. McCalden (1992) 504 U.S. 957, 112 S. Ct. 2306, 119 L. Ed. 2d 227* ("holocaust revisionist" protected under statute)].
*Civ. Code § 51.7* does not apply to statements concerning positions in a labor dispute that are made during otherwise lawful labor picketing [*Civ. Code § 51.7(d)*].
The proscription on intimidation by threat of violence has survived a *First Amendment* challenge [*see McCalden v. California Library Ass'n (9th Cir.) 955 F.2d 1214, 1222*, cert. denied sub nom. *Simon Wiesenthal Ctr. for Holocaust Studies v. McCalden (1992) 504 U.S. 957, 112 S. Ct. 2306, 119 L. Ed. 2d 227*].

Whoever denies, or aids, incites, or conspires in a denial of, rights provided by *Civ. Code § 51.7* is liable for each and every offense for the actual damages suffered by any person denied those rights [*Civ. Code § 52(b)*]. For these purposes of, "actual damages" means special and general damages [*Civ. Code § 52(h)*]. In addition to actual damages, the wrongdoer is liable in an amount as may be determined by a jury, or by a court sitting without a jury, for exemplary damages, plus a civil penalty of $25,000, to be awarded to the person denied the rights, in any action brought by that person or by the Attorney General, a district attorney, or a city attorney [*Civ. Code § 52(b)*].

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

Injunctive relief is also available if there is reasonable cause to believe that a person or persons are engaged in conduct of resistance to the full enjoyment of a person's rights under *Civ. Code § 51.7* [*see Civ. Code § 52(c)*; *see also* Stats. 1991, ch. 839, § 3 (Legislature intended to modify prerequisite for injunctive relief in 1991 amendment to *Civ. Code § 52(c)*; by providing civil remedy for classes of persons specifically identified in *Civ. Code §§ 51.7* and *52*, Legislature did not intend to limit availability of injunctive relief for any other form of discrimination prohibited by *Civ. Code §§ 51.7* and *52*)].

Attorney's fees in an amount determined by the court are also recoverable [*Civ. Code § 52(b)*].

An action under *Civ. Code § 51.7*, including an action for the civil penalty provided in *Civ. Code § 52(b)(2)* to be awarded to the person denied the right provided by *Civ. Code § 51.7* in an action brought by the person denied the right or by the Attorney General, a district attorney, or a city attorney, must be commenced within three years of the alleged practice [*Civ. Code § 52(b)(2)*; *Code Civ. Proc. § 338(n)*].

A civil damages action for violation of *Civ. Code § 51.7* is barred by discretionary immunity [*see Gov. Code § 845*] to the extent that the action is premised on an alleged failure to provide sufficient police protective services [*see Gates v. Superior Court (1995) 32 Cal. App. 4th 481, 508–513, 38 Cal. Rptr. 2d 489*; for full discussion of liabilities and immunities of public entities and employees, see *Ch. 464, Public Entities and Officers: California Tort Claims Act*].

Any person claiming to be aggrieved by an alleged unlawful practice in violation of *Civ. Code § 51.7* may also file a verified complaint with the Department of Fair Employment and Housing (DFEH) pursuant to *Gov. Code § 12948* [*Civ. Code § 52(f)*].

The civil remedies provided in *Civ. Code § 52(b)–(f)* may not be waived by contract except as provided in *Civ. Code § 51.7* [*Civ. Code § 52(i)*; for discussion of waiver under *Civ. Code § 51.7*, *see* [3], *below*].

For a general form of complaint for damages and injunctive relief for violation of the Unruh Civil Rights Act, which may be adapted for use to allege a cause of action pursuant to *Civ. Code § 51.7*, see *Ch. 116, Civil Rights: Discrimination in Business Establishments, § 116.80*. For a related jury instruction, see *Judicial Council of California Civil Jury Instructions, CACI No. 3023* (LexisNexis Matthew Bender, Official Publisher), also available in LexisNexis Automated Judicial Council of California Civil Jury Instructions.

PETITIONER alleges:

PETITIONER, Abanoob Abdel-Malak, is an individual and is now, and at all times mentioned in this complaint was, a resident of County, California.

Defendant, *[name]*, is now, and at all times mentioned in this complaint was, a resident of County, California.

PETITIONER does not know the true names of Respondent(s) DOE

*EX-PARTE* APPLICATION

1 through DOE 5 inclusive, and therefore sues them by these fictitious names. PETITIONER will amend this complaint to include their names and capacities once they are known.

PETITIONER is informed and believes, and based on that information and belief alleges, that each of the Respondent(s) designated as a DOE is legally responsible in some manner for the occurrences alleged in this complaint, and unlawfully caused the injuries and damages to PETITIONER as alleged in this complaint.

At all times mentioned in this complaint, unless otherwise alleged, each defendant was the agent, employee, and coconspirator of every other defendant, and in doing the acts alleged in this complaint, was acting within the course, scope, and authority of that agency, employment, and in furtherance of the conspiracy, and with the knowledge and consent of each of the other Respondent(s).

The acts that are the subject of this complaint occurred on or about *[date]*, in *[city]*, County, California.

PETITIONER is *[specify, for instance: a 21 year old African-American college student of slight build.]*

Defendant, *[name]*, and DOES 1 through 5 are *[all white teenage males or as the case may be]*. PETITIONER is informed and believes, and on that basis alleges, that each of Respondent(s) is *[a member of the local High School football team or as the case may be]*.

*[Set forth detailed description of violence or threat of violence against PETITIONER's person or property giving rise to complaint. Any derogatory language, epithets, or other evidence indicating that actions of Respondent(s) were motivated by bias should be fully set forth. If there were prior interactions between PETITIONER and Respondent(s) indicating prior tensions or bias, they should also be set forth.]*

PETITIONER is informed and believes, and on that basis alleges, that the incidents described in paragraphs through, inclusive, were motivated by Respondent(s)' hatred and prejudice of *[African-Americans or other protected class]*.

*[If events also give rise to cause of action under Bane Act,* Civ. Code, § 52.1, *include Bane Act cause of action.]*

Respondent(s), by their use of violence or threats of violence against PETITIONER because of PETITIONER's *[race or other protected status]*, violated PETITIONER's right to be free from violence or intimidation by threats of violence as guaranteed by Civ. Code § 51.7.

As a direct and proximate result of the conduct of Respondent(s), and each of them, PETITIONER has suffered and will continue to suffer *[specify injuries suffered and anticipated, for example: physical injuries, humiliation, and mental anguish.]*

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1
2
3

Respondent(s)' violation of PETITIONER's rights as guaranteed by Civ. Code § 51.7 entitles PETITIONER to compensatory and punitive damages, a $25,000 civil penalty, attorney fees, and injunctive relief, all of which are provided for in Civ. Code § 52 and are requested below.

4
5
6
7

In doing the acts alleged in this complaint, Respondent(s) knew or should have known that their actions were likely to injure PETITIONER. PETITIONER is informed and believes, and on that basis alleges, that Respondent(s) intended to cause injury to PETITIONER and acted with a willful and conscious disregard of PETITIONER's rights as secured by Civ. Code § 51.7, thus entitling PETITIONER to recover punitive damages pursuant to Civ. Code § 52, subd. (b)(1).

8
9
10
11
12

16. Unless Respondent(s) are restrained by a preliminary and permanent injunction, PETITIONER will continue to suffer severe, irreparable harm in that *[set forth facts indicating risk that Respondent(s)' conduct will continue unless restrained and that PETITIONER will continue to suffer injury.]* PETITIONER has no adequate remedy at law because monetary damages, which may compensate for past violence or threats of violence, will not afford adequate relief for the fear, humiliation, and risk of injury that a continuation of Respondent(s)' conduct, in denial of PETITIONER's rights, will cause.

13
14

WHEREFORE, PETITIONER requests judgment against Respondent(s) as follows:

15

1. General damages according to proof;

16

2. Special damages according to proof;

17

3. Punitive damages pursuant to Civ. Code § 52, subd. (b)(1);

18
19

4. A statutory civil penalty of $25,000 pursuant to Civ. Code § 52, subd. (b)(2);

20

5. Reasonable attorney fees, according to proof, pursuant to Civ. Code § 52, subd. (b)(3);

21
22
23
24

6. A preliminary injunction against Respondent(s), and each of them, enjoining Respondent(s): *[specify conduct to be enjoined, for example: to stay 100 yards away from PETITIONER and PETITIONER's home and worksite, and to refrain from making telephone calls and mailing correspondence to PETITIONER, or attempting to contact PETITIONER in any manner]*;

25
26

7. A permanent injunction against Respondent(s), and each of them, enjoining Respondent(s) from: *[specify permanent injunctive relief requested]*;

27

8. PETITIONER's cost of suit; and

28

9. Such other relief as the court deems just and proper.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

Dated.

_____
*[Signature]*
Attorney for PETITIONER

*PETITIONER's paragraph:* In the paragraph identifying PETITIONER, counsel should provide as much descriptive information as possible to establish PETITIONER's membership in a protected class and any particular vulnerability of the PETITIONER to the acts alleged to have occurred.

*Respondent(s) paragraph:* In this paragraph, counsel should describe those characteristics of the Respondent(s) that are different from those of the PETITIONER mentioned in the previous paragraph. The paragraphs identifying PETITIONER and defendant should set the stage and clarify the alleged motivational bias that led to the actions alleged in subsequent paragraphs.

*Preliminary injunction:* If the PETITIONER seeks a preliminary injunction in a Ralph Act case, the PETITIONER must provide a sufficient factual basis for such relief in either a verified complaint or in a declaration filed when the injunction is sought. [See Code Civ. Proc., § 527] While counsel may choose to file a verified complaint, the better practice is to also include a detailed declaration with the moving papers.

*Emotional distress allegations and discovery:* When alleging emotional distress, counsel should consider the advantages and disadvantages of: (1) recommending that a client receive therapy; or (2) seeking reimbursement for therapeutic treatment. PETITIONER's attorney should explore with the client any prior psychological or psychiatric treatment and the effect of those records being sought in discovery.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

## Conversion

PETITIONERs reallege and incorporate the allegations set forth in each paragraph of this Ex-Parte Application.

PETITIONERs reallege and incorporate the allegations set forth in each paragraph of this Ex-Parte Application, PETITIONER was targeted because of his perceived characteristic of being an Egyptian Middle Eastern Male Speaking Arabic with a and long name of ABANOOB MOUNIR RAGHEB ABDEL-MALAK,

The Defendant's conduct was substantially motivated because PETITIONER was not white, not wealthy, not a resident of Riverside, was not an attorney, was not Mormon, and was called a "sand-nigger", attempted to place methamphetamine in PETITIONERs clothing, and on a medical test the PETITIONER denied to take.

PETITIONER was in possession of his personal property, Ex-Parte Court documents at the time Defendant's agents and employees falsely arrested and confiscate PETITIONER's property and seized and immediately destroyed without notice. Defendant's agents and employees unlawfully prohibited PETITIONERs from filing court documents and securing personal property. PETITIONER was threatened with forcible arrest and was then arrested and beaten.

The **six enumerated 'federally protected activities' are**: '(A) enrolling in or attending any public school or public college; **(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof**; (C) applying for or enjoying employment,…; **(D) serving…as grand or petit juror;** (E) traveling in or using any facility of interstate commerce,…; (F) enjoying the goods [or] services [of certain places of public accommodation].' 18 U.S.C. § 245(b)(2).]

Respondent(s) and its agents and employees had a duty owed, under color of law, to the PETITIONER. A duty was owed to the PETITIONER to allow him to file an Ex-Parte and purchase certified copies of court document's under California Civil Code §§ 2080.2, 2080.4, and 2080.6. and under 18 U.S. Code – Federally Protected Activities. PETITIONERs' property was not abandoned at the time that Defendant seized it and immediately destroyed it and Defendant's agents and employees knew that the property was not abandoned. Defendant breached its duty to protect PETITIONER's personal property and to protect PETITIONER's federally protected activity when its agents and employees wrongly exerted dominion over the property and denied PETITIONER his constitutional and statutory rights.

Defendant had no legitimate governmental interest that gave its agents and employees the legal right or justification for confiscating PETITIONER's, court document's, property and then immediately demolishing it and arresting the PETITIONER without prior notice to PETITIONER and without procedure to permit PETITIONER to recover his property, and without fair compensation to PETITIONER.

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

As a direct and proximate consequence of the acts of Defendant's agents and employees, PETITIONERs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

PETITIONERs also seek attorney fees under this claim pursuant to 42 U.S.C. § 1988 and for violation of the Bane Act, Section 52.1, subdivision (b) which states that any individual whose rights have been interfered with by threats, intimidation or coercion, "may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." (Civ. Code § 52.1.) Section 52 permits such relief as actual damages, statutory damages (including civil penalties), exemplary damages, and attorney's fees. (Civ. Code § 52.).

**FRAUD/FORGERY/DENIED ACCESS TO COURTS**

PETITIONERs reallege and incorporate the allegations set forth in each paragraph of this Ex-Parte Application, PETITIONER was targeted because of his perceived characteristic of being an Egyptian Middle Eastern Male Speaking Arabic with a and long name of ABANOOB MOUNIR RAGHEB ABDEL-MALAK.

The Defendant's conduct was substantially motivated because PETITIONER was not white, not wealthy, not a resident of Riverside, was not an attorney, was not Mormon, and was called a "sand-nigger", attempted to place methamphetamine in PETITIONERs clothing, and on a medical test the PETITIONER denied to take.

PETITIONER was in possession of his personal property, Ex-Parte Court documents at the time Defendant's agents and employees falsely arrested and confiscate PETITIONER's property and seized and immediately destroyed without notice. Defendant's agents and employees unlawfully prohibited PETITIONERs from filing court documents and securing personal property. PETITIONER was threatened with forcible arrest and was then arrested and beaten, and threatened with retaliation by being in violation of "Contempt of Court" and "Trespassing".

The **six enumerated 'federally protected activities' are**: '(A) enrolling in or attending any public school or public college; **(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;** (C) applying for or enjoying employment,...; **(D) serving...as grand or petit juror;** (E) traveling in or using any facility of interstate commerce,...; (F) enjoying the goods [or] services [of certain places of public accommodation].' 18 U.S.C. § 245(b)(2).]

Respondent(s) and its agents and employees had a duty owed, under color of law, to the PETITIONER. A duty was owed to the PETITIONER to allow him to file an Ex-Parte and purchase certified copies of court document's under California Civil Code §§ 2080.2, 2080.4, and 2080.6. and under 18 U.S. Code – Federally Protected Activities. PETITIONERs' property was not abandoned at the time that Defendant seized it and immediately destroyed it and Defendant's agents and employees knew that the property was not abandoned. Defendant breached its duty to protect PETITIONER's personal property and to protect PETITIONER's federally protected activity when its agents and employees wrongly

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1  exerted dominion over the property and denied PETITIONER his constitutional and statutory rights.

2  Defendant had no legitimate governmental interest that gave its agents and employees the legal right or justification for confiscating

3  PETITIONER's, court document's, property and then immediately demolishing it and arresting the PETITIONER without prior notice to

4  PETITIONER and without procedure to permit PETITIONER to recover his property, and without fair compensation to PETITIONER.

5  As a direct and proximate consequence of the acts of Defendant's agents and employees, PETITIONERs have suffered and continue to

6  suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

7  As more fully described above, the forged court documents and false arrest for attempting to file an ex-parte, in addition to the forged

8  substitution of Attorney, and forged stipulation. The court clerks, deputies, judicial officers were aware of the incidents with my signature

9  and false arrest.

The misconduct described in this count was objectively unreasonable

10  and was undertaken intentionally and with willful indifference to PETITIONER's constitutional rights. The conduct of Defendant was

11  wanton, malicious, and done with reckless disregard for the rights and safety of PETITIONER and therefore warrants the imposition of

12  exemplary and punitive damages as to Defendant DOES.

As a result of Respondent(s)' misconduct described in this count,

13  PETITIONER suffered extreme pain and suffering, loss of employment, loss of earning capacity, loss of business earning capacity, loss of loss of

14  liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries

15  and damages.

ABANOOB ABDEL-MALAK and SINAI ACQUISITION LLC seek

16  damages in the amount of $50,000,000.00.

PETITIONERs also seeks attorney fees and expert fees under this

17  claim pursuant to 42 U.S.C. § 1988 and for violation of the Bane Act, Section 52.1, subdivision (b) which states that any individual whose rights

18  have been interfered with by threats, intimidation or coercion, "may institute and prosecute in his or her own name and on his or her own

19  behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief

20  to protect the peaceable exercise or enjoyment of the right or rights secured." (Civ. Code § 52.1.) Section 52 permits such relief as actual

21  damages, statutory damages (including civil penalties), exemplary damages, and attorney's fees. (Civ. Code § 52.).

22

**VI. RELIEF REQUESTED**

23

**1. DECLARATORY RELIEF AND INJUNCTIVE RELIEF AND**

24  **EQUITABLE RELIEF**

PETITIONERs reallege and incorporate the allegations set forth in

25  each paragraph of this Ex-Parte Application.

A real and immediate difference exists between PETITIONER and

26  Defendant regarding PETITIONERs rights and Defendant's duty owed to PETITIONERs to his right to privacy, and access to courts without

27  harassment under federally protected activities. Defendant's policies and actions have resulted and will result in irreparable injury to

28  PETITIONER. There is no plain, adequate or complete remedy at law to address the wrongs described herein. Defendant has made it clear that it

- 122 -

*EX-PARTE* APPLICATION

1    intends to continue these practices of depriving and conspiring against
     PETITIONER without warrant and notice. Unless restrained by this
2    court, Defendant will continue to implement this policy and practice of
     confiscating and summarily destroying crucial evidence to PETITIONER's
3    Ex-Parte Application.
          Defendant's acts alleged above violate established constitutional
4    rights of PETITIONER and Defendant could not reasonably have thought
     that the conduct of its agents and employees in seizing and destroying
5    PETITIONERs' property and privacy was lawful.
          An actual controversy exists between PETITIONER and
6    Respondent(s) in that Defendant's agents and employees have engaged in
     the unlawful and unconstitutional acts alleged herein and intend to
7    continue to do so, In addition to possible Fraud on the Court and Fraud
     Upon the Court. PETITIONERs claim that these acts are contrary to law
8    and seek a declaration of their rights with regard to controversy

9         As a direct and proximate consequence of the acts of Defendant's
     agents and employees, PETITIONER has suffered and will continue to
10   suffer damages through injury to their person and the loss of their
     personal property, including loss of career.
11
     **WHEREFORE**, PETITIONER Prays as follows:
12
          **1. Immediately Open A Hate Crime Police Report With The**
13   **Federal Bureau of Investigations and Department of Justice**
     **pursuant Penal Code Section 13023, Penal Code section 832.5,**
14   **Civil Code section 52.3 and 52.1, Penal Code section 1359.4,  and 42**
     **U.S.C. 14141 regarding The Hate Crimes Mentioned Herein and**
15   **The False Police Reports and An Order Granting Leave To Amend**
     **Complaint;**
16
          2. Immediately dismiss and/or investigate all orders, court
17   documents, minute orders in case DVRI 1901830, 5:19-cv-01808 DOC KKx
     and FAMSS 1901320 and E074593, and criminal case M268212DV;
18
          3. For an emergency protective order pursuant Penal Code section
19   136.2;  temporary restraining order, preliminary injunction and
     permanent injunction, enjoining and restraining Respondent/Defendants
20   from engaging in the policies, practices and conduct complained of herein
     pursuant to Unruh Civil Rights Act, Ralph Civil Rights Act of 1976, Tom
21   Bane Civil Rights Act pursuant to California Civil Code § 51, § 51.1, §
     51.5, § 51.6(b), § 51.7, §52, § 52.1, § 52.3(a), § 52.4(a);
22
          **4. Immediately restraining and enjoining Respondent(s)'**
23   **from destroying, altering, or concealing video footage & phone**
     **call recordings from July 1st, 2019 inside the Riverside Family**
24   **Court House and Riverside Detention Center when PETITIONER**
     **was unlawfully arrested and falsely imprisoned while in line of**
25   **the Riverside Superior courthouse; and,**

26        5. Permanently restraining and enjoining Respondent(s) from
     destroying, altering, accessing, or concealing documents pertaining to
27   PETITIONER's Medical Records.

28

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

6. Temporarily restraining and enjoining Respondent(s) from destroying, altering, or concealing documents pertaining to case DVRI 1901830, FAMSS 1901320.

7. Temporarily restraining and enjoining Respondent(s)' from destroying, altering, or concealing video footage & phone call recordings from July 1st, 2019 inside the Riverside Family Court House and Riverside Detention Center when PETITIONER was arrested while in line of the court house.

8. Temporarily restraining and enjoining Respondent(s)' from destroying, altering, or concealing phone calls from the cell where the PETITIONER was detained on July 1st, 2019.

9. Temporarily restraining and enjoining Respondent(s) from disclosing any Protected Information without first implementing reasonable safeguards to maintain and protect the privacy, security, confidentiality, and integrity of such Protected Information;

10. Temporarily restraining and enjoining Respondent(s) from disclosing or benefiting from any Protected Information that any Defendant disclosed prior to date of entry of TRO and without having implemented reasonable safeguards to maintain and protect the privacy, security, confidentiality, and integrity of such Protected Information;

11. Requiring Respondent(s) and any person hosting or otherwise controlling any Internet content, server, or website that contains Protected Information posted by or on behalf of any Defendant to immediately take steps to ensure that the Protected Information on any website, blog, or social media service is no longer viewable or accessible by persons using the Internet; prevent the alteration, destruction, or erasure of any Internet content, servers, or websites that contain Protected Information posted by or on behalf of the Respondent(s); and implement reasonable safeguards to maintain and protect the privacy, security, confidentiality, and integrity of any Protected Information;

12. Requiring Respondent(s) to provide notification to each person whose Protected Information they disclosed without implementing and using reasonable safeguards to maintain and protect the privacy, security, confidentiality, and integrity of such Protected Information;

13. Restraining and enjoining Respondent(s) and certain third parties from destroying or concealing documents;

14. Authorizing expedited discovery from Respondent(s) and third parties, for the purpose of discovering information about Respondent(s)' identities, assets, and/or business activities;

15. Requiring Respondent(s) to show cause why this Court should not issue a preliminary injunction extending such temporary relief pending an adjudication on the merits; and

16. Providing the assistance of legal counsel in this highly complexed matter;

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

17. Preventing this filing to be randomly assigned to any Judge, Court Clerk, and Bailiff, Employee who has any connection or association with Respondent(s).

18. Providing for other equitable relief;

19. Granting an emergency protective order, temporary restraining order, preliminary injunction and permanent injunction, enjoining and restraining Respondent(s) from engaging in the policies, practices and conduct complained of herein;

20. Issue a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violates PETITIONERs' rights under the United States Constitution, the California Constitution and the laws of California;

21. For an order certifying the injunctive relief class pursuant to F.R.Civ.P. 23(b)(2);

22. For equitable relief and investigation pertaining to case DVRI 1901830 and FAMSS 1901320 based on fraud from the misconduct mentioned in this *Ex-Parte* Application;

23. Preliminarily and permanently enjoin Respondent(s) from violating the California Public Records Act;

24. For damages three times actual damages for cost of medical treatment, lost wages, property repair; payment for emotional suffering and distress but no less than $1000.00 per incident pursuant to Cal. Civ. Code §§ 52, 52.1 and Cal. Government Code § 815.6;

25. For compensatory damages, including both survival damages and federal civil rights statutory damages under federal law and state law, in the amount of $60,000,000,00 or an amount to be proven at trial;

26. For interest;

27. For medical expenses and loss of financial support;

24. For punitive and exemplary damages against the individual Respondent(s) in an amount of $100,000,000.00 or an amount proven at trial;

28. Grant PETITIONER-Petitioner reasonable attorneys' fees and costs and experts' fees and costs of litigation under California Code of Civil Procedure § 1021.5, California Government Code§ 54960.5, 42 U.S.C. § 1988, under Cal. Civ. Code §§ 51.7, 52 & 52.1; and any other applicable provisions of law; and for the costs of suit and attorney fees and expert fees as provided by law;

29. Granting the assistance of legal counsel in serving and properly conducting the necessary elements with initiating and drafting a Ex-Parte Application, in order to avoid the case being dismissed, due to my severe financial hardships from the misconduct in this Ex-Parte Application;

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

30.   For Civil Penalties under Cal. Civ. Code §§ 51.7, 52 & 52.1;

31.   Award such other relief as the Court deems just and proper.

32.   Open an Investigation and Report the Hate Crimes mentioned herein;

33.   For general, special, compensatory (including lost wages and benefits), statutory, exemplary and punitive damages according to proof;

34.   For injunctive relief as described above;

35.   For costs of suit;

36.   For attorneys fees as permitted by law; and

37.   For any and all other appropriate relief the Court deems necessary

## VII. CONCUSION

I believe I have demonstrated my diligence and efforts in requesting help with the color of law violations and HATE CRIMES I have encountered, and now I am left with little choice but to Pray that this Court will grant this Ex-Parte Application under the Ralph Act, Civil Code Sections 51.7 and 52, states that it is a civil right for a person to be free of violence or its threat against the person or his or her property based on a wide range of personal characteristics, including sexual orientation or the perception of sexual orientation. The Ralph Act (and the Unruh Act) is enforced by the Department of Fair Employment and Housing. The Ralph Act provides for civil penalties up to $25,000 in fines for perpetrators of a hate crime and remedies for the victims of hate crimes of three times the actual damages, but no less than $1,000, plus punitive damages and attorney's fees; is needed to protect me from the ongoing harassment, prior to proceeding in Superior Court with my Civil Rights Ex-Parte Application

DATED: ~~March 9, 2021~~ May 27, 2021

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

1

*Ava Malak*
Your signature

2
ABANOOB ABDEL-
MALAK

3
In Pro Se

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)

*EX-PARTE* APPLICATION

# Demand For Jury
## Trial and A Fair Trial.

This Notice of Remud is in complis
with F.R.C.P. 11

X A-A Malek

Abanoob Abdel-Malek

INSERT DOCUMENT TITLE (e.g., MOTION TO STRIKE)